UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BRUCE HAY

               Plaintiff,

    v.

NEW YORK MEDIA LLC,
KERA BOLONIK,
and
DAVID KORZENIK,

           Defendants.

Civil Action No.   **20-cv-6127**

**COMPLAINT**

**Jury Trial Demanded**

## INTRODUCTION AND OVERVIEW

1.    For the half-century since its founding in 1968, *New York* magazine has enjoyed an international reputation for publishing first-rate investigative journalism, particularly on subjects related to civil rights. The magazine has an illustrious record of exposing, and speaking out against, prejudice directed at unpopular groups, including discrimination based on race, gender, sexual orientation and the like. It has an equally illustrious record of exposing, and speaking out against, police misconduct and the abuse of law enforcement authority. These are things on which the magazine's "brand" has been built.

2.    Like many news organizations, *New York* has suffered severe financial problems in recent years, putting the magazine's survival in serious doubt. The present internet-based media environment, dominated by short attention spans and eroding barriers between fact and

1

fiction, holds few rewards for serious journalism. After several years of mounting red ink, Defendant New York Media — owner and publisher of *New York* — was sold to another company in September 2019. In waves of cost-cutting efforts, it has laid off many of its writers and editors.

3.     These economic pressures have created temptations for New York Media to relax its journalistic standards and to use *New York* as a platform for "sensational" stories that will garner immediate attention and generate money quickly. The present case illustrates the catastrophic degree to which New York Media has succumbed to that temptation — trashing a great magazine's hard-earned reputation, wrecking innocent lives, and trafficking in the virulent prejudices that *New York* made its name resisting.

4.     Plaintiff Bruce Hay is a professor at Harvard Law School, where he teaches Civil Procedure and related subjects. In 2018, he found himself in an escalating legal conflict with two women he had loved — Maria-Pia Shuman, a cisgender white woman, and Mischa Shuman, a transgender woman of color ("the Shumans"), who are married to each other. Plaintiff had been very close to the Shumans until 2017, when a painful rupture — facilitated by individuals who had an interest in driving them apart and stoking conflict between them — made them bitter adversaries in court and in Title IX proceedings at Harvard.

5.     In July 2018, Plaintiff agreed to work with *New York*'s editors, and with Defendant Kera Bolonik, on an article for the magazine about his dispute with the Shumans. The agreement was that the article, to be reported by Bolonik, would meet the high standards of professional investigative journalism long associated with the magazine.

6.     Plaintiff then worked closely with Bolonik and New York Media — along with

David Korzenik, counsel to New York Media — for many months, acting not only as a source but as a fact-checker and legal consultant, doing everything he could to make possible the responsible piece of investigative journalism they had promised him. He also gave up — at the urging of Bolonik and her editors — the opportunity to have such a piece done by the *New York Times*, which had repeatedly expressed interest in covering the story before Plaintiff agreed to work exclusively with Defendants.

7.       Defendants did not produce the responsible piece of investigative journalism they promised, and made no real attempt to do so. Instead, they seized the opportunity to produce a sensational "True Crime" story, replete with vicious transphobic and misogynistic stereotypes, portraying the Shumans as scheming, deviant *femmes fatales* preying on a series of men, and Plaintiff as their credulous, hapless victim.

8.       This had been Bolonik and her editors' vision of the project from the start, and remained so throughout. The idea was that such a salacious "True Crime" story would quickly win wide circulation and notoriety, leading to a book and movie and/or television series — which would bring in desperately needed cash for *New York* and  recognition for the unknown Bolonik, who was a copy editor at the magazine.

9.       *New York*'s editors knew that Bolonik, who had no experience as an investigative reporter, was unqualified to perform the task of serious investigative journalism that had been promised Plaintiff. They looked the other way as she violated the protocols of investigative reporting, flouted the interpersonal boundaries normally observed by professional journalists, and exploited her position to sexually harass and seek inappropriate emotional and romantic intimacy with Plaintiff. They ignored the red flags raised by the project's principal editor and

3

supervisor, who — shortly before leaving for greener pastures in the spring of 2019 — started to have second thoughts about the project and warned that Bolonik's article, then in the editing stages, did not meet *New York*'s standards for responsible and accurate reporting. They published the article not because they considered it to be sound journalism — which they knew it was not — but because they expected it would make a splash, which it did.

10.     Bolonik's article, entitled "The Most Gullible Man in Cambridge," appeared in the July 22, 2019 edition of *New York* magazine, and also in the July 23, 2019 edition of New York Media's online journal *The Cut.*

11.     The article — a *Fatal Attraction*-inspired piece of pulp fiction masquerading as journalism, featuring two deranged, predatory women who menace a Harvard Law School professor and his family — caused exactly the sensation desired by its creators. It lit up the internet. It became one of *New York*'s "most read" stories, because — as described by the magazine's features editor, Genevieve Smith, who oversaw the article's publication — it consisted of "wild storytelling that blends reporting with craft." Calls from Hollywood started pouring in, and Bolonik's literary agent began setting up an auction for the rights to publish a book-length version of the article.

12.     As the article went viral, Bolonik heard from several readers with negative stories to tell about the Shumans. These led to the publication of a followup article entitled "The Harvard Professor Scam Gets Even Weirder," which appeared in the August 8, 2019 issue of *The Cut.* Making use of innuendo and dark stereotypes, it added color and depth to the first article's salacious fictional portrayal of the Shumans as sexually deviant predators and Plaintiff as their clueless, gullible victim.

4

13.     Had Defendants actually honored the agreement with Plaintiff, and produced the responsible piece of investigative journalism they had promised him, this would all have turned out very differently. A truly professional investigative work — of the sort *New York* used to pride itself on publishing — would have revealed that far from being the predators portrayed in the article, the Shumans are the victims of a predatory campaign to demonize them for their gender nonconformity; that the "criminal" label affixed to them is the product of a prejudice-driven effort to weaponize law enforcement against them; and that they and Plaintiff are complex individuals who loved each other who find themselves locked in a conflict cynically orchestrated by others. The promised work of journalism would, in other words, have been the very opposite of the "True Crime" melodrama with which Defendants chose to stain the pages of a once-great magazine in financial distress.

14.     Over the past few months, Plaintiff has been seeking to correct the record and limit the damage Defendants have caused. In a series of letters to Korzenik, he has called New York Media's attention to the articles' inaccuracies and its reporter's misconduct; has described them in detail and has offered to provide supporting documentation; and has asked that the articles be removed from circulation, because they fall vastly short of *New York*'s journalistic standards.

15.     Korzenik's handling of Plaintiff's objections has been on the same level of professionalism (i.e., unprofessionalism) as were the reporting and editing of the articles. Instead of addressing Plaintiff's concerns, Korzenik has sought to discredit Plaintiff with defamatory accusations, and has sought to intimidate Plaintiff with threats to expose his confidences and publish another negative article about him if he persists with his objections. When Plaintiff stated

that he would not be cowed into silence and would file suit if necessary to get his concerns taken seriously, Korzenik resorted to dilatory tactics in order to run out the statute of limitations on Plaintiff's claims. Korzenik's dirty tricks have left Plaintiff no choice but to file the present complaint.

16.     Defendants have defamed Plaintiff, have breached their contract with him, and have violated their duty of good faith and fair dealing toward him. In addition, New York Media's turning of a blind eye toward Bolonik's sexual harassment of Plaintiff violates New York's anti-discrimination laws. Plaintiff now seeks relief for the serious economic and nonpecuniary losses he has sustained as a result.

## PARTIES

17.     Bruce Hay is an individual and resident of Cambridge, Massachusetts. He is a professor at Harvard Law School, where he has been on the faculty since 1992.

18.     New York Media LLC is a privately held Delaware limited liability company headquartered in New York, New York.

19.     Defendant Kera Bolonik is an individual and resident of Brooklyn, New York. She is an editor at *DAME* magazine. Until the summer of 2019, she was a copy editor at *New York* magazine.

20.     Defendant David Korzenik is a partner at Miller Korzenik Sommers Rayman LLP, and counsel to New York Media LLC.

## JURISDICTION AND VENUE

21.     This Court has jurisdiction under 28 U.S.C. § 1332(a)(1), because there is complete diversity of citizenship and the amount in controversy exceeds $75,000.

22.     Venue is proper under 28 U.S.C. § 1391(b), because a substantial part of the events giving rise to the claims occurred in the Southern District of New York.

## FACTS

### Background: The Persecution of the Shumans

23.     This case arises out of the decade-long persecution of two women, Maria-Pia Shuman and Mischa Shuman (formerly Mischa Haider), for the crime of defying conventional gender roles and expectations.

24.     The Shumans have been married since 2011. Their children were born in 2011, 2013, and 2016. Before moving to France in 2018, they lived for approximately ten years in Cambridge, Massachusetts.

25.     Mischa, a transgender woman of color, is a Ph.D. student in physics at Harvard. Maria-Pia, who is cisgender, is an accountant. They both grew up in Europe, and met in 2001 while attending the elite Imperial College in London.

26.     Both women have extraordinary intellectual achievements, including top academic degrees in physics, the command of several technical disciplines, and fluency in multiple languages.

27.     They are also vocal and uncompromising activists for gender equality, transgender rights, and the protection of marginalized groups — subjects on which Mischa, a gifted writer, has published numerous essays that have attracted widespread admiration.

28.     The Shumans' family structure is unusual. The two women are lifetime partners and  legally married, but have never been romantically or sexually involved with each other; their romantic and sexual relationships have always been with other people.

29.     Since 2010, Mischa has been in a steady romantic relationship with Andrew Klein, who lives with the Shumans. Andrew is for all intents and purposes is Mischa's husband, though the two are not legally married. They are husband and wife in the old-fashioned sense, monogamous and exclusively committed to each other.

30.     Maria-Pia, in contrast, has had a series of liaisons and relationships with both men and women throughout the marriage. She unequivocally rejects traditional notions of feminine passivity in relationships. She is not shy about approaching strangers she finds attractive, or about having casual sexual encounters, just as many men do.

31.     Maria-Pia's practice of "playing the field" has exposed her, on a number of occasions, to episodes of sexual harassment and assault that she has reported to the police. It has also led her to confrontations with several men concerning the paternity of the Shumans' children.

32.     Maria-Pia is the biological mother of the Shumans' three children, who do not share a biological father. For all intents and purposes, however, the children's true parents are Mischa and Andrew, whom the children address as "maman" and "daddy."

33.     The Shumans' political commitments and activist mentality extend to their personal lives. They have zero tolerance for transphobia, misogyny, and prejudice against unconventional families, which they have encountered for many years. They will not submit to anything resembling gender-based discrimination or harassment, or sexual violence or exploitation. When they encounter these things, they fight back.

34.     All of the above makes the Shumans very strange, and very threatening, to a great many people — because Mischa is a transgender woman with brown skin and middle eastern

heritage; because Maria-Pia is a sexually aggressive pursuer of both men and women; because they are defiantly unapologetic about who they are and how they live, and do not back down when they are under attack.

35.    Predictably, this has drawn the Shumans into a series of interpersonal conflicts and legal disputes over the years. Equally predictably, it has led some of their adversaries to attempt to brand them as criminals and to weaponize the machinery of law enforcement against them.

36.    Andrew's parents, unable to accept the fact that their son had fallen fell in love with a transgender woman, violently opposed his relationship with Mischa as soon as it began in 2010. They told people that Andrew had initially been seduced by Maria-Pia, then had been roped in by the women with claims that Maria-Pia had cancer and was pregnant with his child, and finally had been "brainwashed" into falling in love with Mischa. They took extraordinary, increasingly unhinged, measures to "rescue" their son from the Shumans, including enlisting a state trooper friend to frighten Andrew with unhinged insinuations that Mischa had possible connections to middle-eastern terrorism. In 2013, Andrew finally sought a restraining order against his parents.

37.    Andrew's sister Margaret also developed a violent hatred of the Shumans, and spared no effort to "free" her brother from "their clutches". She spread rumors that they deprived him of food and sleep and forced him to participate in satanic rituals. She particularly hated Mischa, and did not hesitate to exploit nativist and transphobic prejudices against her in potentially deadly ways. During the manhunt for the Boston Marathon bombers in April 2013, the news carried reports that authorities were looking for a possible accomplice — a *man* named

9

Mikhail Allakhverdov, nicknamed Misha, who had supposedly "brainwashed" two young men (the Tsarnaev brothers) into committing the deadly atrocity. Upon hearing this news, Margaret contacted the FBI to report that Mischa Shuman might be the person the authorities were seeking.

38.     Around the time she became pregnant with her third child in April 2015, Maria-Pia had a casual sexual encounter with a man who shall be referred to here as Richard Roe. She notified Roe of the pregnancy in June 2015, which led to a heated exchange in which she urged Roe to get a lawyer. Roe engaged attorney Douglas Brooks, who hired former state trooper Bob Long to investigate the Shumans. Long proceeded to dig up whatever dirt he could on the Shumans, much of it coming from the hate-filled imaginations of Andrew's family members, with whom Long identified and sympathized. He spoke to the Shumans' friends and neighbors, giving the false impression he was conducting an investigation for law enforcement authorities. He got his friends on the Cambridge Police Department to seek records from a bed & breakfast Maria-Pia had stayed at, whose management turned the police away on the ground that they were conducted an unlawful search. Long then wrote a scathing, bigoted report about the women, in which he called Maria-Pia "pathological" and conjectured that she was running a "deviant scheme to extort money from young men." Because he had no evidence to support his conjecture, Long proposed running a "sting operation" with the help of the Cambridge police, the results of which could (Long suggested) be used to extract a hefty settlement payment from the Shumans.

39.     Roe's lawyer Brooks was apparently convinced by Long's groundless conjecture, and thereafter treated it as established fact. Upon receiving Long's report in July 2015, he wrote

a threatening letter to Maria-Pia accusing her of trying to target Brooks's client Richard Roe in a "scheme" that was "aimed at extorting money from men whom you falsely claimed impregnated you." The letter stated that from 2012 to 2014, the Shumans had "extorted" money from a man — here referred to as John Poe — with false claims that he was the biological father of their first child, and then had sought a restraining order against him based on "blatantly false" accusations that he had sexually assaulted Maria-Pia and threatened her life. Brooks's accusations were demonstrably false, and the letter offered no evidence in support of them. The letter nonetheless implied that the accusations might expose the Shumans to a criminal investigation. A short time afterward, Maria-Pia and Roe agreed to drop the matter and to enter into a non-disclosure agreement.

40.     Maria-Pia also had two casual sexual encounters in March and April 2015 with a man named Jeffrey Scuteri, in the second of which Scuteri sexually assaulted her. She reported the assault to the police a short time later, but decided not to press charges once she realized she was pregnant. Over the next year the Shumans had a series of heated exchanges with Scuteri and his lawyer Howard Cooper concerning the assault, the paternity of the Shuman child born in 2016, and a video taken of the April 2015 encounter. Cooper, seeking to divert attention from Scuteri's criminal actions, has accused the Shumans of being "radical feminists" who sought to deceive his client into becoming an "involuntary sperm donor." Scuteri's groundless suit against the Shumans, and their counterclaim for the sexual assault against Maria-Pia, remains pending. Cooper has also sought, unsuccessfully, to make a criminal case out of his client's manufactured grievance against the Shumans.

## Plaintiff's Relationship with the Shumans

41.    Plaintiff lives in Cambridge, Massachusetts, in a house that he shares with his ex-wife Jennifer Zacks. He and Jennifer divorced in 1999, and have not been romantic partners since then. They have, however, continued to share a household, and have two young children, born in 2009 and 2010.

42.    Plaintiff met Maria-Pia in March 2015, when she approached him, struck up a conversation, and agreed to meet him for coffee. They quickly began a romantic relationship, which blossomed in the weeks and months afterward.

43.    Maria-Pia continued to see other men in March and April 2015. By then she knew that Plaintiff had a pronounced jealous streak, and was only interested in sexually monogamous relationships. Fearful of driving him away, she did not disclose to him that their relationship had not been sexually exclusive from the beginning. When she told him in late May 2015 that she was expecting a child, he assumed that he had caused the pregnancy.

44.    Plaintiff and Maria-Pia never discussed the biological paternity of the child because the issue was little significance to either of them. Neither of them were at all interesting in establishing legal claims against each other vis a vis the child. It was clearly understood that Plaintiff could have whatever relationship he chose with all three of her children, and that his genetic connection to the third child had no bearing on the matter.

45.    Plaintiff and Maria-Pia became increasingly close over the course of 2015. In November 2015, Plaintiff met Mischa, to whom he became equally close, though there were romantic feelings on both sides, the two of them were never sexually involved. From then on, Plaintiff and the Shumans frequently declared their love for each other and their desire to live

12

together permanently. Plaintiff spent much of his time with them and their children, and increasingly felt himself to be part of their family. He shared their interests in gender equality and learned a great deal about the subject from Mischa, with whom he became an intellectual collaborator on transgender rights and related topics.

46.     Plaintiff's relationship with the Shumans met with relentless interference from Jennifer, who did not want Plaintiff to be involved with other women. Jennifer was hostile toward the Shumans, strived to prevent Plaintiff from seeing them, and attempted to convince him that they were merely after his money.

47.     The relationship also met with interference from friends of the Shumans. They told the Shumans false stories that Plaintiff was a "sexual predator" with a history of assaulting and exploiting women. These false stories led to distrust and tension during Plaintiff's relationship with the Shumans when they confronted him about them. Plaintiff vigorously and truthfully denied the stories, but the Shumans were left with lingering and mistaken concerns that there might be some truth to the stories. Undoubtedly, these concerns and fears on their part affected their perception of Plaintiff's actions and intentions toward them.

48.     These interferences from Jennifer and the Shumans' friends had the desired effect of creating tension in, and ultimately ending, the relationship. Throughout 2016 and early 2017, the Shumans became increasingly hurt and angered by Plaintiff's continued tolerance of Jennifer's hostile actions and obstruction of their relationship; by his lavishing virtually all of his emotional and material resources on Jennifer despite her unacceptable treatment of the Shumans; by his efforts to placate Jennifer by hiding his relationship with them from her; and by his broken promises to redress the imbalance and draw sensible boundaries on his relationship to Jennifer

that would allow him to have a healthy relationship with them. There were harsh arguments in which they accused him, with considerable justification, of exploiting them and hypocritically ignoring his supposed commitment to gender equality and transgender rights.

49.     In December 2016, Plaintiff invited the Shumans over to his home at a time when he thought no one else would be home. When they arrived, there was a confrontation between Jennifer and Maria-Pia while Mischa remained seated in the car. This confrontation was videotaped by Plaintiff's adult son; Maria-Pia asked him to stop filming, leading to a tussle in which Maria-Pia mistakenly believed that she had been kicked. At that point Mischa got out of the car; not knowing what had happened, she assumed Maria-Pia was being verbally and physically attacked because of her relationship with Plaintiff and the pregnancy. Mischa was angry that Jennifer viewed Maria-Pia as, in effect, Plaintiff's "mistress" who had gotten pregnant; her reaction, caught on camera, was to shout that it was "not Maria-Pia's fault" that Plaintiff had gotten her pregnant. Mischa's point was clearly not that Plaintiff had in fact caused the pregnancy; it was that Jennifer should stop blaming and attacking Maria-Pia for what had occurred between her and Plaintiff since Jennifer likely assumed Plaintiff had caused the pregnancy.

50.     In discussions of how to finance their future together, Plaintiff suggested that the Shumans help him financially in order to pay off Jennifer's mortgage, an idea they resisted. They also complained that he was not contributing to their shared expenses, forcing them to bear Plaintiff's portion and make up the shortfall. The Shumans noted that he seemed to have the money pay for Jennifer and his own children and expected them to pay for Plaintiff despite them having financial obligations of their own. The rare expressions of anger by the Shumans over

14

Plaintiffs failure to pay his share financially were related to these issues and not any form of child support.

51.     Matters came to a head in July 2017, when Plaintiff invited the Shumans to stay at his and Jennifer's house and they refused to leave, declaring that they were tired of being treated like mistresses. Contrary to the articles' defamatory assertion, the Shumans did not invade or steal Plaintiff's house and they also did not move into it in order to extort him or for any unlawful purpose. The Shumans wanted to remain in the house because they believed they had the right to do so. Jennifer sued to have them ejected, prompting a bitter standoff between Plaintiff and the Shumans. He was angry at them for standing up to Jennifer; they were angry at him for failing to do so; the rift became unbridgeable. The relationship came to a painful, acrimonious end when Plaintiff and the Shumans broke off contact in late August 2017. Both sides were left feeling hurt and betrayed.

### The Fomented Conflict between Plaintiff and the Shumans

52.     The rupture was applauded by friends of the Shumans, who were aware of the situation and harbored ill will toward their relationship. After the rupture, they continued to encourage the Shumans to embrace the nonsensical view that Plaintiff was a serial predator who had victimized them. They successfully urged them to take action against him in court and at Harvard.

53.     The rupture was also applauded by the people advising Plaintiff, who encouraged Plaintiff to take the equally nonsensical view that the *Shumans* were serial predators who had victimized *him*, and that his relationship with them had been one big scam on their part. His advisers successfully urged him to avoid all efforts at compromise or reconciliation, and to treat

the dispute as a matter for courts and the police.

54.     The intense feelings of hurt and betrayal on both sides rendered both Plaintiff and the Shumans highly susceptible to such manipulation. Plaintiff and the Shumans had virtually no communication after their rupture; as their conflict escalated, each side developed increasingly outlandish ideas of the other's behavior and intentions.  On each side, they reinterpreted their history, and interpreted each new development, in the light most unfavorable to the other side — prompting the other side to do the same, in a vicious cycle leading each side to develop a dark, twisted view of the other bearing no relation to reality.

55.     On Plaintiff's side, this process was aggravated by the fact that he was very isolated in the aftermath of the rupture. He discussed his conflict with the Shumans with no one but a few advisers who, in addition to having personal antipathy toward the Shumans, had material interest sin convincing Plaintiff that the Shumans were his sworn enemies. Together, these advisers formed an "echo chamber" surrounding Plaintiff, amplifying that idea and driving out all others.

56.     The process was also aggravated by Plaintiff's mental health problems, including a history of clinical depression, mild autism spectrum disorder, and the aftereffects of childhood sexual abuse. These make Plaintiff especially vulnerable to feelings of isolation and abandonment, and also to emotional manipulation.

57.     This process was also aggravated by Plaintiff's discovery of "other men" in Maria-Pia's life.  During the relationship, the Shumans' had told him of their disputes with Roe and Scuteri, but had not shared with him some of the underlying details and chronologies. Blinded by feelings of jealousy and betrayal, Plaintiff no longer knew what to believe about the

16

Shumans, and was increasingly vulnerable to those who wanted him to believe the worst.

58.     In October 2017, Attorney Howard Cooper told Plaintiff that he and Cooper's client Jeffrey Scuteri (see ¶ 40 above) were both victims of a "paternity fraud." This was pure fiction, designed to enlist Plaintiff in Cooper's effort to discredit the Shumans to cover up his client Jeffrey Scuteri's sexually assaulting Maria-Pia. Cooper had undisguised animosity towards the Shumans. Plaintiff nonetheless trusted Cooper and accepted this false version of events. He accepted Cooper's offer to represent him, not realizing he was in effect being used to protect Scuteri from credible sexual assault accusations.

59.     In December 2017 Cooper, exploiting information obtained from Plaintiff, sought to persuade the Massachusetts Attorney General's criminal division to investigate the Shumans. In February 2018, that office informed Cooper that the evidence did not warrant opening an investigation.

60.     In late March 2018, the Shumans filed a lawsuit against Plaintiff in Massachusetts Superior Court. The complaint contained numerous accusations that the Plaintiff denies; on information and belief the Shumans were persuaded by friends and lawyers to believe the accusations were true.

61.     In early April 2018, Plaintiff engaged Attorney Doug Brooks, who showed Plaintiff the 2015 letter (see ¶ 39 above) in which Brooks had falsely accused the Shumans of deceiving Andrew about the first child's paternity and about Shuman's health; of committing "extortion" and making "blatantly false accusations" against John Poe and of forming a "scheme" to extort Richard Roe. Plaintiff — wrongly assuming that these accusations were based on sound evidence — accepted the accusations as true.

62.     From that time forward, Plaintiff mistakenly considered himself to be part of a "trail" of Shuman "victims," which included Poe, Roe, Scuteri, and Andrew. In early May 2018, he filed suit against the Shumans in Massachusetts Superior Court, making allegations of fraud and extortion that Plaintiff incorrectly believed to be true.

63.     On May 7, 2018, Mischa filed a Title IX complaint against Plaintiff at Harvard. The complaint contained numerous allegations of harassment and discrimination that the Plaintiff denies; allegations which, on information and belief Mischa's friends and lawyers had persuaded Mischa (who, like Plaintiff, was in an emotionally vulnerable state) were true.

64.     On May 24, 2018, Plaintiff received a deranged series of text messages, calculated to appear to be from Maria-Pia, taunting Plaintiff about the proceedings launched by the Shumans and threatening that his ordeal was just beginning; warning that he would soon be facing accusations from numerous people. The messages read as follows:

> Hey :-)
>
> Having fun?
>
> You should have believed me when I said I was prepared, for everything.
>
> [Morgan] Freeman had 8 accusers.
>
> Find a way to connect if you want a chance to take the last exit before HELL.
>
> I'm honestly not scared, if you think I am.
>
> Couldn't care less. It's sort of fun. I just find a tiny part of me still does care about you. Very tiny, and rapidly shrinking.
>
> Take my word, you ain't seen nothing yet. I promise.
>
> Oh and as to your quest for motives? Don't bother. I just really hate the patriarchy, that's it.

These messages were in fact sent by someone who was fully acquainted with the escalating conflict and was impersonating Maria-Pia. The Shumans did not know about the messages and

had nothing to do with their being sent.

65.     The purpose of the individual impersonating Maria-Pia with the above messages was to further escalate the conflict between Plaintiff and the Shumans. The impersonator knew that the messages would inflame Plaintiff and discourage him from settling the conflict, which the Shumans were showing signs of wanting to resolve. The impersonator also knew that the messages could be used as evidence of criminal extortion, which Plaintiff would (and did) report to law enforcement authorities as well as to Harvard — so that the impersonator was thus exposing the Shumans to possible criminal prosecution, as well as to disciplinary action against Mischa at Harvard. It is evident that the impersonator was eager to see Plaintiffs and the Shumans destroy each other.

66.     Plaintiff and his advisers were fooled into believing that the May 24 messages were indeed sent by Maria-Pia. Had he been been more alert and detached, Plaintiff would have noticed some obvious alarm bells: the Shumans, in his experience, never used the term "patriarchy"; the messages were not written in her "voice"; and more importantly, it would have been completely insane of Maria-Pia to send such obviously self-incriminating statements. These messages harmed the Shumans' case and would not at all be in their interests to send. Viewed as evidence against the Shumans, the messages were a little "too good to be true." But Plaintiff, by then in siege mentality, ignored these obvious signs that the messages were fabricated.

67.     The May 24 messages had the effect desired by their sender. To Plaintiff and his advisers, they were "proof" that the Shumans were unscrupulous predators out to destroy him. Plaintiff gave up on the idea of compromise or reconciliation with them. He reported the threats to law enforcement and to Harvard. In mid-June, his lawyers again approached the state Attorney

General's office, encouraging it to open an investigation of the Shumans.

68.     On June 22, 2018, the state Attorney General's office again informed Plaintiff's lawyers that the evidence did not warrant opening a criminal investigation of the Shumans.

69.     Convinced that the Shumans were determined to ruin his life, and unable to interest law enforcement in his predicament, Plaintiff reluctantly decided to take the story to the press. His hope was that an investigative journalist would "expose" the Shumans for the predators that Plaintiff had come to believe — quite falsely — that they were.

### Plaintiff's Agreement with Defendants

70.     Plaintiff reached out to Defendant Kera Bolonik on June 24, 2018, seeking her advice about taking his story to the press. Plaintiff and Bolonik were connected as "friends" on Facebook, but had never met or communicated before. They came from the same hometown, and had some old childhood friends in common. Plaintiff contacted her because her frequent posts on Facebook indicated that she was a writer interested in gender issues, and that she had many journalistic connections.

71.     Plaintiff had been agonizing for some weeks about whether, and how, to obtain press coverage of the story. He was worried not only about the embarrassment that press coverage would bring him and his family, but about the danger that the story would be covered in an irresponsible manner that would fuel misogynistic and transphobic stereotypes. The latter concern had led him to reject two New York-based journalists whom he had been intermittently communicating with for several weeks. Plaintiff was not well connected to the world of investigative journalists, and was unsure how to find the right one. Bolonik's apparent combination of qualities — interest in gender issues, professional ties to journalism, and personal

ties to old friends of Plaintiff's — made her, to Plaintiff's mind, someone he could safely confide in and trust to render sound advice.

72.     In their exchange (conducted on Facebook's text messaging application) \of June 24, 2018, Plaintiff told Bolonik that he believed he and several other men had been victimized by the Shumans; that he was now going through a conflict that had left him very badly shaken emotionally; that his personal and professional life were in a state of upheaval; and that he was looking for a journalist who could cover the story responsibly. He shared with Bolonik his recently completed written statement in the Title IX proceeding, which asserted that he was the victim of a "campaign of fraud, extortion, and false accusations" by the Shumans. The written statement also set forth Plaintiff's mistaken understanding, acquired from Brooks and Cooper, about what the Shumans had done to Poe, Roe, and Scuteri.

73.     Bolonik immediately expressed sympathy for Plaintiff and outrage at what the Shumans — whom she called "grifters" and "predators" who should "rot" — were doing to him and other men. She agreed that the story called for a responsible reporter who was sensitive to gender issues, and proposed that she herself cover the story herself for *New York* magazine. She concluded the June 24 exchange by saying she would pitch the story to editors at *New York*, and would get back to Plaintiff.

74.     Still unsure what to do, Plaintiff contacted and shared his story with Jodi Kantor, an investigative reporter at the *New York Times*, on June 26, 2018. Kantor told Plaintiff that the story was highly newsworthy and suitable for the *Times*, but that she herself was too busy to take on the story. She told Plaintiff that she would see whether one of her investigative reporter colleagues at the *Times* colleagues had time to take on the story. On July 6, 2018, Kantor wrote

Plaintiff that she was still searching for an available colleague at the *Times*, and that Plaintiff should plan on being in touch with her again soon.

75.      On July 7, 2018, Bolonik told Plaintiff that her pitch had been accepted, and asked him to work exclusively with her on the story for *New York* magazine. Upon hearing Plaintiff describe his communications with Kantor, Bolonik told Plaintiff that he should work with Bolonik and *New York* rather than with a reporter at the *Times*. She assured Plaintiff that her investigation and reporting of the story would be thorough, professional, and sensitive to the delicate gender issues raised by the story. She also assured Plaintiff that she understood that he was in a state of emotional turmoil; that she understood that his personal and professional lives had been turned upside down by the events she would be covering; and that she understood that her coverage of the matter would have a major impact on his life and his career and position at Harvard. On that understanding, Plaintiff agreed, on approximately July 9, 2018, to work exclusively with Bolonik and New York Media on the preparation of an article for *New York* magazine.

76.      In reaching that agreement, Plaintiff placed great weight on the fact that *New York* is a widely respected publication with a distinguished history of investigative reporting on issues relating to gender, race, and civil rights. The magazine's willingness to assign such an obviously delicate story to Bolonik was, for Plaintiff, a strong indication that she was up to the job. Moreover, Plaintiff took it for granted that the magazine's editors would review her work carefully, and would publish it only after ensuring that it met the highest journalistic standards. He knew next to nothing about Bolonik's work history, and was unaware that she had no experience as an investigative reporter.

22

77.    From that time forward, Plaintiff repeatedly told Bolonik that he expected her to produce a piece of investigative journalism that was truthful and accurate, and that he would do his best to help her produce it. He also repeatedly told her that he had only very limited experience with journalism, and that he was counting on her to comply with the procedures and ethical rules applicable to sound investigative reporting, of which he had only rudimentary knowledge. Bolonik repeatedly assured Plaintiff that she was doing so.

78.    Six months into Bolonik's reporting, in January 2019, Plaintiff had an extended phone conversation with Laurie Abraham, then an editor at *New York*, who had commissioned Bolonik to write the article and had principal responsibility for overseeing it. Abraham informed Plaintiff that in addition to being an editor she was trained as a lawyer, having attended Yale Law School. She assured Plaintiff that she was closely following Bolonik's work on the story, that Bolonik could be trusted to report it thoroughly and professionally, and that the published final product would meet the highest journalistic standards.

79.    In reliance on these promises and expectations, Plaintiff exposed the most intimate details of his life to public view via the Defendants. He gave Bolonik and her editors all of the relevant information and documents that he could, answered their questions and recounted his perceptions of events as accurately as he could, and did everything else in his power to make their work easier.  Following publication of the resulting article in the summer of 2019, he helped Bolonik and New York Media promote the article and defend it from legal attacks; helped Bolonik explore movie and TV deals based on the article; and helped Bolonik begin work on her book based on the article.

80.    Also in reliance on these promises and expectations, Plaintiff gave up the chance

to have the story investigated and reported by journalists at other publications. Upon agreeing to work with Bolonik, Plaintiff ceased communicating with the *New York Times*, and ended his search for a reporter. Thereafter, on several occasions during Bolonik's reporting, Plaintiff was contacted about the story by reporters from other news outlets; at the request of Bolonik and her editors at *New York*, Plaintiff turned away all such inquiries without comment, which led the inquiring reporters to abandon the story.

### What Responsible Coverage Would Have Revealed

81.    Had they lived up to their agreement with Plaintiff and the trust he placed in them, Bolonik and her editors would have greeted Plaintiff's account of the Shumans and their "trail of victims" with a healthy dose of skepticism, despite the Plaintiff's sincere belief in the account. They would have investigated it with care, as they had promised, and would have found that it was thoroughly contradicted by the evidence.

82.    The resulting coverage would have revealed that Plaintiff was tragically mistaken about the Shumans; that the false picture he had formed was the product of his escalating conflicts with the two women, stoked by third parties with ulterior motives; that far from being the predators he supposed them to be, the Shumans were the victims of a campaign of lies directed at them for years, fueled both by prejudice and by the cynicism of those willing to harness it to their own advantage.

83.    The coverage would have revealed that attempts to falsely portray the Shumans as criminals, and to weaponize law enforcement against them, had been snowballing for years — in the enlistment by Andrew's parents of a Massachusetts state trooper to scare Andrew with suggestions that Mischa had connections to middle-eastern terrorists; in Andrew's sister

Margaret's attempt to have the FBI arrest Mischa as a suspect in the 2013 Boston Marathon bombing; in former state trooper Bob Long's effort to dig up dirt on the Shumans with the help of his friends in the Cambridge Police Department; in the demonstrably false accusations contained in Brooks's 2015 letter to the Shumans, based on Long's evidence-free conjectures; in Howard Cooper's unsuccessful attempts to launch a criminal probe against the Shumans, for use as leverage against them on behalf of his client Jeffrey Scuteri; in the fabricated "incriminating" text messages of May 24, 2018, sent to Plaintiff in the knowledge that he would report to the police as having come from the Shumans.

84.     The coverage would have revealed that Plaintiff was the victim not of the Shumans, but rather of the individuals — such as Margaret Klein, Howard Cooper, Bob Long, and the sender of the fabricated incriminating messages — who had contributed to the false portrayal of the Shumans as criminals and were now using it to inflame the conflict between him and the two women, which was ruining his life as well as theirs.

85.     The coverage would have revealed that the "real" story here was about the destructive effects of transphobia, misogyny, and bigotry toward unconventional families: these prejudices (and their skillful deployment) were at the root of the false portrayal of the Shumans as predators, a portrayal that Plaintiff had been deceived and manipulated into accepting despite his abhorrence of the prejudices that underlay it; the Shumans, in turn, had been deceived and manipulated into believing that Plaintiff was a sexual predator who had aligned himself with the bigots, and fought back relentlessly; the ensuing war was devastating all three of them.

86.     The coverage would also have revealed that this tragedy was having real consequences not only for Plaintiff, the Shumans, and their families, but for the broader world. It

would have revealed, for example, that in wrecking Mischa Shuman's life and reputation, demonizers of the Shumans had silenced the voice of a brilliant writer and commentator on transgender rights, gender equality, and other subjects related to politics and injustice. It would have revealed that they had also deprived transgender girls of the rarest of role models — a transgender woman who is in a stable, loving relationship with a cisgender man; who is the one and only mother to her three children; who has a dazzling record of intellectual achievement despite the formidable barriers put in her way.

87.     Unfortunately, none of this minimally responsible coverage happened, because neither Bolonik nor her editors lived up to their agreement with Plaintiff. Rather than provide the professional investigative journalism they had promised Plaintiff, they decided it would be more to their advantage to use him for a tabloid-style, stereotype-filled thriller about two deviant women who prey upon a hapless Harvard professor.

### Defendants' Abuse of Trust and Exploitation of Plaintiff

88.     From the beginning of their work with Plaintiff, the goal the goal of Bolonik at her editors at New York Media was to exploit Plaintiff's story to produce a salacious "True Crime" tale portraying the Shumans as deviant villains who target men for extortion by means of paternity scams and false sexual assault accusations. That is how Bolonik pitched the story to the editors; it is how she and her editors conceived of the project throughout its development; it is how they packaged the false and defamatory final product.

89.     Bolonik's explicit model for the project, shared with her editors at New York Media, was her late friend Michelle McNamara's *I'll Be Gone in the Dark: My Obsessive Quest for the Golden State Killer* — a book that Bolonik mentioned in her first conversation with

26

Plaintiff and many times afterward, with a combination of reverence and envy.

90.    McNamara's book, published shortly after the author's death at the age of 48, had reputedly helped the police catch and imprison a serial killer. It had become a bestseller, had led to a lucrative movie deal, and had won the author considerable posthumous fame. Upon being contacted by Plaintiff in June 2018, Bolonik quickly spotted an opportunity to match her late friend's feat. She would don the mantle of investigative reporter, would "expose" the Shumans as dangerous serial predators, and get them prosecuted and imprisoned; this would make her a bestselling author, would lead to a Hollywood deal, and bring her fame and fortune. No longer would she be a failed middle-aged writer that no one had ever heard of, nursing an inferiority complex about her Rutgers education, supporting herself with a dead-end job as a copy editor at *New York* magazine.

91.    To Bolonik, Plaintiff represented not just an opportunity for financial gain and professional success; he represented an attractive prospect for an intimate personal relationship and a romantic relationship with a professor at Harvard, the glamorous "intellectual epicenter of the country," as she called it. She was openly jealous of his relationship with the Shumans, who had top degrees from world-class universities and "think they're smarter than everyone else," as she told him. She suspected that he still had feelings for them, which she would try hard to extinguish. Throughout her association with Plaintiff, she would seek to replace the Shumans as the object of his romantic affections.

92.    Bolonik's pursuit of intimacy with Plaintiff frequently crossed the line into sexual harassment. She contacted Plaintiff almost daily by telephone or text message, often outside of business hours, insinuating herself into his personal life and trying to draw him into hers. She

shared inappropriate details about her sexual relationship with her domestic partner, her romantic history, and her sex life, and pressed him to provide equivalent information about himself. From early on Bolonik sought romantic intimacy with the Plaintiff. Early in their acquaintance she took Plaintiff to dinner with two of her personal friends, telling him afterward that her friends had "approved" him for her, hinting at the double meaning. During their early in-person encounters Bolonik detected Plaintiff's discomfort with her intimate advances and sought to reassure him that she was exclusively lesbian. She repeatedly told Plaintiff that she "cared" about him, and expressed concern that he did not return her feelings.

93.    To New York Media, Plaintiff represented an opportunity for a sensational article that would help stave off the tide of red ink at the company. It would sell print copies of *New York* magazine and would generate "clicks "on New York Media's online platforms — and might then go on to have a profitable afterlife in other media. From the beginning, Bolonik's editors at New York Media shared her hope that her article, if it generated enough buzz, would lead to a book and/or movie and/or TV series labeled as being "based on" the article, which would redound to the benefit of New York Media as well as Bolonik herself.

94.    When it commissioned her to write the article, New York Media knew that Bolonik was unqualified to do the work of professional investigative journalism that it had promised Plaintiff she would do.

95.    Throughout her reporting and afterward, Bolonik's editors at New York Media ignored signs that Bolonik had no regard for the procedures, standards, and ethical norms of professional investigative journalism, including rules against forming intimate ties with sources and sexually harassing them.  On information and belief, in the spring of 2019, editor Laurie

28

Abraham — then in the process of leaving the company because of its financial problems —
informed superiors at New York Media of her view that she had developed doubts about the
project; that Bolonik's reporting was unprofessional; and that her article, then in draft form on
the editors' desks, did not meet criteria for responsible journalism; and that New York Media
should not go forward with the article. Abraham's superiors ignored her opinion, and replaced
her with another editor to shepherd the article through the remaining stages of publication.
Bolonik shared with Plaintiff her relief that Abraham was no longer working on the article and
said her departure was a positive development.

96.     Throughout their work together, Bolonik treated Plaintiff as a researcher, fact-
checker, and legal expert as well as a source and romantic partner. She frequently relied on him
to obtain and interpret documents for her; to evaluate information she obtained from other
sources; to explain past and present proceedings involving the Shumans, including those in
which he had no role; and to answer her questions about the law, including questions about her
own legal exposure to the Shumans, and the circumstances in which they might successfully
attack her article as defamatory. Referring to Plaintiff's assistance in explaining the latest motion
practice in litigation between the Shumans and Jeffrey Scuteri, "It's a good thing I have a civ pro
prof to consult!"

97.     Throughout their association, Bolonik encouraged Plaintiff to treat her as a close
friend and personal adviser, whom he should rely on for emotional solace as well as an
understanding of what he was going through in his conflict with the Shumans; pressed him to
confide in her about the most intimate details of his life, including his mental health challenges
and emotional vulnerabilities; and assured him that this was necessary for her work, that she

could be relied on to use his confidences professionally and responsibly.

98.    Plaintiff believed her and trusted and confided in her accordingly, throughout their association.

99.    Bolonik proceeded to use Plaintiff's trust and confidence to manipulate and exploit him, and also to prevent him from seeing how badly he was being used by her and New York Media. She was successful in this effort precisely because she — along with New York Media — had deceived Plaintiff into believing she was responsibly and professionally carrying out her duties as an investigative journalist.

100.   Bolonik never had any interest in conducting an impartial journalistic investigation, or in ascertaining  and reporting the facts about the Shumans. Rather, her objective throughout was to build a case against them, and to help others do the same, with no regard for the precautions designed to protect the integrity of the reporting process, or for the boundaries that normally separate a reporter from her sources and story.

101.   Throughout her reporting, Bolonik sought evidence that supported the case she was building against the Shumans, while ignoring or minimizing contrary evidence. She cultivated relationships with sources who had negative things to say about the Shumans, and avoided sources who did not. She compromised sources' independence by sharing negative information about the Shumans given to her in confidence by other sources. She pushed her preferred narrative on sources, encouraged them to believe the worst about the Shumans, and "corrected" them if they did not tell her what she wanted to hear. She did not interview the Shumans or anyone close to them, did not get their side of the story or the evidence that supported it, and made no serious attempt to do so.

102.    Throughout her reporting, Bolonik formed inappropriate ties to sources, and inappropriately intervened in the events she was reporting on. She sought to aggravate the Shumans' conflicts with their adversaries. She advised their adversaries on strategies to take in legal proceedings. She encouraged sources to file lawsuits against the Shumans, to file police reports against them, and to seek their criminal prosecution. She befriended Howard Cooper and recruited clients for him, urging sources to hire him to initiate proceedings against the Shumans. She befriended Margaret Klein, whom she promised to help "free" her brother and exact revenge against the Shumans, particularly Mischa, for having "brainwashed" him into joining their family.

103.    Throughout her reporting, Bolonik deceived and manipulated Plaintiff into believing that she was performing her duties as an investigative reporter responsibly and professionally; that her investigation established the truth of the accusations against the Shumans lodged by Cooper, Brooks, and Plaintiff himself; that she had uncovered evidence demonstrating that the Shumans were even worse predators than he had imagined; that he had indeed been victimized by the Shumans, and was doing a great public service by helping Bolonik "expose" them before they did more harm.

104.    As desired by Bolonik, this had the effect of further escalating Plaintiff's conflict with the Shumans. All talk of settlement in the litigation between them vanished, and the accusations and counter-accusations in the Title IX proceeding at Harvard became more extreme. In early 2019, the Shumans were charged with larceny after Plaintiff — at Bolonik's urging — called the police about some withdrawals they had made from his bank account in 2017, which he had authorized but forgotten about. Arrest warrants were issued, which effectively prevented

the Shumans from returning to the United States from France, where they had settled; they were fearful of what would happen to a transgender woman of color taken into custody at the United States border. Plaintiff eventually realized his mistake and notified authorities, leading to the charges being dropped and the warrants withdrawn — but not before Cooper secured a default judgment on Scuteri's behalf, taking advantage of the Shumans' inability to come to this country to defend themselves, and preventing an airing of the facts of the case.

105.    Bolonik consistently tried to run down the Shumans in Plaintiff's estimation — claiming (falsely) that they were frauds, that Maria-Pia was not "smart" enough to have a physics degree, that Mischa might not really be enrolled at Harvard. She repeatedly told Plaintiff that his relationship with the Shumans had been a sham, that their feelings for him were feigned, and that (unlike Bolonik herself) they did not care about him and never had.

106.    Bolonik repeatedly told Plaintiff that she had no desire to get the Shumans' side of the story.  Following an off-record phone call with Mischa in October 2018, she shared details of the call with Plaintiff; she told Plaintiff that she had no desire to speak to her again; that she had not believed a word Mischa had said; and that further communication with the Shumans was pointless. She later gloated to Plaintiff that that no reporter or publication would help the Shumans tell their side of the story, because "everybody knows they are liars and grifters."

107.    Bolonik consistently expressed an almost boundless antipathy toward Mischa in particular, using crude transphobic stereotypes to describe her as a fraud and impostor, a leech who sucks the life and productive energy out of others. In the early months of her work with Plaintiff, Bolonik described Mischa as the weak and ineffectual dependent of Maria-Pia, who had "turned Mischa into the conniving person she is now." But Bolonik's words about Mischa took a

darker turn in March 2019, when she befriended Andrew's sister Margaret — who (as Bolonik well knew) had told the FBI in April 2013 that the transgender *woman* who had "brainwashed" Andrew into marrying her might also be the cisgender *man* who had "brainwashed" the Boston Marathon bombers into committing mass murder. From March 2019 forward, Bolonik routinely described Mischa as a "cult leader" who had "brainwashed" not only Andrew but also Maria-Pia into leaving "normal" lives and moving in with her. Bolonik repeatedly told Plaintiff that he himself had been brainwashed by Mischa, but fortunately had made a narrow escape from her "cult." Bolonik repeatedly insisted to Plaintiff that Andrew could not possibly be in a healthy romantic relationship with Mischa, and that Mischa was not actually the mother and principal parent to her three children.

108.    Bolonik repeatedly expressed to Plaintiff her view that Andrew should leave Mischa, and take the children with him; that if he did not do so, the authorities should take the children away and put them up for adoption; and that the Shumans, particularly Mischa, should be criminally prosecuted and sentenced to long prison terms. Bolonik repeatedly expressed to Plaintiff her fervent hope and confidence that these things would happen as a result of her own reporting about the Shumans.

109.    Bolonik repeatedly told Plaintiff that he should view the Shumans as monsters, and should view Bolonik as his savior and avenger. She told him that the Shumans were "demonic" and "vampiric," that they were "sharks out for blood" who "suss out people's vulnerabilities and seize upon them." She told Plaintiff that the Shumans had ruined his life, and that now — because of her — "the favor is being returned." She told him that he would be "redeemed" by her work.

33

## Defendants' Publication of the Fictitious "True Crime" Narrative

110.    Bolonik's article, entitled "The Most Gullible Man in Cambridge," appeared in the July 22, 2019 print edition of *New York*, and appeared in the July 23, 2019 issue of *The Cut*, https://www.thecut.com/2019/07/bruce-hay-paternity-trap-maria-pia-shuman-mischa-haider.html. (The article is attached below as **Exhibit A** to this complaint.)

111.    The article, approximately 6,000 words long, is primarily about Plaintiff's history with the Shumans, which it presents in a thoroughly false, misleading, and journalistically irresponsible manner. It converts a complex, turbulent relationship among three people who loved each other into a *Fatal Attraction*-style thriller featuring sinister, crazed women tormenting a hapless man and his family — a fiction that bears no relation to reality. A non-exhaustive list of some of the article's falsehoods includes the following:

- It falsely asserts that the Plaintiff was a "mark" whom Maria-Pia lured into the relationship.

    The truth is that Plaintiff pursued her from the first day as much as she pursued him, and that there was deception on both sides as their romance blossomed. He did not disclose the fact that Jennifer was likely to oppose and obstruct the relationship; she did not disclose the fact that she continued to see other men in the early days of the relationship. He was no more a "mark" than she was.

- It falsely describes Plaintiff as the victim of a paternity trap.

    The truth is that Plaintiff would have remained with the Shumans even if there had been no pregnancy, and that the pregnancy and baby played almost no role in their relationship.

34

- It falsely implies that Plaintiff was pressured or tricked into showing affection for Mischa, and that he was somehow reluctant or ashamed of loving a transgender woman.

   The truth is that he loved her unreservedly during their relationship, was in love with her, had romantic feelings for her, and said so publicly.

- It falsely claims that the Shumans deceived him with an invented story that Maria-Pia was suffering from cancer.

   The truth is that the cancer was very real; she suffered cervical cancer in 2011, went into remission for five years, and then suffered a recurrence in 2016.

- It falsely asserts that the Shumans sought to separate Plaintiff from his family and from his money.

   The truth is that they simply did not want to be treated as mistresses; resented the fact that Plaintiff lavished all of his resources on Jennifer, who rewarded their overtures to her with unrelenting hostility, and did all she could to sabotage the relationship; and felt they should not be asked to "subsidize" Jennifer and his household by giving him money or covering his share of expenses in his relationship with them.

- It falsely claims that the Shumans invaded Plaintiff's house and held it for ransom, forcing Jennifer and her children onto the streets.

   The truth is that Plaintiff invited them to stay in the house; that they remained because they felt they had a right to be there; that they said Jennifer and the children were also welcome there, so long as Jennifer acknowledged their right to be there; and

that their purpose was not to exact ransom, but to be treated as equals rather than as mistresses.

- It falsely states that Mischa's Harvard complaint against Plaintiff was an attempt to "weaponize" Title IX with deliberately false accusations.

    The truth is that Mischa was manipulated by others into believing, genuinely but mistakenly, that Plaintiff had harassed and exploited her; that her allegations were based on genuine misunderstandings about Plaintiff's actions and intentions toward her; and that a frank conversation between the parties (which was prevented by their lawyers) would have cleared up these mistakes and misunderstandings.

These and other falsehoods — and, more generally, the false notion that the Shumans "scammed" Plaintiff — are contradicted by his written correspondence with the Shumans, which Plaintiff had supplied Bolonik with as soon as she began her reporting. On information and belief, they are also contradicted by written materials that the Shumans furnished to New York Media before the article was published.

112.    The article also contains short accounts of the Shumans' dealings with John Poe, Richard Roe, and Jeffrey Scuteri (whom the article refers to as John Doe). The accounts essentially repeat, and present as fact, the unsubstantiated accusations described previously (see ¶¶ 39-40 above). These accounts are also false, misleading, and journalistically irresponsible. In particular:

- Contrary to the article's implication, the money supposedly "extorted" from Poe was understood by all concerned to be repayment of funds Maria-Pia had given him in a

36

time of need. This fact, and the documentary evidence establishing it, go unmentioned
in the article.

* Contrary to the article's implication, the judge hearing Maria-Pia's request for a
  restraining order made no finding on the Shumans' assertion that he had assaulted and
  threatened her.

* The story that the Shumans' "extorted" money from Roe is contradicted by the
  undisputed fact that the Shumans never sought or received money from him. The
  article makes no mention of this.

* Bolonik did not speak to anyone involved in the Poe and Roe events; her only source
  was Plaintiff himself, who was repeating the client-serving accounts offered by Poe
  and Roe's lawyers. The article does not disclose this.

* Astonishingly, the article repeats Scuteri's uncorroborated accusations against the
  Shumans, without revealing that he has been publicly accused of sexually assaulting
  Maria-Pia. While *his* accusations against them are presented as fact, *their* accusations
  against him — contained in public litigation filings in New York Media's possession
  — are completely concealed from the reader.

These accounts — designed by Bolonik and her editors to create the appearance that the
Shumans have a "trail of victims" — fall far short of any reasonable standard for responsible
reporting.

113.   A few weeks after the article appeared, Defendants published a shorter follow-up
article entitled "The Harvard Professor Scam Gets Even Weirder." It appeared in the August 8,
2019 issue of *The Cut*, https://www.thecut.com/2019/08/bruce-hay-paternity-trap-maria-pia-

shuman-mischa-haider-follow-up.html.  (The followup article is contained in **Exhibit A** below,
appended to the original article.)

114.    The follow-up article, which purportedly reports what Bolonik heard from several
sources who contacted her after reading the original article, is also false, misleading, and
journalistically irresponsible.

- It falsely implies that several innocuous exchanges on the street between the Shumans
  and men they did not know were evidence of predatory intentions on their part.

- It falsely implies that the Shumans attempted to commit a paternity "scam" against a
  man the article calls Anthony, with whom Maria-Pia had a sexual encounter in April
  2015, and whom she later informed that she was pregnant.

- It conceals from the reader the fact that Maria-Pia never sought or received money
  from Anthony, a fact he himself readily acknowledges.

As with the stories in the original article, these stories — also designed by Bolonik and her
editors to create the appearance that the Shumans are predators with a "trail of victims" — fall
far short of any reasonable standard for responsible reporting.

115.    Both the original article and the followup article employ transphobic and
misogynistic stereotypes to falsely portray the Shumans as criminal predators. The effect is
magnified by "mug shot"-style photos of the Shumans (which look nothing like them) in the
original article. It is further magnified by the use of cover photos done in what the editors told
Plaintiff was a "Hitchcock" style; they evoke the movie *Psycho*, which is about a cross-dressing
*male* serial killer who believes he is a woman.

116.    The combined effect of the articles is falsely portray Plaintiff as a fool, utterly

38

lacking in common sense or judgment — a fool who (according to the articles' false representations) fell for a "scam" run by two scheming, deranged *femmes fatales*, and allowed them to deceive him with obvious lies and to terrorize his family over a period of months, without having the faintest idea of what was happening.

117.    The combined effect of the articles is to hold Plaintiff up to ridicule based on this false narrative, and to make clear to the reader that Plaintiff had no business holding a faculty position at Harvard, much less teaching a course on Judgment and Decision Making there.

### Aftermath of the Articles' Publication

118.    In July 2019, Bolonik announced to Plaintiff she was considering the idea of expanding the articles into what she called a "True Crime" book. She pretended to have just spoken with her literary agent Sarah Burnes about this idea for the first time. In fact, she had planned all along to publish such a book, had written the articles with that objective, and had frequently discussed the idea with Burnes ever since beginning her reporting.

119.    In August 2019, Bolonik informed Plaintiff that she was arranging for United Talent Agency in Los Angeles to solicit bids for a possible movie or TV series based on the articles. Bolonik persuaded Plaintiff to join the arrangement with the agency, which (in her words)  was setting up a "nice bidding war" for the movie and TV rights, which is "great news for us, drives up the price."

120.    In September 2019, Bolonik informed Plaintiff that the Harper Collins publishing house had agreed to publish her proposed book, which was to be entitled *Gullible*. She persuaded Plaintiff to continue working with her, and not to work with any other journalists, as she completed the book.

121.    In November 2019, Bolonik informed Plaintiff that she, along with New York Media and Harper Collins, had received a letter from counsel for the Shumans claiming that the articles and book-in-progress were defamatory. Bolonik disparaged Harper Collins's lawyers, and said she was depending on New York Media's lawyer — Defendant David Korzenik, who had cleared the articles for publication the previous summer — to repel the Shumans' attack and keep her book project alive. At Korzenik's request, Bolonik asked Plaintiff to help write a response to the letter that would negate the defamation claims. Plaintiff's task was to write about the various legal proceedings involving the Shumans; once again, Defendants were using him as a legal consultant as well as a source. Plaintiff was not shown the letter or informed of the basis of the defamation claims. Plaintiff wrote the requested material, which (on information and belief) Korzenik used in the response he eventually sent to the Shumans' counsel.

122.    In December 2019, Jeffrey Scuteri won a default judgment against the Shumans, exploiting their inability to safely travel to the United States to defend themselves (see ¶ 104 above). In securing the judgment, Scuteri's counsel Cooper called the judge's attention to the articles' portrayal of the Shumans as predators, attaching them to his filings. Bolonik expressed joy to Plaintiff that her "reporting" was bringing the Shumans to "justice," and encouraged him to employ Cooper's strategy in Plaintiff's own litigation against the Shumans.

123.    Throughout the fall and winter of 2019, Bolonik continued, as she had since 2018, to seek inappropriate personal and romantic intimacy with Plaintiff, to emotionally manipulate him into thinking the worse of the Shumans, and to pressure him to support her quest to get them arrested and imprisoned.

124.    In January 2020, Plaintiff complained to Bolonik about her lack of journalistic

interest in what was happening to him at Harvard, where his conflict with the Shumans was continuing to have adverse repercussions for him. In response, Bolonik sent Plaintiff text messages castigating him for never showing any personal interest in her, despite all the attention she paid to him: "I talk to you more than anyone in my life"; "When was the last time you asked what was going on w me?"

125.     In several telephone exchanges in February and March 2020, Bolonik angrily accused Plaintiff of failing to appreciate what she was doing for him, failing to reciprocate her attention to his personal life, and failing to match her emotional investment in their relationship.

126.     During the early months of 2020, Plaintiff began to realize he had been badly used by Defendants, and that the Shumans were not the predators he had been led to believe they were by Bolonik, Cooper, and others who stood to gain from the Shumans' demonization. This realization had several sources: evidence had emerged in the litigation between Plaintiff and the Shumans, showing that many of the accusations lodged against them were simply false; the bitter Title IX dispute at Harvard had ended in late 2019, ratcheting down the level of conflict; and most crucially, Plaintiff — much to Bolonik's chagrin — was having less contact with Bolonik herself, with the result that her influence on him was correspondingly reduced and he was able to see things more clearly.

127.     In March 2020, Plaintiff informed the Middlesex County District Attorney's office of his discovery that he had in fact authorized the bank withdrawals (see ¶ 104 above) that he had previously reported as unauthorized.

128.     In April 2020, Plaintiff withdrew his lawsuit against the Shumans, which rested on allegations he no longer believed to be true.

129.   In June 2020, the Middlesex District Attorney's office dropped the mistaken larceny charges against the Shumans and had the warrants for their arrest withdrawn.

130.   In the year since their publication, the articles have been extensively circulated, and have exposed Plaintiff to widespread ridicule among his friends and colleagues, in professional circles, and in the public at large. His personal and professional reputations have suffered immeasurably.

## Defendants' Recent Conduct

131.   On April 23, 2020, Plaintiff wrote a letter designated "confidential and off-record" to Defendant Korzenik. In the letter, Plaintiff stated he no longer stood by the account of him and the Shumans presented in the original article; that both articles were inaccurate and misleading; that Bolonik had committed serious professional misconduct in reporting the articles; that the articles should be removed from circulation; and that Plaintiff was prepared to provide information in support of his position upon request.

132.   Korzenik did not reply to Plaintiff, did not request any supporting information from him, and did not launch an investigation into his assertions.

133.   Instead, Korzenik immediately telephoned Doug Brooks, Plaintiff's counsel in the civil litigation against the Shumans. In the call, Korzenik — ignoring the "confidential and off-record" designation — informed Brooks of the letter he had received from Plaintiff. He then falsely accused Plaintiff of having written the letter under pressure from the Shumans, or in exchange for something; stated that New York Media would never remove the articles from circulation; and threatened that if Plaintiff persisted in the matter, New York Media would publish another negative article about him.

134.    Korzenik also immediately telephoned Howard Cooper, informing him — again in violation of the "confidential and off-record" designation — of Plaintiff's letter and stating that Plaintiff had written it under the Shumans' "spell," falsely implying that the letter was not sincere and that it had been written under duress or in exchange for something.

135.    On information and belief, Korzenik also contacted other third parties about Plaintiff's letter, making the same false statements to them.

136.    The obvious purpose of Korzenik's calls to Brooks and Cooper was to pressure Plaintiff into backing away from the position he had taken in his letter. The pressure took several forms.

137.    First, Korzenik's calls signaled to Plaintiff that his attempt to correct the record and report journalistic misconduct would be futile. He signaled that he and New York Media had no intention of taking Plaintiff's letter seriously; that they would reflexively dismiss the letter's charges, without investigating them or taking into account the information Plaintiff had to offer; and that they were going to stand by the articles no matter what the evidence showed.

138.    Second, Korzenik's calls signaled to Plaintiff that his confidential, off-record communications would be shared with others — despite Plaintiff's long understanding with New York Media that his communications with them would remain confidential and off-record unless he explicitly agreed otherwise. Bolonik and her editors had explicitly assured Plaintiff of this on numerous occasions; he had supplied enormous quantities of highly sensitive information to them, and freely shared his thoughts and opinions with them, in reliance on this assurance; indeed, the previous November, Korzenik himself had sought out Plaintiff's confidential assistance on the written response Korzenik was preparing to send the Shumans' counsel. Now,

43

Korzenik was making clear to Plaintiff that whatever he said to Defendants — including, perhaps, some or all of the things he had shared with them in the past — was fair game for them to disclose to others, regardless of their previous assurances of confidentiality.

139.    Third, Korzenik was signaling to Plaintiff that if he persisted in his attempt to correct the record and call out Bolonik's unprofessional conduct, he would face retaliation from New York Media in the form of another negative article about him — which (Korzenik implied) would surely get the same national and international attention that the original articles had received, would bring still more humiliation and ridicule upon him, and would cause still more harm to his personal and professional reputation and further endanger his position at Harvard.

140.    Fourth, Korzenik was enlisting Brooks and Cooper, lawyers with whom Plaintiff was working closely in the pending civil litigation, to use their influence with Plaintiff to get him to back away from the position taken in his April 23 letter.

141.    Another obvious purpose of Korzenik's calls to Brooks and Cooper — and the communications that, on information and belief, he made to other third parties about Plaintiff's letter — was to discredit Plaintiff with the defamatory accusation that his April 23 letter was not sincere, and that it had been written under duress or as part of an exchange.

142.    Such treatment of Plaintiff — who had served as the principal source for the articles, who had long relied on the promise of confidentiality, who was now trying to correct the record and to blow the whistle on a reporter's misconduct — was a shocking departure from the high journalistic standards *New York* magazine has long held itself out as adhering to, and a bad-faith breach of Plaintiff's agreement with the magazine.  Plaintiff was attempting to secure the accurate journalistic coverage he had been promised; Korzenik, on New York Media's behalf,

was seeking to intimidate him into silence and to discredit him with defamatory accusations.

143.    Korzenik's motive for doing this was plain to see: he himself had conducted the pre-publication review of the articles the previous summer; he had botched the job, approving them for publication when no reasonably competent counsel in his position would have done so; Plaintiff's April 23 letter raised the prospect that Korzenik's substandard performance would come to light, putting at risk his position as New York Media's counsel.

144.    On May 7, 2020, Plaintiff wrote a followup email to Korzenik, calling attention to Korzenik's unacceptable actions and demanding a response to the April 23 letter.

145.    On May 12, 2020, Korzenik sent an email to Plaintiff warning him that his communications were not confidential; questioning the "credibility" of his challenge to the articles and to Bolonik's conduct; and defending Bolonik's "past and current work." The email requested no information or documentation from Plaintiff, and gave no indication that New York Media was conducting any investigation into the concerns Plaintiff had raised about the articles and their reporter.

146.    On June 9, 2020, Plaintiff sent Korzenik a letter making clear that Plaintiff had no intention of backing down, and that Korzenik's efforts to intimidate and silence him were only further steeling his resolve to speak up. In the letter, Plaintiff went on to detail at length the articles' inaccuracies, their failure to meet the standards of sound journalism, and Bolonik's misconduct in reporting them. Plaintiff one again offered to provide documentation in support of his assertions, and reiterated his demand that New York Media remove the articles from circulation. (Plaintiff's letter is attached below as **Exhibit B** to this complaint.)

147.    On June 15, 2020, Korzenik sent an email to Plaintiff again warning him that his

communications were not confidential; cautioning him against "impugning" Bolonik; and asking a series of irrelevant and intrusive personal questions that (combined with the implied threat that his answers would be shared with third parties or even published in the press) were clearly intended to deter him for pursuing the matter further. Once again, the email requested no documentation from Plaintiff, and gave no indication that New York Media was seriously investigating the concerns Plaintiff had raised.

148.    A few days later, former *New York* editor Laurie Abraham confirmed to Plaintiff that no one associated with New York Media had recently contacted her about the articles. This was fully two months after Plaintiff's April 23 letter. Clearly, New York Media was not seriously investigating Plaintiff's concerns; if it had been doing so, it would surely have contacted Abraham, who oversaw Bolonik's work on the original article until leaving her job at New York Media in the spring of 2019.

149.    On June 18 and 23, 2020, Plaintiff sent two more letters to Korzenik, in which he observed that Korzenik was not acting in good faith, and stated that he was preparing to file suit.

150.    At that point, Korzenik adopted a conciliatory tone, suddenly pretending to be interested in addressing Plaintiff's concerns about the articles. On June 26, 2020, he sent an email telling Plaintiff that he would respond to the concerns within two weeks. On July 9, 2020, he sent an email telling Plaintiff to expect his response the following week. On July 17, 2020, Korzenik sent an email telling Plaintiff that the response would arrive the week after that. To date, Plaintiff has not received the promised response.

151.    The transparent purpose behind these repeated delays and assurances was to run out the New York statute of limitations for Plaintiff's defamation claims against Defendants,

which (for the first article) was set to expire on July 22, 2020.

152.    As *New York* continued to lose money in the spring of 2020, a number of the magazine's journalists were put on unpaid leave. On July 16, 2020, it was announced that many of these furloughed journalists were being laid off permanently. Meanwhile, New York Media continues to promote Bolonik's shameful "True Crime" articles on social media, and sponsors Korzenik's dirty tricks to prevent the actual truth from coming to light.

## CLAIMS FOR RELIEF

### COUNT ONE
### (Breach of Contract)

153.    Plaintiff repeats and re-alleges each of the foregoing paragraphs.

154.    Plaintiff had a contract with Bolonik and New York Media providing that in return for his exclusive cooperation, they would do a responsible and professional job of investigative reporting about Plaintiff and the Shumans, and would ensure that the resulting published work of journalism was commensurate with the magazine's usual and professed standards of quality.

155.    Abetted by Korzenik, Bolonik and New York Media breached this contract.

156.    Defendants' actions caused Plaintiff to suffer loss of income exceeding $75,000 as well as other economic and nonpecuniary losses.

### COUNT TWO
### (Bad Faith)

157.    Plaintiff repeats and re-alleges each of the foregoing paragraphs.

158.    Abetted by Korzenik, Bolonik and New York Media violated the covenant of good faith and fair dealing.

159.    Defendants' actions caused Plaintiff to suffer loss of income exceeding $75,000 as

well as other economic and nonpecuniary losses.

## COUNT THREE
### (Defamation)

160.    Plaintiff repeats and re-alleges each of the foregoing paragraphs.

161.    Abetted by Korzenik, Bolonik and New York Media produced articles containing statements about Plaintiff that were false, unprivileged, and maliciously published to third parties.

162.    In response to Plaintiff's attempt to correct the record following publication of the articles, Korzenik made statements about Plaintiff that were false, unprivileged, and maliciously published to third parties.

163.    Defendants' conduct harmed Plaintiff's personal and professional reputation, causing him loss of income exceeding $75,000 as well as other economic and nonpecuniary losses.

## COUNT FOUR
### (Sexual Harassment)

164.    Plaintiff repeats and re-alleges each of the foregoing paragraphs.

165.    For purposes of New York Human Rights Law, Plaintiff was a "consultant or providing services in the workplace pursuant to a contract" with New York Media. N.Y. Exec. L. § 296-d.

166.    For purposes of New York Human Rights Law, Bolonik's sexual harassment of Plaintiff constituted "harassment because of [his] sex." N.Y. Exec. L. § 296.

167.    New York Media knew or should have known that Bolonik was subjecting Plaintiff to sexual harassment.

168.   New York Media's failure to take appropriate corrective action constitutes "an unlawful discrimination" against Plaintiff. N.Y. Exec. L. § 296-d.

169.   As a result of this sexual harassment, Plaintiff suffered loss of income exceeding $75,000 as well as other economic and nonpecuniary losses.

## PRAYER FOR RELIEF

Plaintiff requests damages not less than $75,000 to be determined at trial, together with costs, interest, and such other relief as the Court finds just and proper.

Respectfully submitted,

Bruce Hay
1525 Massachusetts Ave.
Cambridge, MA 02138
(617) 496-8277
bruce.l.hay@icloud.com

Date:  July 21, 2020

Exhibit A



# The Most Gullible Man in Cambridge A Harvard Law professor who teaches a class on judgment wouldn't seem like an obvious mark, would he?

By Kera Bolonik

Bruce Hay outside his home in Cambridge. Photo: Jeff Brown for New York Magazine

I t was just supposed to have been a quick Saturday-morning errand to buy picture hooks. On March 7, 2015, Harvard Law professor Bruce Hay, then 52, was in Tags Hardware in Cambridge, Massachusetts, near his home, when a young woman with long reddish-brown hair approached him to ask where she could find batteries. It was still very much winter, and, once the woman got his attention, he saw that underneath her dark woolen coat and perfectly tied scarf she was wearing a dress and a chic pair of boots — hardly typical weekend-errand attire in the New England college town. When he directed her to another part of the store, she changed the subject. "By the way, you're very attractive," he remembers her saying.

"Sorry, I'm married," he responded impulsively. It wasn't exactly true — Hay has been legally divorced since 1999, but he lives with his ex-wife, Jennifer Zacks, an assistant U.S. Attorney in Boston, and their two young children. The woman quickly apologized, Hay recalls. "I didn't mean to bother you," she said. "I'm just here on business for a few days. I don't really know anybody."

Hay, a Francophile, noticed the woman had a French-sounding accent, and he asked if she spoke the language. She told him her name was Maria-Pia Shuman, that she was born in France but her father was the American songwriter Mort Shuman, and that she was in town from Paris, en route to New York.

Shuman gave Hay her email address. The professor wasn't accustomed to picking up women in random places, let alone getting picked up by them; he was intrigued. Since moving back in with his ex-wife in 2004, he says, their relationship had been mostly platonic, and the two had an understanding that if either of them wanted to see other people, they'd have to move out. But casual flings, he believed, fell under a tacit don't-ask-don't-tell policy.

By email, Hay and Shuman arranged to have coffee that afternoon, where they bonded over losing parents too young: His mother had died from breast cancer when she was 54; her

father, whose prolific catalogue includes "Save the Last Dance" and "Viva Las Vegas," had died
from liver cancer in 1991, at 52, when Shuman was 8 years old.

She was now 32, an accountant with young children. Hay says she told him she had two
toddlers she was co-parenting with an ex-wife, who lived in London. *File under friendship*,
Hay thought. Shuman also told him about the friend she was staying with, Mischa Haider, a
brilliant trans woman pursuing a doctorate in physics at Harvard who was struggling with
crippling depression. Hay, who also battled depression, listened with particular interest.

*Get unlimited access to The Cut and everything else* New York.
**LEARN MORE ›**

After a couple of hours, Shuman said, "I've really enjoyed this, but I have to leave town in a
couple of days. I hope we can see each other before then." They went to dinner that night and
again the next. At the end of the second evening, Shuman asked him to join her for breakfast
the following morning. "I was smitten," Hay says. "I wasn't sure what the Maria-Pia thing was
going to be. That's the truthful answer, because one of the first things out of her mouth was
that she had just divorced a woman in England."

He didn't mind that a physical relationship was probably off the table — he was taking
antidepressants, which often hampered his ability to enjoy sex anyway. Then, on the day
Shuman told him she was leaving for New York on her way back to Europe, Hay says, she
invited him to her room at the Taj Hotel in Boston, started kissing him, and led him to her
bed.

Hay drove Shuman to the airport early that evening. For the next few weeks, as she traveled to
London and Paris, she called and texted him daily — 102 calls that month, according to phone
records. A few times, he asked if she would FaceTime or Skype with him, but she refused. He
found her resistance strange, but he didn't press the issue. By this point, she had begun
declaring her love for him. "She told me that she never got involved with men and I was this
big exception," he says. It seemed odd that she would express such feelings for him after only a
few days together, but while he dismissed her intensity as the folly of youth, there was a part of
him that entertained the possibility that she was serious. *Why not be open to it?* he wondered.
It had been years since he'd felt such a profound connection.

A few weeks later, she texted to say she was returning to Cambridge and wanted to see him.
They met the next day at the Sheraton Commander and had sex. Almost as soon as it was over,

Shuman's mood shifted. She became dour, then angry, telling him she couldn't abide his keeping their relationship a secret, nor what he says she referred to as his "continued attachment" to Zacks. She demanded he leave her. Hay was confounded. He wasn't about to leave his partner of 28 years for a woman he'd slept with twice. He got dressed and left.

Later that day, Shuman contacted him to say she was open to discussing pursuing a relationship. When Hay demurred, she told him, in that case, she didn't see any point in staying in touch.

But they would stay in touch. Over the next four years, the law professor would be drawn into a "campaign of fraud, extortion, and false accusations," as one of his lawyers would later say in legal proceedings. At one point, Hay's family would be left suddenly homeless. At another, owing to what his lawyer has described as the "weaponiz[ation] of the university's Title IX machinery against Hay," he would find himself indefinitely suspended from his job. He would accrue over $300,000 in legal bills with no end to the litigation in sight. "Maria-Pia and Mischa want money," Hay told me last summer, "but only for the sake of squeezing it out of people — it's the exertion of power."

W hether Shuman knew it when she met him, she'd found the perfect mark in Bruce Hay, an authority on civil procedure who'd spent much of his life in the ivory tower. A child of two esteemed professors who divorced when he was 5, Hay had earned his degree from Harvard Law School and, though he leans left politically, briefly clerked for Antonin Scalia. Hay joined the Harvard Law faculty in 1992; his former students describe him as a dynamic Socratic professor who commands a classroom but can nevertheless be painfully awkward in social situations. A close friend calls him the "quintessential absent-minded professor" who tends to lose things (phones, laptops) and to miss social cues.

Hay, who is compact and wiry and bears a passing resemblance to George Stephanopoulos, has a tight-knit circle of friends, many of whom are women, and though their relationships are nonsexual, the intensity, he tells me, has been a continual source of conflict with Zacks. "Jennifer says my women friends always have ulterior motives, and my response has been that my best friends have been women for my entire adult life," he says.

He and Zacks first met at Harvard Law in 1987. They married two years later and had a son before separating in the mid-'90s. After Hay moved back in, they had two more children

together. "Jennifer and I are the opposite — she's very skeptical. And I'm very gullible," he says. When we met for pizza at his Sunday-night hangout one evening, he wondered aloud whether he might be "on the spectrum."

That could help explain why warning signs that might have been obvious to many managed to elude a man who teaches a Harvard Law class on "Judgment and Decision-Making," which analyzes those elements of human nature that allow us to delude ourselves and make terrible decisions. "Of course, now I feel slightly ridiculous teaching it," Hay told me, "given how easily I let myself be taken advantage of."



Haider and Maria-Pia Shuman, photographed by Hay in 2017. Photo: Courtesy of Bruce Hay.

Six weeks after they broke off contact, Shuman called Hay to tell him she was pregnant with his baby. She hadn't had sex with another man in the past year, she said. Hay was stunned; he hadn't ejaculated during either of their encounters, a side effect of his medication. But he understood that pregnancy was possible, if rare, without orgasm. Shuman said she was weighing whether to terminate the pregnancy, then quickly followed up by saying she'd made the decision to carry to term — she was due in January.

Hay says she didn't bring up money, which didn't surprise him because she'd told him she owned two properties in Paris that were worth millions, and later she would tell him that her share of the Mort Shuman Songs partnership was worth some $25 million. He was more surprised when he learned that Shuman would be relocating to Cambridge that summer. She told him in June that she had purchased a three-bedroom mansard Victorian, now valued at $1.9 million, on a small side street in the Radcliffe neighborhood less than a half-mile from his house, and had brought her children over from London. She wouldn't be able to move in until October, so she and her kids would be staying in an apartment she owned on Massachusetts Avenue, where her graduate-student friend Haider had been living with her longtime boyfriend, Andrew Klein, who was moving out.

"Maria-Pia made it sound as though she had scarcely ever been to Cambridge," he says. "She said she didn't know the area very well and didn't really know anyone." Shuman explained that she'd purchased the apartment as an investment and as a place for Haider to live while she finished her graduate work. She and Haider, she told Hay, had been best friends since they met as physics students their first year at Imperial College in London. In a later conversation that summer, Shuman revealed that she and Haider were raising the children together.

The unfolding revelations did little to put off Hay, who says he was determined to "take full responsibility for my actions." Throughout the summer of 2015, Hay says, he and Shuman got together once or twice a week for coffee or a meal and discussed rekindling their romance. But she told him it was contingent on his telling Zacks about their affair and the baby, which he wasn't yet willing to do.

They hadn't been sexually involved since their encounter at the Sheraton Commander in April, but Shuman could be effusive, telling him repeatedly how much she loved him. Other times, their exchanges were tense. In one email, Shuman chastised him for not making himself available to see her. "I made arrangements with my nanny at the last minute to help with the children so I could come see you, and then called you several times in your office with no response," she wrote. "You should be the one providing support to me, not mistreating me and piling further stress onto me. Today was the last time that I am going to pander to your tantrums."

Haider often loomed large in their conversations. Even as Shuman demanded more of Hay's time, she was cagey about letting Hay meet the woman she called her "soul sister." When Hay asked about her, he says, Shuman responded that Haider was depressed and wasn't up for

meeting new people. Two months before the baby was due, Shuman finally arranged for Hay and Haider to meet at a diner in Watertown.

Shuman had told him that Haider was weary of her physics program and wanted to get more involved in trans activism and write about trans issues. "I thought, *Maybe I could help?*," recalls Hay. "She had been described to me as this very exceptional person but downtrodden, treated unfairly by her family and by the world. By her body. By the time I met Mischa, I had a protective feeling for her."

Their bond appeared instantaneous. "We had similar political views," he says. "She told me a lot about the trans world. I had known nothing about it." Soon they were getting together almost daily, talking for hours, sometimes meeting at a coffee shop near Harvard called Darwin's. Haider regularly texted and emailed Hay articles and statistics about trans women being brutalized and murdered by men. Her communications were often punctuated with a kind of fixated anxiety about, if not expectation of, being ridiculed, persecuted, and traumatized for being trans — a rational terror, to be sure. In 2015, according to the Human Rights Campaign, at least 21 trans people were killed in the U.S., then the biggest number to date, a rate that has since climbed.

Hay believed he'd identified a kindred spirit in Haider, so he was sensitive to her emotional state. They confided in each other about their depression and suicidal thoughts. Hay had been molested as a teenager, and he told Haider about the experience and the lingering trauma from it. Hay also struggled with drinking. He insists his friendship with Haider was more familial than romantic: "It wasn't uncommon for us to say 'I love you' in texts. I just offered Mischa as much support as I could."

A month after their first coffee, Haider texted Hay to say, "I am so happy we met, you're wonderful and stimulating company, I understand why MP is crazy about you." Behind his back, though, the women mocked Hay. In a text message to Haider that they provided, Shuman refers to him as "Fucking desperado." By then, Hay rarely saw Shuman anymore. Still, they began discussing the possibility of Hay moving in with them. They would be a family, she said: Hay, Shuman, Haider, and their children, including the new baby.

Hay's relationship with the women could be intoxicating. Even in an international, liberal college town like Cambridge, Hay had never encountered anyone like them, "nearly perfect people" who were "bright and kind and sweet to their children and socially conscious," and whose family composed a striking, distinctly modern portrait: Haider, a loquacious,

impassioned Indian-Pakistani trans woman physicist, the mother of two children (who call her "Maman") birthed by the sultry, soft-spoken French daughter of a major Jewish American songwriter (she's called "Sumi"). (Haider's boyfriend Klein, Hay later discovered, also helped raise the children, who refer to him as "Daddy.")

Hay wanted both families to meet, certain that they could find a way to make peace. "I had this crazy idea that everyone could get along, that Jennifer would like them," he says. He wouldn't sacrifice his existing family, but he didn't want to abandon the family he believed he was building with the women.

In the weeks leading up to the January due date, Hay used his publishing connections to help Haider pursue her writing. They began collaborating on projects. "I felt duty-bound to help this brilliant person blossom," Hay says. Haider asked him to share a byline, but he usually served as more of an editor and agent, reaching out to magazine editors to help place their work, including an op-ed for Huffington Post on anti-discrimination bathroom bills and another for *The Guardian* on the need to block Judge Neil Gorsuch's nomination to the Supreme Court. When Shuman was too pregnant to travel, Hay accompanied Haider to Phoenix to consult with a doctor about scheduling gender-affirmation surgery in the spring. Conveniently, he didn't have to mention the trip to Zacks. She and the kids had decamped to Paris, where he would be joining them in late January for a semester-long sabbatical.

On January 14, 2016, Haider called Hay to tell him Shuman had given birth to a baby boy. Hay had asked to be present for the baby's birth, but Shuman refused. "Her line was consistently, even before his birth, 'I don't want the baby getting attached to you unless you've made a commitment to me. And I don't want him embroiled in that toxic mess you have made with Jennifer,' " he says.

Hay asked to meet the newborn before he departed for Europe, but again Shuman refused. The women also told Hay that because he'd failed to separate from Zacks, they had listed Haider's name, not his, as the other parent on the little boy's birth certificate. Hay was distraught, but he still held on to the idea that somehow both families would find a way to coalesce.

But while he was in Paris, the women's calls and texts intensified, taking on an increasingly combative tone. They berated him for "having fun with [his] family in Paris" while Shuman was suffering from postpartum depression. They complained that Haider had been left to care for both Shuman and the new baby, forcing her to postpone gender-affirmation surgery, which

was exacerbating her depression. At one point, Haider told Hay she was going to a euthanasia clinic in Zurich, before Hay talked her out of it.

Meanwhile, Zacks had become suspicious about the nature of Hay's relationship with his new friends. While they were in Paris, she could no longer ignore how consumed he was by the women. "There was anger and crying when I spent hours on the phone with them," he says. "She thought I was being lured away and that everything was falling apart." He finally told her he'd been involved with Shuman. Zacks took it as an enormous betrayal. She declined to speak on the record, but as far as she was concerned, there was no don't-ask-don't-tell arrangement. He had cheated on her, physically and emotionally. In June, he told her he couldn't break things off with them because the child was his. "Her immediate reaction was: 'How do you know?' " he says. "She raised points that were tactical on her part. I thought that this was her mental strategy for splitting [Mischa, Maria-Pia, and me] up. I just thought she was deceiving herself."

Zacks told Hay it was highly unlikely that he could have gotten Shuman pregnant without ejaculating. (According to a study by Human Fertility, pre-ejaculate can contain enough residual motile sperm from a previous ejaculation to make its way to an egg, but it's extremely rare.) "Jennifer suggested I was ignoring the evidence because I wanted to believe the child was mine," Hay says. "Perhaps she was right."

Zacks pushed Hay to ask for a paternity test, but Hay wouldn't have it. Not only did he trust Shuman, he felt it would have been insulting for a heterosexual cisgender man to question a professed lesbian as to whether she'd had sex with other men. He believed her when she said her sexual relationship with him was an exception.

Hay met the baby for the first time soon after he got back from Paris that June. "I never doubted he was my son," he says. In the months after, he'd visit the women's house every few weeks to see their son. "They didn't let me take the baby out or to my own home, but it's not like I pressured them," he says. "I just felt it wasn't worth fighting over. I certainly wasn't going to take them to court."

The same month, Shuman told him she was being treated for a recurrence of cancer. (Hay says she told him her first bout had followed the birth of her eldest child.) As with the paternity claims, Zacks found Shuman's cancer diagnosis "fishy," according to Hay. "She was like, 'What

treatment is she getting?' I would describe it, and she'd say, 'They'd be treating it much more aggressively.' I'd get mad at her: 'How dare you question these people who are suffering?' "

Still, Hay began to entertain doubts about the women. Their mood swings could be hard to take. Haider attributed the cancer to hormonal changes from the pregnancy, telling Hay it was his fault and that he'd ruined their lives by bringing an unplanned child into the world. When they fought, Shuman would threaten to cut off contact between Hay and the baby. "I was very upset with how brutally they were treating me," he says. "I didn't know what to do. I told Jennifer I felt responsible for these people, that they needed me." Zacks recognized how spellbound he'd become and how vulnerable that made him. By the time she and the children returned to Cambridge that July, the crying had stopped and concern for her partner and family took over.

Throughout the summer and fall, the women suggested Hay financially "disentangle" from Zacks, proposing he sell his house or ask Zacks to buy him out so he could invest in the women's house. ("Shuman and Mischa were always saying 'disentangle' — it was like a mantra," says Hay.) At one point, Haider and Hay went to a bank to see what kind of home-equity loan he could get.

By October, even as Hay continued to meet with Haider almost daily to talk about her writing, the texts from both women had become increasingly hostile. They told Hay that his failure to leave Zacks was tantamount to torture and attacked him for, in Shuman's words, "exploiting and manipulating" Haider. "She feels there should be criminal legal and administrative consequences for your behavior," wrote Shuman. They began threatening to report him to the police and the university for "raping" Shuman. On the afternoon of October 26, Haider texted, "I'm going now with pitou [Shuman's nickname] to file a complaint at Harvard. I'm going to add that you just now attempted to extort her for 1 million dollars. If you make any further threats to 'destroy me' I will share those with the administration as well. You calling me and hanging up also constitutes harassment."

Hay replied, "Headed to Darwins" — the coffee shop.

By that time, Haider had already sent an email to Harvard student services offering to report an unnamed professor for harassment. She continued sending emails to Harvard administrators throughout the fall, often bcc-ing Hay. In one, dated November 11, 2016, to the program officer of Title IX and professional conduct, she wrote, "I have been in an extremely abusive situation with a faculty member and it has been taking a tremendous toll on me. I'm

Case 1:20-cv-06135-UA   Document 1   Filed 08/05/20   Page 61 of 125

sorry I have not reached out earlier but coming to this decision was difficult and painful. My functioning on many levels has gone to zero, my interest in anything has vanished, I'm transgender and it has taken a horrific toll on my transition." Hay shrugged off the emails as a manifestation of Haider's illness. He didn't think she would go so far as to file an actual complaint against him.



Bruce Hay outside his home in Cambridge.
Photo: Jeff Brown for New York Magazine

W hen the women couldn't reach Hay on his cell phone, they would often call his landline repeatedly and send texts demanding he "Pick up the phone!" Sometimes they would call Zacks — and even once called their oldest son — to try to track Hay down.

In early December 2016, Haider and Shuman tried to reach Hay on his landline and discovered Zacks had blocked their number. They left a message on his cell: Tell Jennifer to unblock us or we're coming over. When he didn't respond, they showed up at his house and had their first face-to-face encounter with Zacks while Hay's oldest son filmed the incident on his iPhone. It was night and the video is dark, but you can hear Haider shout at Zacks in a harsh staccato: "It is not our fault that Bruce got her pregnant! Do you understand that?" as Hay's younger children cry in the background. Shuman berates Hay for "yelling at us" instead of at his older son, whom they order to stop filming. Hay then moves toward his son as if to block the camera, and you can hear Hay sigh. "Listen, they aren't well," Hay tells him. The confrontation ends when the police arrive; no charges were filed.

The women returned to the house again just before Christmas. Zacks again called the cops. The next day, the women sent texts to Hay calling him a "rapist" who needed to be reported to authorities. He started receiving texts from an unknown number: "You will not get away with rape." Once more, he was able to calm them down, and they reconciled long enough to spend Christmas together at Shuman and Haider's house.

After her confrontation with the women, Zacks realized she had to be more active in protecting herself and her children — especially after Hay told her about Shuman and Haider's various proposals for selling their home and Zacks found on his desk an application for a $500,000 home-equity loan. The day after Christmas 2016, she and Hay signed an agreement to take his name off the title.

The Christmas détente was short-lived. "I think you should tell the dean how you have raped women, how you have sexually abused them, and that now you will be held accountable," Shuman wrote in February. "I'm going to write her and detail the abuse you have done, and explain how if they have any decency they will fire you." The fighting was punctuated by occasional in-person meetings among the three, purportedly to figure out a harmonious path forward. During one of these periods, in April 2017, they agreed that Haider, Shuman, Haider's boyfriend Klein, and the kids would stay with Hay in July while Zacks was away in Spain with his other children. The women were planning to sell their house and buy a bigger place in Cambridge (though, at other times, they discussed moving to Europe to flee Trump's

America). Hay asked only that they not tell Zacks. He went house hunting with Haider in May and June and helped them make arrangements to have their stuff moved into storage in July.

At the beginning of July, just before their stay at the Hay household, he says Shuman and Haider invited him to Paris over Bastille Day weekend — and gave him a check for $3,000, claiming it was for expenses. Shuman told him she had another surprise for him, but she needed his computer password. He complied; he'd given Shuman the password to his devices and accounts before. (Shuman denies ever having his passwords.) At the last minute, Haider and Shuman opted for a long weekend in Quebec instead.

Acting on what he says were Shuman's requests, Hay booked a moving truck, putting the $200 deposit on his university credit card, and rented a series of storage units. He says Shuman claimed it was necessary for insurance purposes that he sign the paperwork, even though the units were not for his belongings. He deferred to her authority; as an accountant, she was business-minded, he reasoned. He signed without reading them. (Shuman says Hay did this all on his own initiative; she denies giving him instructions.)

He desperately wanted to appease both families — Shuman and Haider on one side, and Zacks and their children on the other. Less than a day after the three arrived in Quebec, Shuman disappeared. She'd mentioned earlier that she might see a specialist in Montreal — but Hay says she had his laptop. He remembers Haider telling him not to worry; she'd rejoin them soon.

It was Hay's neighbors who tipped off Zacks with the first clue to Shuman's "surprise." "Gosh," one emailed the couple, "I hope those moving trucks don't mean you're leaving us?" Zacks was freaked out, but Hay assured her the women were just using the driveway as a "staging area" for transferring the women's things to storage.

But when Hay and the women returned to Cambridge two days later, Hay and Zacks's beautiful Italianate home on a quiet corner of Mount Vernon Street had been emptied of his family's furniture, cookware, toys, documents, books, Zacks's mother's and grandmother's heirlooms — and everything replaced with the women's furniture. When Shuman had gone MIA in Quebec, Hay believes, she wasn't seeing a doctor. She'd been overseeing the complicated move, all $10,000 of which had been charged to Hay's credit card.

The next day, Hay called the Cambridge police. When the officer accompanied him to his house, the women came to the door — his door — and furnished a lease renting them the $3.2

million home for two years for $1,500 a month. He says Shuman had used his laptop while they were in Quebec to send an email to her lawyer from his Harvard account, in which he purportedly said the "lease" "looks good." Then they produced a copy of the $3,000 check they'd made out to Hay before the Quebec trip. See, we paid a security deposit, they said.

Shuman also told the officer that she'd thrown Hay out of the house the night before for unwanted sexual advances. The officer saw no reason to believe Hay's story over hers. Hay tried to appeal to the women to leave and de-escalate the situation before Zacks returned. On July 24, Haider texted Hay to say, "All this is difficult, but we love you."

Zacks, for her part, didn't waste time when she returned to the U.S. She immediately hired a lawyer to serve Shuman, Haider, and Klein with a notice of trespass. The Hay family moved into an apartment while they began court proceedings to evict Shuman and Haider — and Klein and the kids — who meanwhile continued to hound Hay. "You took ALL my love for you, and TRASHED it," Shuman texted. "You are pathologically involved in a toxic mess with Jennifer."

At a hearing on August 16 in Cambridge District Court, after Haider and Shuman claimed, among other things, that Zacks had personally agreed to the lease and had confided to them that she planned to move to Providence, Rhode Island, the judge overseeing the case issued a preliminary injunction ordering Shuman and Haider to move out of the Mount Vernon Street house by that Saturday.

More than two months passed before the women and their family finally cleared out and Zacks and Hay could move back into their home. Due to how things had gotten unsettled during the move, Zacks still can't find her grandmother's needlepoint chair covers, or her engagement ring, which had belonged to Hay's mother and grandmother before her, or her own mother's ring. The house-napping was a deep violation. Two years later, the two younger kids, now 9 and 10, still ask whether the women will return to take over their home.

But the house incident would turn out to be only phase one. In spring 2018, the women filed restraining orders against Hay (ultimately denied) and sued him for defrauding them into leasing a house that wasn't his to lease. On April 8, he says, they rammed his car outside a restaurant with a Zipcar they had rented (the women claimed it was the other way around; the police declined to charge anyone, and there were no witnesses). And Haider made good on her earlier threat: In May 2018, she filed a formal Title IX complaint against Hay for sexual harassment.

Two days after the alleged car collision, Hay hired a civil-defense lawyer named Douglas Brooks. By what Hay insists was sheer coincidence, Brooks turned out to be very familiar with Shuman. Another client of his, a prospective graduate student, referred to as "Richard Roe" in an affidavit Brooks had filed on his behalf, was also alleged to be the father of Shuman's baby boy born in January 2016.

Shuman had approached Roe on the street in Cambridge in May 2015 and invited him back to a nearby bed-and-breakfast. They had a brief sexual encounter in which he wore a condom and did not ejaculate. The next time they spoke, on June 12, she told him she thought she might be pregnant — confirming it three days later — and texted, "My wife is furious." Roe found her claims implausible, and when he requested proof, she balked. "It had to have been with you," she texted. "There is absolutely no reason I would have for supposedly making this up." Shuman told him she was expecting in February. "If I end up giving birth," she texted, "my attorney will contact yours to inform you of what decision has been taken, and what responsibilities you have in the matter." Through Brooks, Roe requested that Shuman submit to a paternity test. She refused, but after the two parties entered negotiations to drop the matter, she stopped contacting him.

Roe had also hired a private investigator to find out more about Shuman. The investigator found another similar case: In October 2009, Shuman had picked up a Harvard medical student, referred to in a court-case transcript as "John Poe," and later confronted him with a paternity claim. During a restraining-order hearing she was pursuing against Poe, she alleged that he was not only the father of the oldest of her three children (following their single sexual encounter, in which he had worn a condom) but that he had raped her and said he was going to kill her. The request for the restraining order appeared to be retaliatory; Poe, who suffers from severe anxiety disorders, was himself pursuing a restraining order against a woman named Jacqueline Lescarret, who, allegedly at Shuman's behest, had been terrorizing him for years. The outlines of that case are eerily similar to Hay's: Lescarret threatened to expose Poe to the university and his family as the father of the child, and she and Shuman extorted from him $11,000 as well as favors — among them, befriending Haider and offering her weight-loss training in preparation for her transition. A private investigator hired by Roe's lawyer found no records of Lescarret's existence.

In the hearing, Poe described his friendship with Haider as initially being motivated by pity. "I generally felt sorry for her, like I could see the pain she was going through." As with Hay, they bonded over their mental-health issues, only to have the women turn his illness against him.

Oddly, one key fact eluded the attention of everyone in the court: Shuman's first child's birthday is December 10, 2011—two years after their encounter.

Hay would soon find yet another case involving Shuman. On the morning of March 13, 2015, when she told Hay she was texting and calling from Europe, she was picking up a young, lanky, blue-eyed CPA on Boylston Street in Boston's Back Bay, who would go by "John Doe" in court papers.

This past fall, I met Doe, who told me Shuman appeared out of nowhere at an intersection where he was standing with two colleagues and started chatting him up in what he described as hushed tones. He recalled her saying, "Excuse me, but I couldn't help but notice that you're attractive. I'm in town from New York, visiting a friend, and I was hoping you'd be willing to show me around." He gave her his cell number.

They met the following night at the Taj Hotel bar — the same place she'd had an encounter with Hay. Shuman arrived with a friend, Haider. According to Doe, the two women ordered virgin Bloody Marys ("I should have gotten up and left right then," Doe now says) and interrogated him about where he had gone to school and what he did for a living. He assumed he was being vetted "to make sure I was safe, an on-the-level member of society. I had the feeling that they were sharing an inside joke or a secret." In retrospect, he says it struck him more like an interview with a potential sperm donor. After Haider left, Shuman took Doe to her room, where, he says, she became sexually assertive, even aggressive.

Two months later, in mid-May, Shuman reached out to Doe to say she was back in Boston and wanted to get together. She asked him to meet at a Massachusetts Avenue apartment in Cambridge. When he arrived, she answered the door naked and positioned him on the couch. Again they had sex. After that, they didn't speak until June, when she informed him she was pregnant with his baby. Doe suggested a paternity test after the baby was born. Later he indicated that he wanted to co-parent the child; Shuman demanded he back off. "She launched into this tirade of 'We are feminists and hate men, and we aren't going to allow men into our child's life.' It was horrible," he told me, tearing up at the memory. Doe still thought they could work something out, but Shuman demanded he relinquish his parental rights. By July, she'd stopped responding to him, which is when he hired a lawyer.

Soon after his lawyer, Howard Cooper, took steps to pursue legal action against Shuman, she claimed to have received a menacing letter with a thumb-drive video that depicted her and Doe having sex at the apartment. Doe recalls that the note said "something to the effect of

'Better not tell your side of the story, or you don't know what's going to happen.' " Cooper believed the women were suggesting that if Doe were to pursue legal action, the video would be weaponized to imply that Doe had violated Shuman's privacy by secretly filming her — which is against Massachusetts law. Finally, on April 8, 2016, Shuman capitulated to the paternity tests. The results revealed that Doe was not a biological match.

Last year, Doe filed suit against Shuman and Haider for "intentional infliction of emotional distress" and invasion of privacy. He asked for unspecified damages and to have the sex tape destroyed. In June, the Superior Court of Massachusetts denied Haider and Shuman's requests to dismiss the complaint against them. The women have yet to appear for their scheduled depositions.

L ast June, Hay reached out to local law enforcement, who told him it would be difficult to prove the women had committed a crime. Soon after, he contacted me through Facebook to ask if I would be interested in writing a story. (We grew up in the same Chicago suburb, but he was eight years older and we never knew each other.) When I met him, he was tightly wound and pensive. His deep-set eyes couldn't quite find a comfortable place to land. As he recounted the convoluted events of the past four years, his tone would shift from indignant to wistful, bewildered to humiliated and then grief-stricken. He didn't seem to know whether to feel redeemed by the fact that he wasn't the only person duped, or overwhelmed by the extent of the deception. Yet there were moments when he still sought ways to justify, or at least make sense of, Shuman and Haider's campaign against him, searching in earnest for evidence of genuine affection amid the years of deceit.

Hay had been keeping the university apprised of Shuman and Haider's actions, but Harvard's regulations governing Title IX investigations mean that Hay is still barred from teaching until investigators issue their findings. In the past few years, Harvard has made efforts to take claims of sexual misconduct against professors more seriously. The university recently stripped retired vice-provost and noted Cuban scholar Jorge Domínguez of faculty privileges after confronting four decades' worth of sexual-misconduct allegations. More recently, Harvard suspended economist Roland Fryer for allegations of sexual harassment.

Harvard has yet to decide Hay's fate, but according to multiple off-the-record sources, Hay has already run afoul of investigators for reaching out to journalists (namely me), which they view

as an act of retaliation. Harvard has also required Hay to undergo "coaching" for boundary issues.

"I don't blame Harvard for initially taking the side of the women," Hay says, "but after presenting them with all this evidence — these people aren't who they say they are." The women declined to speak on the record for this story, but, through their lawyer, they denied most of Hay's account, calling it "a fantastical tale that conjures stereotypes and nativist tropes to exact revenge against Mischa Haider for filing a Title IX complaint against him."

Both sides have now filed suit against each other. In their complaint against him, Shuman and Haider claim he sexually assaulted Shuman and groped Haider and ejaculated on her while she slept, all of which he denies. After Hay filed his suit against them for the years of harassment, he finally asked for a paternity test. So far, they've refused. He hasn't seen the baby since 2017, when the child was a year and a half old.

Hay remains mystified about what the women really wanted from him.
Money appears to be a factor but not necessarily the only one — after all, theirs was a long, expensive, and punitive game with no guarantee of a big payoff. Hay says Shuman once told him they'd targeted him for signing an open letter in late 2014 calling for more due process in Harvard's Title IX proceedings. (Shuman denies ever saying this.) "I don't know if that's the real reason or something she made up later," says Hay. In May 2018, Hay received a barrage of text messages from an unknown number: "Find a way to connect if you want a chance to take the last exit before HELL ... Take my word, you ain't seen nothing yet. I promise. Oh and as to your quest for motives? Don't bother. I just really hate the patriarchy, that's it."

*This article appears in the July 22, 2019, issue of* New York *Magazine.* **Subscribe Now!**

RELATED

> The Harvard Professor Scam Gets Even Weirder: A Follow-up

TAGS: HARVARD   POWER   CRIME   NEW YORK MAGAZINE   MORE

🗨 **264 COMMENTS**

STYLE · SELF ⋮ CULTURE    POWER ⊜

SCAMS | AUG. 8, 2019

# The Harvard Professor Scam Gets Even Weirder Six other men describe their encounters with the same mysterious Frenchwoman.

By Kera Bolonik



Bruce Hay outside his home in Cambridge. Photo: Jeff Brown for New York Magazine

wo weeks ago, *New York* readers were introduced to Bruce Hay, the Harvard Law School professor who had a brief affair with a young woman named Maria-Pia Shuman and suddenly found himself drawn into a combative relationship with her and her wife, a trans graduate student named Mischa Haider, that would unravel his life, leaving him indefinitely suspended from his tenured teaching job, temporarily homeless, and with mounting legal bills that eventually exceeded $300,000. Since the publication of "The Most Gullible Man in Cambridge" on July 22, six other men have come forward with accounts of Shuman's attempting to pick them up, including one who says that, as with Hay, she told him she was pregnant with his child.

In one incident, a man named Aaron Holman was moving into a new apartment on Merrill Street, near Harvard Square, on a sweltering afternoon in September 2012, when, he believes, Shuman approached him and his friend *Matt. He and Matt recall seeing a woman who resembles Mischa Haider sitting in the driver's seat of a black car across the street. Holman says Shuman came up to him and Matt and said, "You guys are so sweaty, I like seeing you like this — let's go upstairs." Matt tells me, "It was really over the top." Holman says he and Matt were dumbfounded and tried to brush her off but that she continued to talk with them until she gave up, finally returning to the black car — where she sat in the backseat and the two women watched them until Holman called out to his neighbor, a Boston cop ("Straight out of central casting," says Matt), who was just getting home. "But the second he turned around to check them out," says Matt, "the women took off."

Two months later, in December 2012, Steve* met Shuman in a Starbucks in Harvard Square. She approached him, as she had Hay, and as she had two other men she'd picked up in Boston and Cambridge, John Doe and Richard Roe from our original story — stopping them on the street and saying, in a hushed tone, "Excuse me, you're very attractive." Steve says he gave Shuman his number after a brief chat and made a lunch plan, via text, a week later. But just before they were to meet, he says, she called to say there had been a change of plans. She told him a relative was making a surprise visit — Steve can't recall whether it was a parent or a grandparent, but he remembers Shuman explaining that the relative was not aware that she'd had a child with a trans person. In an email to me, he explains that Shuman wanted him to come over and pretend to be the child's father "for the benefit of the visiting relative." Steve declined and says he never saw her in person again, but the conversation didn't end there. He provided some text exchanges he'd had with Shuman: "I understand u didn't want to do this, but I feel it's unfair of u to act as if I asked some outrageous thing," she texted. "Well honestly it did seem a bit outrageous to me. I know it must be a difficult situation for you bit it didn't

Case 1:20-cv-06135-UA   Document 1   Filed 08/05/20   Page 72 of 125

seem my place to get involved," responded Steve. Shuman suggested, "Then you politely decline, and express some understanding and sympathy. A simple polite comment would be, 'I'm sorry but I don't feel comfortable doing that. I understand it's a tough situation and I hope you find a way to handle it.'" After three months of silence, Steve received a text from Shuman, dated March 2, 2013, that read, "Are you down to fuck"; when he didn't respond, she followed up two days later: "Lets hang out this week?" He ignored that text, too — he says he found the whole encounter odd. When he read the story in *New York*, he wrote in an email, "Within the opening paragraphs, I was already about 90 percent certain that I had met Maria-Pia several years ago. I typed the name into my phone. Right there, under the name 'Maria S,' were all the old texts." (The number corresponds with one Shuman has used to correspond with Hay.)

On Friday, April 17, 2015, a third-year Harvard Law School student named Jordan, who asked that we not use his last name, was walking down Massachusetts Avenue near the law school's Wasserstein Hall late in the afternoon. (Shuman's apartment was across the street from HLS.) Jordan says he was bound for the T to Boston to meet up with friends and see comedian Hannibal Buress perform when Shuman's delivery of the "attractive" line caught him off guard. He said, "Thank you, I have a girlfriend" — which was true — and continued walking, only to find that she was following him, wanting to continue the conversation. She said, "I'm attached, too. Here's my number if you change your mind." She said she was only going to be in town for a few weeks, if he wanted to get together — no strings attached. Jordan brushed her off with another polite thank-you and continued on, even as she asked if he had somewhere to be. He says he was surprised by her persistence and told her, "Yes, I do," and headed for the train. When he got to Boston, he immediately called a friend about the encounter. The friend confirmed their conversation to me via email, recalling it because it was so strange and, in part, because she was French and the friend and Jordan have a passion for Richard Linklater's films about an American man's longtime love affair with a Frenchwoman.

*Get unlimited access to The Cut and everything else* New York.
**LEARN MORE ·**

David*, who asked that we use a pseudonym because of his job, said he encountered Shuman in the spring of 2015 on Boylston Street in Boston following a night with friends at a bar called Whiskey's. At around 2 a.m., as he was returning to his South End apartment with his roommate and another friend, Shuman approached him and, in an encounter that echoes John Doe's, spoke to David in hushed tones to tell him how attractive he was, that she was

visiting from Paris for a few days and would love to see him before she left. They exchanged numbers and started texting that night. "I don't remember exactly what we said in the texts, but I think we were making plans to meet up the next night," says David, who says he lost the texts when he got a new phone. "She told me she was staying at a hotel. My friends and I were talking about how shocking and weird the whole encounter was. There was none of the standard-protocol flirtation leading up to an exchange of numbers; it was short and direct." As David and his friends were talking about the encounter, another friend, Carl*, arrived, and upon hearing the story, he "looked stunned. Because the exact same thing had happened to him" that same week," says David. "He thought that we were playing a prank on him."

Carl says that one evening around six, as he was returning from his office, a woman approached him on the corner of Charles and Revere Streets in Beacon Hill and delivered the same pickup line. "This was the same backstory that David heard," says Carl, "which helped us confirm it was the same woman." And then, David says, "we took a deep breath, and I read her phone number out loud. The four of us in the room all went CRAZY when the numbers matched. It was the same girl." Another of David and Carl's friends decided to call her right then, pretending to be David, and spoke with Shuman, initially flirtatiously, and then changed tactics, interrogating her, asking her where she was staying, where she was from, what she wanted from them: "Finally, he fully called her out: 'We know you're lying, you approached my friend on Charles Street a few days ago — was your plan to rob us?' She started to yell, and we hung up." David says that moments later, he received a Facebook request from Shuman (David shared a screenshot of the Facebook request) — which rattled him because he'd never told her his first or last name. Then his phone rang, and he heard a different, deeper voice on the other end, which he now suspects might have been Haider. "[The person] knew my full name and where I worked. And she was ANGRY. Screamed at me for being a misogynistic pig and threatened to call my workplace. I put the phone on speaker so my friends could hear, and they got involved as well, yelling back that they were con artists. Shuman was in the background on the other end, yelling as well. They were mostly going on about how me and my friends were pieces-of-shit men. I threatened to contact the police if they kept harassing me in any way and hung up," recalls David. Carl adds that the women left between 20 to 30 missed calls on both his and David's phones that night — until Carl blocked her number. David says, "I ignored them, and they eventually gave up."

In a story that hews most closely to that of Doe's and Hay's, Anthony*, a Harvard graduate student, was approached by Shuman in early May 2015 on Massachusetts Avenue near the law-school campus. She stuck to her script and invited him for coffee. Anthony told her he had

a girlfriend — which wasn't true, he says, but he wasn't interested. She countered that she had a wife and asked for his number. He obliged, thinking he could simply not answer if she contacted him. Later that day, she texted — and soon the tenor of their exchanges became sexual. He agreed to meet her at an apartment on Massachusetts Avenue — she said it belonged to a friend — where she appeared at the door in just "this little coat." They had sex, during which his condom broke, though he quickly replaced it.

A couple days before he was to travel for the summer, on June 7, she reached out to him saying she wanted to talk — he braced himself, remembering the broken condom. She told him by phone that she was pregnant, that it had to be his because "she didn't have sex with any other man," says Anthony. "She first said that she was thinking about whether to terminate it, that she has to tell her wife now, and it's going to be very difficult, that she is going to be furious and it's going to endanger their marriage. But then she called again a few days later to say that she would keep it," he says. He gave Shuman a fake email address, associated with a fake name and birth date, and a prepaid-cell-phone number to continue their correspondence, because he didn't want her to know his actual identity and he was suspicious of her story. He says, "I tried not to reveal any more personal details. She only knew where I went to school and my first name because I thought this was some sort of scam where she wants money." But when he returned home, he says, "I felt pretty bad about it because I was like, *Is that the kind of person I want to be? Botching responsibility and leaving this poor woman alone?*" That is, until her correspondence took on an increasingly angry, threatening tone, as she told him her lawyer had contacted Harvard, retrieved all of his personal information, and was now preparing documents to have him release his parental rights to the child. When he told her that he had no intention of staying connected to her or the baby and suggested that she not name him as the father on the birth certificate, she changed her approach, proposing that he stay in monthly contact with the child. He refused, then canceled his prepaid phone, telling her he was moving abroad and suggesting she contact him via email. He hasn't heard from her again, but he says he's nervous she'll find him and seek child support.

Late last week, a friend of Shuman's, who asked to remain anonymous, reached out to defuse some of the mystery of who she is. She says Shuman — who really is the daughter of Mort Shuman and his second wife, also named Maria-Pia Isabelle Shuman — grew up in the Chelsea section of London and lived there since she was around 4, so she was surprised to learn Shuman was using a French accent around Boston. "She speaks French, and was born in France, but she's British," she says. "Her accent is English." She says Shuman had a core group

of friends throughout her life, but once she and Mischa Haider became close during their final year at Imperial College, where they studied physics, she "ghosted" them.

"They had a very, very, very intense friendship — the kind of intense friendship you have when you're a teenager, when you're always talking. I remember around 2008, Mischa was in New York, I think, and [Shuman] would take calls [from Haider] at strange hours of the night, leave the apartment at 2 a.m. and talk and then come back, and we'd be like, 'Is everything okay?' And she'd be like, 'I can't tell you.'" When Haider moved to Cambridge, Massachusetts, to pursue her doctorate in applied physics at Harvard, Shuman, who has U.S. citizenship, followed her. "She went to visit Mischa," says the friend, "and basically never came back. She just came back to pick up some more clothes, and that was about it." The friend is also puzzled by the story Shuman told Hay about an ex-wife. "I don't know who that is. I've never known her to be a lesbian, and as far as any of her friends are aware, none of us know of any woman she was married to in London. I think it's complete nonsense."

In fact, the friend says, Shuman always had a serious boyfriend. But it wasn't until she met Haider that she became obsessed with men. "She changed when they became friends. I noticed in the last couple of years of knowing her that there was a serious preoccupation with men. I don't know why — she had nice boyfriends, long-term relationships, and she was now suddenly single and she was out there trying to meet up with a lot of guys, with a use-them-and-abuse-them kind of feel to it," says the friend. "She had never been like that before. I assumed it was like she was young, free, and single. She and Mischa were both very obsessed, something about going out and picking up men and finding hot men and wanting to hook up with men. It was just off." After reading the *New York* story, the friend was reminded of one of their last conversations. "I remember she said, 'I love corrupting these really Waspy Bostonian guys.' The impression I got was, if she picked up a guy, told him he was really hot, went back and slept with him and then discarded him, she felt like, 'I'm in control, I'm so powerful, I used him, I tossed him aside.' She liked the idea of corrupting what looked like these innocent, nice guys."

*Some names have been changed at the request of the subjects to protect their anonymity.*

RELATED

› **The Harvard Professor and the Paternity Trap**

TAGS: POWER  HARVARD  CRIME  BRUCE HAY  MORE

■ 28 COMMENTS

Exhibit B

Bruce L. Hay
1525 Massachusetts Ave.
Cambridge, MA 02138
bruce.l.hay@icloud.com
617.955.5955 (mobile)

June 8, 2020

David Korzenik
Miller Korzenik Sommers Rayman LLP
1501 Broadway #2015
New York, NY 10036

      **Re:**    **"The Most Gullible Man in Cambridge,"** *The Cut, July 2019*
             **"The Harvard Professor Scam Gets Even Weirder,"** *The Cut,* **August 2019**

### OFF RECORD
### NOT FOR PUBLICATION

Dear Mr. Korzenik:

They are "demonic."[1] They are "vampiric." They are "terrifying." They are "sharks out for blood" who "suss out people's vulnerabilities and seize upon them." The man who lives with them was "stripped of his autonomy and his personality." They are ruled by an "asshole trans cult leader." They cast "spells" on men.

There can be only one word for these satanic creatures, who make so many memorable appearances in your reporter's correspondence with me. They are witches. And we all know that in the pursuit and exposure of witches, the usual rules of procedure, evidence and proof — and simple human decency — do not apply.

This is why your reporter was at liberty to cast aside the conventions that govern investigative journalism. It is why she has asked sources to help her "bring the two to justice."[2] It is why she has cheered on the lawyers leading the legal attack against the women, has recruited clients for them, and has urged them to seek federal criminal charges. It is why she boasts of humiliating women who "think they're smarter than everyone." It is why she hurls slurs at a trans woman of color, and hopes to see her lose her children and sent to prison as a result of the

---

[1] Except where noted, all emails and text messages quoted in this letter were sent by Kera Bolonik to me. The quotations in this paragraph are taken, respectively, from her correspondence of 3/7/19 (email); 1/28/20 (text message); 9/14/19 (text message); 8/29/19 (text message); email 10/30/19.

[2] Email 8/9/18. All other examples in this paragraph are documented in part III below.

1

articles. It is why she has suggested getting Harvard to punish the women for criticizing her work and telling their side of the story to another journalist.

It is also why your reporter has exploited the unhinged bigotry that so many people direct at Mischa Haider for the crime of being a transgender woman of color. People who have wished to harm this woman for personal reasons have long understood the power they have to threaten her and endanger her — a brown trans woman of foreign ethnicity — at the hands of law enforcement. That has been her experience with her husband Andrew's estranged sister Margaret, who never forgave her for the inexcusable fact that Andrew fell in love with a transgender woman. Since the spring of 2019, your reporter has become Margaret's latest avenue for taking revenge against Mischa, and Margaret has become your reporter's principal source. As your reporter knows, this individual once reported to the FBI that Mischa was the mastermind behind the Boston Marathon bombing.

It is also why the articles conceals so much information from the reader about the women's supposed "trail of victims." The lead article does not disclose, for example, that Jay Scuteri — whom the article calls John Doe — has been credibly, and publicly, accused of raping one of the women. He is allowed to hide behind the cloak of anonymity and his accusations are presented as established fact; the women are named against their will, and their side of the story is not told at all despite its ready availability in public legal documents. The article conceals from the reader that the accounts of the other two purported victims — Poe and Roe — are unsourced and completely uncorroborated. Your reporter never spoke to these men or anyone connected to them and rely completely on what I myself had told her. It conceals the evidence demonstrating that the entire "extortion, fraud and false accusations" narrative is the fictional creation of lawyers seeking to intimidate and silence the women.

This is also why the articles' editors were willing to run pieces that, on such flimsy evidence, effectively convict two women of being serial predators. If this work had been about a *man* accused of serial wrongdoing, there can be no doubt that the editors would have insisted on far more direct sourcing, and would have examined it with a far more skeptical eye, before wrecking the subjects' lives with an inflammatory story like this one. But in the case of these strange, nonconforming women, there was no need to take such precautions — call it journalistic due process — before destroying their lives. Everything about them is sinister. Proof of their guilt is everywhere, even in tales of men's innocuous encounters with them on the street. For such encounters only *seem* innocuous; in truth, as the editors observed, they are "weird and fascinating," and the men in question "dodged a bullet."[3]

This is why the lead article's photos of the women, which I took in ordinary social settings, were cropped and photoshopped to resemble mug shots that look nothing like them, activating the dark prejudices on which the case against them really rests. Dehumanizing the women in this way was precisely the point. They are less than human.

---

[3] Email correspondence of Genevieve Smith and Ted Hart, forwarded to me in Bolonik email 7/25/19.

2

This is also why, as the editors told me, the garish cover photo was staged and designed to evoke "Hitchcock." The photo is an obvious allusion to *Psycho*, a movie set in a Victorian house nearly identical to mine, whose titular villain Norman Bates — in case you have forgotten — thinks he is a woman, and dons a dress before butchering his victims. Truthfully, I cannot imagine a better advertisement for these articles, which are after all little more than a horror movie featuring a villainous trans woman, depending for their effect on the same transphobic impulses so often exploited by the "slasher movie" genre that inspired them. Give the editors credit: they know their product.

This is also why my effort to call attention to all of this has met with a response that, in ordinary circumstances, would be considered outrageous treatment of a source. Upon receiving my April 23 letter challenging the accuracy of the articles and the conduct of the reporter, you immediately set about trying to frighten me into silence. You contacted my counsel in the civil litigation, making the false and defamatory accusation that I must be in the pay of (or under pressure from) the women, and threatened that *New York* would publish an article to that effect if I did not back off. You also contacted Jay Scuteri's counsel in the litigation, to say that I was "again" under the women's "spell."

*Again under their spell.*

When I followed up with a note objecting to these bullying tactics and seeking a written reply to my letter, you did write a reply — in which you attacked my "credibility" without explanation, threatened to publicize my off-record communications, and defended your reporter against my "attacks." You have not invited me to detail my concerns about the articles or to provide supporting evidence; to the contrary, you have gone to some lengths to discourage me from doing so. Perhaps that is because the people responsible for these articles — including those who vetted them for publication — would rather not know the details of what I have to say and the evidence I have to offer, and would rather no one else did as well.

These attempts to silence me are not going to work. More than once, your reporter has asked me, her source, to help her silence the women — proposing that Harvard's disciplinary machinery be deployed to punish them for the negative things they have said about her, and for their attempts to get their side of the story told by another journalist. I did not go along with those contemptible efforts to shut people up, and will not go along with yours. Quite the contrary. Your bullying only further convinces me of the need to dig further into the evidence revealing your reporter's misconduct and speak up about your magazine's immolation of a transgender woman of color and her family.

In the present letter I will discuss your own inappropriate and unprofessional response to the concerns I have raised; the way that transphobia, racism and misogyny have snowballed into the false narrative about the women that your articles represent; the myriad ways in which your reporter has violated ethical and professional standards of journalism; and finally the deeply false

3

portrayal of the women and the fictional "victim" narrative in your articles. In a subsequent letter, I will provide more detail in the ways in which the articles distorts my own story with the women and will provide documentation of your reporter's unprofessional and unethical conduct in reporting these pieces, contained in the hundreds of pages of my correspondence with her.[4] This material, which I am at work compiling, will surely be of interest to *New York*'s masthead, as well as to the magazine's parent company as they decide whether they want their brands associated with this journalistic witch trial.

The articles were right about exactly one thing: I am gullible. For the past two years, I put my trust in lawyers who I thought were representing my interests, and in your reporter, who I thought was in search of the truth about these women and my relationship with them. Having gradually gained distance from the lawyers and especially your reporter in the past six months, I have come to see how badly I have been deceived and exploited. The real story here is not the fictional tale in your articles, rather the real story is how this fictional tale came to be constructed about these women and published as fact in your magazine.

This story is not just about the injustice your magazine has inflicted on two people, it is a case study in some of the most pressing issues dominating the national conversation in this unprecedented moment. It is a story about the ways in which systemic racism, xenophobia, transphobia and misogyny are deployed to oppress and marginalize vulnerable people. It is a story about the pathologies afflicting law enforcement and our legal system that are weaponized against people of color and trans people. It is a story about the failure of journalism and the media to confront these issues openly and honestly and report them responsibly rather than treat them as occasions for creating salacious clickbait.

We watch in horror daily at white people who abuse law enforcement to scare and frighten people of color for "being in their way": for birdwatching, for dating a family member against their wishes, for being "uppity" and "difficult". Your magazine has long been known for exposing injustices of this nature and calling them by their true name. Yet with these articles, your magazine has enabled and participated in the very forms of injustice that it has been its mission to fight against. The magazine has deployed and fomented the bias and prejudice against those outside the norm, to destroy the life and family of a transgender mother of color whose only "crime" has been to upset cis white people. Especially ones who are wealthy and male.

## I. MY APPROACH, AND YOUR RESPONSE

In my April 23 letter and followup email of May 7, I stated that I could no longer stand by the account attributed to me in the lead article; that the articles were filled with misrepresentations and put Maria-Pia & Mischa in a profoundly false light; that the reporting of the story had been thoroughly unprofessional; and that the results were surely causing

---

[4] In the present letter I cite a small sample of the correspondence that will be attached to the subsequent letter.

devastating harm to the women and their loved ones. I made clear that the articles fall far short of the standard of any serious journalistic outfit, let alone a publication with the distinguished history and outstanding reputation that *New York* enjoys.[5]

The same is true, I am sorry to say, of the response my communications have received.

1.     As I have said, your immediate reaction to my letter, which I designated off-record, was to disclose it to two people who have nothing to do with my retraction and our correspondence: Doug Brooks, my counsel in civil litigation against the women; and Howard Cooper, Jay Scuteri's counsel in civil litigation against the women. This is unethical and unprofessional.

2.     You called Brooks with the slanderous assertion that I had written under pressure or in exchange for something. (That is something I denied in the letter itself, and I deny it again here. No one asked me to contact *New York* about the articles; no one offered me anything, or put any pressure on me; I have not asked for, and will not accept, anything in return.)[6] You called Cooper with the equally slanderous assertion that I had acted under the women's "spell," not of my own accord. This is unethical and unprofessional.

3.     The obvious purpose of these calls was to get these lawyers, with whom I have worked in the civil cases against the women, to use their influence to get me to withdraw my letter. This is unethical and unprofessional.

4.     Your calls constitute interference in the matters that your reporter has been covering. As you know, Cooper and his client Jay Scuteri are in active litigation against the women. You effectively intervened in that dispute, making yourself and your client, *New York*, a participant in it. This is unethical and unprofessional.

5.     You told Brooks that the articles would never be taken down, regardless of the very serious concerns that I had raised about them and your reporter, and threatened that my retraction letter would merely invite a third damaging article if I pursued the matter. The obvious import of this statement was that my attempt to correct the record and report journalistic misconduct would be futile and that I would face retaliation from a powerful, national media entity if I persisted. I must say, it seems to me that intimidating a source in this way is antithetical to everything *New York* stands for; and to do so in a case involving an article that has

---

[5] In my April 23 letter, I retracted my story and withdrew all participation in the articles and in any reporting whatsoever by Kera Bolonik, including but not limited to any use of information or documents or interviews obtained from me, and I demanded that the articles be taken down immediately. As should be evident, I still take the position set forth in that letter, which I hereby repeat and renew.

[6] The same is true of my decision to drop my lawsuit against Maria-Pia and Mischa, which I did last month. No one asked me to do it, no one offered me anything to do it; the decision was not part of any settlement or exchange; I have not received or been promised anything, and will not accept anything in return.

ruined subjects' lives is beyond the pale. But that is what your actions amount to. This is unethical and unprofessional.

6.      In your email of May 12, you renewed the threat, stating ominously that you reserved the right to publish my off-record communications with you. Please note: I was the principal source for your articles, both of which feature me as the hook. As you well know, I shared an enormous amount of information with your reporter on the understanding that it would not be shared without my express permission. I find it simply extraordinary that you would attempt to intimidate a source into silence by threatening to break such an agreement. I will add that *New York* has rightly expressed outrage at the Trump administration's treatment of whistleblowers. I cannot believe the magazine would countenance strong-arming a source who comes forward with evidence of one its reporters' misconduct. But again, that is what your actions amount to. This is unethical and unprofessional.

7.      In your email of May 12, you questioned my credibility without giving an explanation. In addition, you defended your reporter's work without seeking the details or supporting evidence for my objections to it. In so doing, you once again effectively dismissed without investigation the very serious concerns I had raised, and further underscored your message that *New York* wishes to silence and discredit individuals who come forward with damaging information about the accuracy of its articles or the performance of its reporters. This is unethical and unprofessional.

8.      In saying you "respect [your reporter's] past and current work," you failed to acknowledge that she has no experience as a reporter, much less an investigative reporter equipped to handle such a complex and sensitive story. It seems to me that given her lack of qualifications, the magazine's decision to assign her this story amounted to journalistic malpractice. This was compounded by the magazine's failure to review her work more closely before it was published, and is now being further exacerbated by the refusal to take seriously the objections I have raised about the articles and your reporter (aside from the concerns I raise about her journalistic misconduct, I find it alarming that this individual so unqualified and inexperienced as a reporter, has secured a contract to publish a book on a subject whose complexity requires considerable expertise in investigative journalism). Your letter displays complete indifference to these problems and the serious harm that has resulted. This is unethical and unprofessional.

In her correspondence with me last fall, your reporter used offensive language to disparage Harper Collins's legal team for their response to complaints about her work being raised by Schillings, counsel to Maria-Pia and Mischa. The publishing house's lawyers, in her opinion, were being entirely too cautious and deliberative in evaluating the complaints. In short, they were being too professional. In retrospect, I now wish very fervently that such caution and deliberation had been exercised on behalf of *New York*. If they had been, these articles never would have seen the light of day and a great deal of gratuitous harm and undeserved suffering would have been avoided.

## II. GENESIS OF THE ARTICLES

### A.     The Weird Sisters

When I was with them, Maria-Pia and Mischa used to say they were "soul sisters." If I had had any idea of what was coming, I would have proposed they adopt the moniker Weird Sisters instead.[7] That would have better captured their defiant refusal to conform to gender expectations, the virulent prejudice directed at them on that account, and the way they would be put on trial and punished for it.

Mischa, a trans woman of color, makes people uncomfortable. People used to glare at her when I took her to restaurants; Harvard campus police would hassle her and ask her for ID when they were asking no one else, and would order her off campus if she could not produce it;[8] at playgrounds, children's parents would direct nervous glances at her and her children. Liberally-inclined acquaintances complimented me for being so "openly" affectionate toward Mischa, as if it were an act I was putting on or some form of brave charity. No one has ever been able to quite believe that this woman could be loved by, and attractive to, a "normal" man, or that she could be a "real" mother to her children.[9]

Maria-Pia, a woman who flouts sexual mores, makes people uncomfortable. She approaches strangers in public, and sometimes "hits on" them; this is unremarkable for a man when a man does it, but a sign of trouble when a woman does it. She sometimes has multiple "hookups" in a short period of time; she can be deceptive and manipulative toward sex partners; she does not always answer honestly when asked about sexual activities with others or details of her personal life. All OK when done by a man, but ominous and disturbing — *What is she really after?* — when done by a woman.[10]

The women's relationship, which flouts conventional expectations about family structure, makes people uncomfortable. They are legally married to each other, but not a couple. Mischa's

---

[7] This is what the witches in *Macbeth* are called.

[8] I personally witnessed this on one occasion, and urged her to file a complaint.

[9] I would describe our own relationship as one of platonic romantic love. As *maman* to the children, she was the one mostly responsible for their upbringing, and was as attentive, caring, and capable as any mother (or parent) I have ever seen.

[10] As I explain below, this side of her life was something the women kept from me during our relationship, which I believe became monogamous after the pregnancy began and remained so until we split. I wish they had been more open about it. Maria-Pia's sex life before our relationship was her business, but her deceptiveness toward me about it — she told me she had not been with another man in a long time — came at a heavy price for everyone. When I found out it was a lie, I started to question everything about our relationship, and began drawing the worst possible conclusions about what she and Mischa had been up to.

husband[11] is Andrew Klein, who lives with them. Maria-Pia has romantic involvements with women as well as men. Mischa is the three children's mother; Andrew is their father; Maria-Pia is something like their aunt. When I was in the picture, I was in love with both women, and something like an uncle to the children. This is all very weird and troubling.

What really makes people uncomfortable, though, is the women's defiant refusal to be ashamed about any of this. They are uncompromising feminists and trans activists, and adhere to the old feminist slogan that the personal is political. Rather than submit to personal mistreatment or social injustice, they fight back. This was something they often talked about when I knew them. It is, I now realize, what has led to all the conflicts and police reports and legal proceedings over the years that are now being held up as evidence of their depravity. Here are two examples, central to the story:

First example:  During my relationship with them the women felt, justifiably, that they were being treated as mistresses. I had drawn Maria-Pia into the relationship with the assurance that Jennifer would tolerate our romance, and then strung her (and later Mischa) along with assurances that I would put an end to Jennifer's incessant attempts to sink it. I and Jennifer were lord and lady of the manor; they, the mistresses, were unwelcome at my house and had to remain out of sight. Their refusal to accept this demeaning role led to heated exchanges, angry confrontations with Jennifer, and ultimately the standoff over the house.

None of this had anything to do with severing me from my family, or getting hold of my money. It was about being treated with dignity. But to those inclined to see these women as sinister, and to see the worst in everything they do, this episode provides plenty of material. It is easily converted into a juicy *Fatal Attraction*-style thriller in which the scheming "abnormal" women seduce the hapless man, target him for fraud and extortion, and attempt to break up his happy all-American "normal" family. Such an account is pure fiction, and is flatly contradicted by the roughly 2000 pages of text message communications between me and the women. But it sells easily, because it confirms so many people's prejudices about women like this.

Second example: Maria-Pia apparently told three other men,[12] deceptively in some cases, that her "hook ups" with them in the spring of 2015 had made her pregnant. She did not ask any of them for money, and they did not give her any.[13] I believe these acts of deception on her part, assuming that is a correct description, were Maria-Pia's way of fighting back against men who

---

[11] Mischa and Andrew consider themselves wife and husband, though they are not legally married.

[12] I am referring to Jay Scuteri (referred to as John Doe in the lead article) and Richard Roe of the lead article, and Anthony of the followup article.

[13] Anthony has confirmed this about himself in communications with me. Scuteri's lawyer Howard Cooper, and Roe's lawyer Doug Brooks, also confirmed it to me about their respective clients.

think of women as disposable sex toys.[14] What Maria-Pia was doing, I think, was disabusing these men of the idea that they could have a sexual encounter with a woman and then forget about her, making any resulting pregnancy *her* problem alone. This led to conflict-ridden communications with two of the men,[15] who went to lawyers and, as I will explain below, touched off the conflagration that led to the articles.

It is quite clear that this had nothing to do with getting money from the men; to repeat, Maria-Pia did not ask a single one of them for a dime, none of them paid her a dime, and none of the men has ever said otherwise. But once again, for those inclined to see the worst in these women and everything they do, it is easy to portray this as a scheme of serial "fraud and

---

[14] When I knew them, Maria-Pia and Mischa often railed against the "sexual marketplace," in which some men considered themselves entitled to be "consumers" of women without worrying about the consequences. They also told me that they both engaged in unusual forms of activism against sexual violence and exploitation, without giving me the details. I believe Maria-Pia's conduct in contacting the men was one such form of activism on her part, designed to remind the men that pregnancy is not something that only *women* should have to worry about, and — more generally — to impress upon them the radical idea that women are not commodities to be used, thrown away, and forgotten if any complication arises.

To explain: the three of us talked about gender politics all the time, at great length; one of the reasons they valued me was that I shared their commitment to feminism as well as their interest in its theory and practice; I valued them for the same reason, learned a great deal from them, and came to see the world through a very different lens as a result of being close to them. In numerous conversations on the subject, they used to regale me with their thoughts about and experiences of male entitlement. They had worked out an elaborate theoretical apparatus on the subject, including the typology of male sexual entitlement below, which they would often articulate in endless depth:

- Moral Majority types who tout "family values" and denounce extramarital sex while holding forth on the sanctity of life, who then pressure their secret mistresses and casual hook-ups into having abortions.
- "Gentleman" types who hold the women they marry to strict standards of purity and propriety, while acting out degrading pornographic fantasies with the "loose" women they use for recreational sex.
- Powerful "progressive" men who say all the right things about feminism, but who take advantage of their positions to exert sexual pressure on women under their authority in workplaces or universities.
- Men who enthusiastically cheat on their partners with other women, who become angry and aggressive when a complication such as an unexpected pregnancy arises and — often enabled by their girlfriends or wives and assisted by their wealth and influence — do all they can to make the women go away.
- "Woke" men who claim to be in favor of sexual liberation and denounce the objectification of women, who nonetheless behave in violent and degrading ways toward women in the bedroom, and who — when faced with an unexpected pregnancy — engage in slut-shaming, blame the women, and abandon all pretense of living by the values that they profess to hold.
- Men, conservative or liberal, who are willing to sexually consume trans women and exploit and objectify them, while being ashamed of any public or visible connection with them and projecting their own rage and shame onto the trans women themselves.

Pregnancy is a sort of flashpoint in many of these cases, exposing the hypocrisies and privileges of male power. Facades are harder to maintain if a woman refuses to slink away in silence and deal with the pregnancy on her own, leaving the man free to carry on as before, and instead expect the men to deal with the consequences of their actions.

Maria-Pia and Mischa and their lawyers have not quite admitted that Maria-Pia's conduct was not just a "courtesy" to the men she had hooked up with, but was also a form of activism against male power. I myself am convinced that it was. It is the only explanation that makes sense to me, given what I know about their belief in personal and political "defiance."

[15] Roe engaged Doug Brooks in June 2015, after heated exchanges in which Maria-Pia urged him to consult a lawyer. Scuteri engaged Howard Cooper sometime in early 2016. Maria-Pia and Anthony apparently resolved the matter without the involvement of lawyers.

extortion" — without even *asking the question* whether money was sought from the men. That is what lawyers arrayed against the women have done; it is what I myself did, following the the the lawyers' lead; and it is what your magazine has done.[16]

These are the Weird Sisters. To understand what has been done to them, it is helpful to recall the following facts:

- Many people's perceptions of individuals like these women are distorted by explicit or implicit biases — against trans women, against people of color, against women who are "too" sexually active, against unconventional families, against women who refuse to be quiet or submissive.

- Many people are quick to assume the worst about individuals like these women. As with Jews in the eyes of antisemites, minor or innocuous incidents are taken as proof of sinister activities. A convincing "case" can be built against them on the basis of lies or half-truths that would never be accepted if used against others.

- Conflict, trouble, and negative stories play an outsized role in the lives of individuals like these women — which, in many people's eyes, is proof of their perfidy. The conflicts they get embroiled in are their fault, not the fault of the others involved. *They*, and not the prejudice of others, are the cause of the trouble surrounding them. Negative stories about them accumulate like a snowball, which means they must be true.

- Law enforcement is easily weaponized against individuals like these women, whose actions are easily couched in the language of crime.

- The terms "trans woman" and "predator" are almost interchangeable for many people. Any narrative in which these two women are portrayed as predators will find acceptance all too quickly, with or without supporting evidence.

- Calling individuals like these two women witches, and accusing them of casting spells on men, is as old as the trees. We moderns have replaced the term "witches" with *deviant*, and the term "casting spells" with *brainwashing*, but the signification is the same.

## B.   The Klein Family's Attacks

Andrew became involved with Mischa in 2010, and has lived with her and Maria-Pia since 2011. At the beginning of their relationship, Andrew struggled to disclose the fact that he was in a relationship with a transgender woman to his family and friends. When he did finally

---

[16] Your articles plainly imply that these men were victims of such a scheme, without telling the reader that none was asked for money, and that none has ever said otherwise.

tell them in 2011, he encountered violent opposition to the relationship, particularly from his father, William, and his sister, Margaret. I will go into a bit of detail about this, both because it shaped the events leading up to the article and because Margaret has become your reporter's close friend and principal source.[17]

Andrew's family were determined to break up his relationship with Mischa by essentially any means necessary. When efforts to persuade him failed, they moved on to other, less scrupulous methods. Margaret, by her own admission, staged an incident to make it appear that Mischa was harassing her.[18] To "free" Andrew from the women, who "had a strange hold on Andrew, as if they were brainwashing him,"[19] she and William lured him up to Margaret's New Hampshire apartment under some pretense; once he arrived, they snatched his phone, locked him in the apartment, and released him only on the condition that he stop seeing Mischa. Not surprisingly, this was unacceptable to the women as well as to Andrew, who broke contact with his father and sister.

Andrew's parents then turned to a friend on the Massachusetts state police force, who traveled to Cambridge to speak to Andrew. Andrew was away that weekend, so the trooper arranged to have Maria-Pia and Mischa called to the Cambridge police station, where the trooper asked intrusive questions — notably, about Mischa's family history and her ethnic origin — in an effort to intimidate and extract information from them. State troopers continued to call Andrew, prompting him to hire a lawyer to issue a cease-and-desist letter, to which the state trooper replied that he would leave Andrew alone if the lawyer met with Andrew without Mischa present to confirm he was aware of Mischa's dead name.[20] The officer's transparent purpose was to deploy Islamophobia in order to deter Andrew from associating with Mischa. In this way, a white family exploited the state police apparatus against a trans woman of color, knowing full well the intimidating effect it would have on her and the heightened dangers it would expose her to.[21]

---

[17] My version of the story is drawn from drafts of an essay that Andrew asked me to read in 2017, and on numerous conversations I had with Andrew and Mischa in 2016 and 2017. I also rely on private investigator Bob Long's account of his interview with the Klein family, which is contained in Long's 5/18/18 report to Doug Brooks.

[18] The trick involved turning on a recording device, and then pretending to receive a phone call from Mischa. The listener to the recording would hear Margaret responding to the abusive tirade Mischa was supposedly delivering from the other end of the conversation. Margaret played the recording for her mother Cynthia, apparently to convince Cynthia that she underestimated Mischa's awfulness.

[19] I am quoting private investigator Bob Long's account of his interview with Andrew's father William, which is contained in Long's 5/18/18 report to Doug Brooks.

[20] Andrew confirmed to his lawyer that he was aware of Mischa's dead name — and was rightly offended by the xenophobic and racist implications of this inquiry, which was obviously motivated by the Arabic origins of Mischa's dead name.

[21] As noted elsewhere, your publication has in fact called attention to the weaponization of law enforcement by white people against persons of color and marginalized people. It is therefore unfortunate that your reporter has not given more attention to the Klein family's victimization of Mischa in this regard.

11

The state police backed down; Andrew's family did not. William sent a barrage of transphobic messages to Andrew calling Mischa a "freak" who deserved to die.[22] His father called the Cambridge police to report Andrew was having a nonexistent mental breakdown, urging them to compel Andrew to go to the hospital by ambulance for an evaluation. Unable to stop his family's meddling, Andrew eventually sought restraining orders against his parents.

The official lie circulated by Margaret and William became that the women had torn the family apart and estranged Andrew from his loved ones, when in fact — as he told me on a number of occasions — Andrew had long detested his father for, among other things, his violence toward Andrew's mother.[23] Margaret, meanwhile, spread wild rumors about Mischa and Maria-Pia among Andrew's circle of friends to try to isolate him from the women. They were snake worshippers, said Margaret, who forced Andrew to participate in strange satanic-tinged rituals.

Margaret developed an obsessive, unhinged hatred of Mischa. During the 2013 Boston Marathon bombing manhunt, it emerged on the news that the Tsarnaev brothers had a possible accomplice — Mikhail Allakhverdov, nicknamed Misha, who supposedly had converted them to a radical strain of Islam and "brainwashed" them into committing the crime. Upon seeing these news stories Margaret contacted the FBI, "reporting what she knew about the Mischa that was in Andrew's life, wondering if they [i.e., Misha and Mischa] were one and the same."[24] Let that sink in a moment: Margaret called the FBI to report that Mischa might be the suspect they were looking for in the investigation of the Boston marathon bombing. Given Mischa's ethnic background, this obscene action of Margaret's reveals a combination of racism, Islamophobia, transphobia and sheer malice toward Mischa that would sicken any fair-minded observer. If the FBI had taken her absurd identification at all seriously, Mischa could have been exposed to any number of grave dangers that many people of Middle Eastern backgrounds were being indiscriminately subjected to in post-Guantanamo America. Margaret's behavior could easily have landed Mischa on a no-fly list, on a terrorist-watch list, in arbitrary detention, or worse.[25]

All of these actions left Andrew with no choice but to distance himself from these family members who were harassing and endangering his wife and children. Several years later, in 2016, Margaret and Cynthia made conciliatory overtures to Andrew and Mischa, apologizing for their past behavior, and attempting to reestablish ties. With characteristic generosity and

---

[22] Andrew shared these text messages with me in 2017 as supporting material for the essay he was writing.

[23] This had been a recurring feature of Andrew's childhood, leading to a number of police incidents. Andrew later learned that his father had kicked Andrew's mother in the stomach during a pregnancy, causing her to miscarry.

[24] That Mischa bore absolutely no resemblance to the suspect, whose photograph was all over the news, seemingly had made no difference to Margaret. The incident is recounted by Margaret herself in the Long report of 5/18/18 (p. 9), from which the quoted language is drawn.

[25] This sheer lunacy has not prevented a lot of people, your reporter included, from accepting Margaret's view of Mischa. On the contrary, your reporter has befriended Margaret and has completely embraced her point of view, as we will see below.

kindness, Mischa forgave Margaret's years of basically unforgivable behavior, and agreed to open a new chapter.[26] This rapprochement lasted until May 2018, when Margaret was contacted by a private investigator sent by my own lawyer.[27] With no apparent hesitation, Margaret performed a quick about-face and resumed hostilities against the women. She rehashed for the investigator the same vitriolic lies she had been spreading five years earlier, and pointed him in the direction of others who would be willing to say damaging things about the women. Her loathing of Mischa was as thoroughly unhinged as ever, and remains so today.

Kera Bolonik connected with Margaret in early March 2019. She immediately told me Margaret was "lovely,"[28] and for the next year often spoke of the close friendship they had developed. Soon after their first conversation, Margaret agreed to start talking off-record about Mischa and Maria-Pia. In the spring and early summer of 2019, your reporter told me of several extensive off-record and confidential conversations with Margaret in which your reporter had acquired many negative stories about the women.[29] I believe your reporter gave the stories obtained from Margaret to your editors to help them overcome qualms they were having about publishing the article. Though Margaret's stories did not appear in the article, I believe they were instrumental to getting the article greenlighted, because they appeared to bear out the proposition that the women were villains.[30]

---

[26] So much for the idea, peddled by the your reporter, and central to the lead article, that these women are in the business of breaking up families and estranging men from their loved ones.

[27] The investigator was Bob Long, discussed below.

[28] Email 3/3/19.

[29] This is one of many instances in which your reporter shared other sources confidential information with me.

[30] I find this deeply troubling for two main reasons.

First, the women were never given an opportunity to respond to the stories, neither for that matter was Andrew whose relationship with the women those stories were about. They were never made aware of the magazine's use of the stories and were given no chance to demonstrate that they were false and to demonstrate Margaret's complete lack of credibility as a source. This violates all notions of due process, and is a method calculated to undermine journalistic accuracy.

Second, since the article came out, your reporter has told me that Margaret is willing to go on record to corroborate the article's claims. This is highly deceptive to potential readers because it conceals the instrumental role that Margaret played in the publication of the lead article itself. She would misleadingly be presented as an independent corroborator to an article for which she has been a source. The "corroboration" is entirely spurious.

Let me add this: The role that she is playing in the article is parallel to the role she has played in the entire saga: as we will see below, the hateful things she was saying years ago about the women snowballed into the "serial predators" narrative later developed by lawyers, which was then embraced by your reporter and made the entire basis of the article. Having made Margaret her best friend and new principle source, your reporter is in effect using Margaret to "corroborate" the very slanders of the women that she herself uttered years ago that produced the reporter's narrative in the first place.

As I point out in part in three below, your reporter and Margaret have in effect joined forces to realize Margaret's long-simmering vengeful fantasies about punishing the women and reuniting Andrew with his wholesome family, fantasies that are shared by your reporter and suit her True Crime project perfectly.

## C.    Origins of the "Predator" Narrative

The paper trail behind your articles can be traced to two 2015 documentary sources: a report about the women written by private investigator Bob Long; and a letter by attorney Doug Brooks incorporating Long's findings, which Brooks sent to the women on behalf of his client Richard Roe. They are shocking documents — not for what they reveal about the women, but for what they reveal about the raw bigotry animating the effort to make criminals out of them, as well as the corruption in the law enforcement machinery that has been used in service of that effort.

### 1.    The 2015 Long Report

Roe retained Brooks in June 2015, following angry text message exchanges with Maria-Pia in which she urged him to consult a lawyer.[31]  Brooks engaged Long, a former state police trooper and longtime president of the Boston Police Foundation,[32] to look into Maria-Pia's private life. Long wrote a three-part report discussing what he had found out concerning Maria-Pia, Mischa, and Andrew.[33]

The Long report builds up to the dramatic conclusion that the women were operating a "deviant scheme to extort money from young men for the purpose of financial gain."[34] The report contains no evidence of this supposed scheme on the women's part. What it *does* contain, however, is unambiguous evidence of Bob Long's scheme to entrap and extort them.

The Long report oozes with xenophobia, transphobia, and misogyny. It repeatedly misgenders Mischa, referring to her as "he/she." The report mocks an essay she had written on motherhood, calls undue attention to her ethnic background, and highlights her progressive political leanings. It calls Maria-Pia "a manipulating, calculating, pathological liar," and makes clear the author is repelled by her sexual activities. It refers to Long's conversation with Andrew's father William, who described how "bizarre and unusual" Andrew's behavior had become after he fell in with the women. The reports leave no doubt where Long's sympathies lie — with this poor man whose formerly *normal* son has been carried off, and his *wholesome* family life destroyed, by this trans woman of color and her sexually profligate partner in crime.

---

[31] Why a would-be extortionist would do this — urge her target to consult a lawyer — is a question that has only recently occurred to me. Like their failure to seek money from any of their supposed victims, it suggests that these women do not understand their supposed trade very well.

[32] Long's website is https://www.boblongpi.com. He was president of the Boston Police Foundation from 2012 to 2019.

[33] The report is contained in Long's letters to Brooks dated 6/25/15, 7/9/15, and 7/21/15.

[34] Letter from Long to Brooks, 7/21/15.

This demonization of the women, and the weaponization of law enforcement against them, was simply a continuation of the campaign that Andrew's family members had launched against them in the preceding years. As we have seen, Andrew's parents in effect dispatched a state trooper friend against the women in 2011, knowing of and seeking to exploit the vulnerability they face as a result of their unconventional family arrangement and Mischa being a trans woman of color. That trooper made full use of whatever weapons lay at hand, including Mischa's ethnic background and family history, in order to intimidate the women and separate them from Andrew. Long, dispatched against the women in 2015, picked up where the state trooper left off. His report incorporated and validated the animosity of Andrew's family members toward the women; it built up and ratified the idea that the women had brainwashed Andrew into moving in with them; it gave ammunition to people seeking to harness transphobic, misogynistic, and xenophobic stereotypes against the women; and it created a destructive new narrative about the women, portraying them not only as "deviant" but as *criminals*.

The Long report provides a disturbing window onto the way in which its author has used corrupt and unscrupulous methods, with the participation of the Cambridge police, to "criminalize" these women — to gather private information about them, to intimidate and silence them, to isolate them from their friends, to extract money from them, and to set them up for criminal prosecution.

    1.    In interviewing people connected to Maria-Pia and Mischa, Long and his associates misleadingly said that he was working with law enforcement, giving the false impression that he was conducting a criminal investigation of the women. His obvious purpose was to put pressure on the interview subjects to divulge any dirt he might find useful. An equally obvious byproduct was to make these people worry that the women were possible criminal suspects, thereby damaging the women's relationship with friends, co-workers, and so on.

    2.    Using his connections at the Cambridge Police Department, he got police records on the women what were not publicly available — reports of perfectly legitimate complaints the women had made[35] — in order to cherrypick them for snippets, taken out of context, to construct a misleading narrative about the women.

    3.    At Long's request, police officers were dispatched to seek records from Maria-Pia's stay at a bed & breakfast in Cambridge, "whose owners refused to cooperate based on a recent Supreme Court decision."[36] In other words Long had effectively commissioned an unlawful search and seizure to be carried out by the Cambridge police on behalf of his client.

---

[35] I discuss these below.

[36] Letter of 7/21/15.

4.      Having failed to turn up any evidence of the "deviant scheme," Long —
along with two detectives and three commanding officers of CPD — met and drew up
plans to run a sting operation against the women using Tinder, the dating app. Though the
report did not spell this out, the sting operation would presumably have involved luring
Maria-Pia into having sex with a man working for the police, and then waiting for her to
claim she was pregnant and demand money from him.

In the conclusion to his report, Long recommended that Brooks approve the proposed sting
operation, which if successful would make possible a case of extortion against the women, and
would also make possible a lawsuit with which to extract money from them. Long told Brooks
that the sting operation had the enthusiastic support of his friends in law enforcement, assuring
him that "the police would be more than glad to cooperate with us and investigate the matter
further if [Maria-Pia] makes an overt act with respect to any extortion attempt."[37] Finally, he
noted that his research had revealed that the women appeared to have significant financial
resources, which would make a lawsuit against them a rewarding method of exerting pressure on
them. In other words: unable to find any evidence that the women had extorted Roe or anybody
else, the private investigator effectively proposed enabling Roe to extort money from *them*.

Ordinarily, this whole episode would be the subject of a *New York* exposé of corruption at
the top. Just look at the story: By hiring the president of the Boston Police Foundation, a wealthy
and powerful white man[38] essentially purchases law enforcement's help to intimidate and shake
down two women for the "crime" of upsetting his son; the engagement results in a misogynistic,
transphobic report revealing the investigator's bigotry and the police's willingness to employ
unlawful methods at his request; the police provide him with nonpublic information about the
women, agree to conduct an unlawful search and seizure to obtain evidence against them, and
help draw up a sting operation approved by top brass at police headquarters; the sting operation
would entrap the women into committing an act of extortion they had never committed before;
the evidence would then be turned over to the wealthy client, who could then use it to extort *the
women*.

*That* is the sort of grotesque misuse of police power that the magazine would normally
make its target. But not this time around. Rather than side against this corrupt machine and its
persecution of two vulnerable women, *New York* sided with it. As we will see, the Long report is
the root of the poisonous tree of which the magazine's articles about the women are the fruit.

---

[37] Letter of 7/21/15.

[38] I should note that Poe, Roe and Scuteri are all from very wealthy, well-connected families. They are all the sons of
powerful white men who hired private investigators to follow these women around and dig in to their private lives
once their twentysomething sons became upset with Maria-Pia. Though the PI surveillance revealed nothing
incriminating about the women, pricey Boston lawyers were nevertheless dispatched by the fathers to intimidate,
shake down and silence the women.

2.   **The Brooks Letter**

Brooks, apparently convinced by his PI, wrote a letter to Maria-Pia on behalf of Roe in which he accused her of engaging in a series of "schemes aimed at extorting money from men whom you have falsely claimed impregnated you."[39] He gave the following instances:

- He recounted the story of John Poe that eventually made it into lead *New York* article. He stated that Maria-Pia and Mischa had "extorted" Poe, and then — when he tried to break free of their grasp — had brought an abusive restraining order proceeding in which they made "blatantly false" accusations that he had raped Maria-Pia and threatened her life.

- He claimed that Andrew had tried to leave the women in 2011, and that they had "enticed him back by falsely claiming that you had cancer and that you were pregnant with his child."

- He recounted an incident in involving a man whom Maria-Pia had met on Tinder and had considered "hooking up" with. In a text exchange with the man, Maria-Pia had told the man that he would not need to use a condom, because she "couldn't get pregnant."

- He stated that she had said Roe had made her pregnant; that it was "unlikely" she was telling the truth; and that this was another one of the "schemes" in question.

**The Letter's Deceptiveness.** The letter gave the impression that there was evidence supporting its inflammatory "extortion scheme" charges, without disclosing what it was. In truth, there was essentially no evidence at all. Let us look at each instance Brooks gave.

1.   Poe

a.   For the Poe story, Brooks simply appropriated, and presented as established fact, Poe's testimony at a 2014 proceeding in which Maria-Pia had unsuccessfully sought a restraining order against him. The letter did not disclose that Brooks was ventriloquizing Poe in this way. It also did not disclose that Maria-Pia was unrepresented at the proceeding; that Poe was not cross-examined; and that the judge had been essentially silent at the hearing, and gave no reasons for his ruling.

b.   At the hearing, Poe testified he had paid $11,000 to Maria-Pia via her friend Jacqueline Lescarret. What Poe did *not* say was that some time earlier Maria-Pia

---

[39] Brooks letter of August 6, 2015 to Maria-Pia.

had given him at least $10,000, as a third party bank subpoena shows.[40] So much for the "extortion" charge.

       c.     Brooks's assertion that the women's accusations against Poe were "blatantly false" — or false at all — came out of thin air. The judge had made no finding about the accusations, and expressed no view about them from the bench.[41] He had denied the request for a restraining order, without explanation, after it emerged that Poe had not seen Maria-Pia in several years and had not spoken to her in nearly a year. For all anyone knows, the judge *credited* the women's accusations, but decided they did not warrant issuance of a restraining order.

2.     Andrew

       a.     Brooks did not disclose that his source was Andrew's father William Klein, who apparently did not believe that Maria-Pia had cancer and that Andrew had caused her first pregnancy.[42] William gave no reason for his belief, and Brooks gave no reason for supposing it was true. The letter simply presented, unattributed, William's opinion as established fact.

       b.     By its own terms, this was a story about getting Andrew back into a relationship that became permanent. What did this have to do with extortion?

3.     Tinder

       Brooks had no evidence that Maria-Pia was planning to ask this man for money.

---

[40] This has emerged through a third-party subpoena in civil litigation.

[41] The focus of the hearing was on Mischa's testimony that in a conversation the previous week, Poe had told Mischa that he wanted to kill Maria-Pia. Maria-Pia testified that Poe had sexually assaulted her five years earlier; this got essentially no attention in the hearing, either from the judge or Poe's counsel.

[42] Bob Long's report of July 21, 2015, on which Brooks relied, stated the following (p. 2): "Mr. Klein had become concerned over his son's bizarre and unusual behavior since he became involved with Shuman. At one point, Andrew moved out on Shuman, but she soon enticed him back after claiming she was sick with cancer and was pregnant with his child."

Brooks also neglected to mention that the Tinder communication had come to light because the man on Tinder had begun harassing and threatening Maria-Pia, leading her to contact the police.[43]

4.    Roe

Brooks omitted the fact that Maria-Pia had not asked Roe for any money.

**Impact of the Brooks Letter.** On inspection, then, Brooks's tale about "schemes aimed at extorting money from men whom you have falsely claimed impregnated you" was smoke and mirrors. Its transparent purpose was to scare off the women with the possibility that they would face serious felony charges if they did not leave his client alone. Shortly after sending this letter, Brooks negotiated an agreement with Maria-Pia's lawyer in which Roe and Maria-Pia promised to have no further contact.[44] Matters might have rested there if events had not led me to Brooks three years later, at which point I saw the letter and accepted it at face value, not realizing how deceptive it was.

## C.    My Embrace of the "Predator" Narrative

**Sequence of Events.** My own relationship with the women came to a sudden, acrimonious end in August 2017, when we found ourselves in court during the standoff over the house. There were police episodes and restraining order hearings, after which my lawyers insisted that I change my phone number and break contact with Maria-Pia and Mischa. I finally did so, for good, on August 23, 2017. I was left feeling angry, betrayed, and very alone.

Jennifer, unsurprisingly, had long told me that the women were up to no good with me. In the wake of the August 2017 rupture, she claimed to be vindicated. She said that the house standoff had proved the women were "grifters," as she called them. They had lied about the baby's paternity; they had manipulated me with tales about Maria-Pia's nonexistent cancer; the whole relationship had been one big scam. So she said.

---

[43] The subsequent omission of this account by those seeking to demonize Maria-Pia and Mischa can hardly be an accident. According to the police reports on the matter, the police credited and acted on Maria-Pia's allegations of threats and harassment by the unnamed Tinder man because they were supported by text messages he had sent.

I need to make a more general point about the Brooks letter's claim about "blatantly false accusations," which took on a life of its own later, and eventually made its way into Kera Bolonik's reporting. His investigator Long found three police episodes involving Maria-Pia: Poe; the unnamed Tinder man; and a man named Benji, whom she had reported to the police for stalking and telephone harassment. Long's report makes evident that the police credited her complaint about Benji, which was supported by phone and text records.

It is notable that two of the three individuals Maria-Pia reported to the police undeniably harassed her, in the view of the police; Poe's situation is at best unclear. One would never know this from the lead article's claim that Maria-Pia has a history of filing false police reports.

[44] As I discuss below, Brooks insisted that Maria-Pia sign a nondisclosure agreement, which his own client did not sign. He has taken the position that he is free to talk about the matter.

I resisted this idea until October 2017, when I met Howard Cooper, counsel for Jay Scuteri (referred to as John Doe in the lead article).[45] Cooper told me the story about Scuteri that eventually made it into the lead article, and offered to represent me in litigation against the women. I gave far too much credence to Cooper, in part because I was blinded by feelings of sexual jealousy.[46] The women had told me that Scuteri had sexually assaulted Maria-Pia;[47] I believed them, and Cooper — who avoided the subject entirely — gave me no reason not to continue believing them.

Cooper made no secret of his intense dislike of the women and repeatedly told me they were dangerous women who sought to destroy men's lives. As with Brooks in the Roe episode, Cooper's reflex was to attempt to criminalize the women by taking the matter to law enforcement. Cooper, aiming higher than the Cambridge police, approached the Massachusetts Attorney General's office in December 2017 with information about me and Scuteri — an approach which I was easily talked into authorizing. In hindsight, it is surprising Cooper thought that these two minor matters would interest the Attorney General's office. He was clearly banking on the potentially sensational nature of the case, owing to the unconventional lives these women led. Unsurprisingly, Cooper's request for an investigation of the women was turned down.

The predator narrative was further reinforced for me in when I engaged Brooks in April 2018.[48] His 2015 letter, which he showed me at our first meeting, enraged me at the women — enraged me so much that I did not take the trouble to inspect the letter's evidentiary basis or the soundness of its reasoning. The letter itself, written by a reputable lawyer, was all the "ocular proof" I needed. Jennifer had been right all along. The women were predators, with a trail of victims. I filed my lawsuit against them in May 2018. The following month Brooks, like Cooper

---

[45] I contacted Cooper because the women had told me about their dispute with Scuteri.

[46] As our romance unfolded in the spring of 2015 and she became pregnant, Maria-Pia told me that I was the only man who could have caused the pregnancy. I now see her reasons for deceiving me: she wanted a relationship with me and feared, quite rightly, that I would make a quick exit if I knew that someone else might have caused the pregnancy. She and Mischa never disabused me afterward. In retrospect, I very much wish they had done so: it would have been painful to hear from them at the time, but that would have prevented the conflict that arose from my hearing about it from the lawyers later.

[47] Mischa had told me about the sexual assault in 2016 and both women told me about it in the summer of 2017.

[48] Cooper had decided it would be better if he did not represent both me and Scuteri, so I hired Doug Brooks based on the referral given by a friend. In fact, in 2015 Mischa had shown me the non-disclosure agreement prepared by Brooks in the Roe matter. I presumably saw Roe's and Brooks' name in the document when I was shown it in 2015, but did not register them and therefore had no memory that Brooks had been adverse to Maria-Pia and Mischa when I was referred to him in April 2018. The person who referred me to Brooks knew no identifying details of any of these matters.

before him, tried to interest the Attorney General's Office in launching a criminal investigation of the women. Once again, the Attorney General's Office sensibly declined.[49]

**Overlooked Problems.** A detached observer, if I had consulted one, would have had a word for this whole narrative:  idiotic. She would have pointed out two problems:

1.    Evidence of the "trail of victims" was nonexistent.

      a.    There was no indication the women had "extorted" any of the other men. On the contrary, their behavior contradicted it: they had not asked Scuteri or Roe for any money.[50] In Roe's case, Maria-Pia urged him to seek counsel almost right away — hardly the act of an extortionist. As for Poe, we saw above the problems with Brooks's "extortion" and "blatantly false accusations" claims.

      b.    Scuteri was notably reluctant to actually sue the women for the terrible things Cooper was claiming they had done to his client.[51] Perhaps he was afraid of the evidence that would emerge in support of Maria-Pia's rape accusation against him.[52]

      c.    None of the men would talk. According to Brooks, his former client Roe was too "traumatized" to speak about what had happened to him; so, I was told, was Poe;[53] Cooper said the same thing about his client Scuteri. *Too traumatized to speak* — this was proof, of course, that the men had indeed been terribly victimized by the women. A detached observer would have pointed out that they might have other reasons for keeping quiet.

---

[49] Brooks's failed overture to the AG's office was the fifth time law enforcement authorities had considered and outright rejected the idea of launching an investigation of the women — the others being the Klein family's 2011 approach to the Massachusetts State Police; Margaret Klein's 2013 approach to the FBI; Bob Long's 2015 approach to the Cambridge police; and Howard Cooper's 2018 approach to the AG. Kera Bolonik was aware of all of these failed attempts to interest law enforcement in the women. These repeated failures would have been a red flag to any reasonably sensible professional journalist, a suggestion that the accusations being made against the women were not credible. Undeterred, Bolonik uncritically embraced the view that these women were criminals, and has hoped ever since to manufacture a case that will finally persuade the authorities to prosecute the women and make her True Crime dreams come true.

[50] This was confirmed by their respective lawyers, Brooks and Cooper.

[51] He filed suit in July 2018, two months after I did. This was over two years after the March 2016 communications in which Cooper had threatened to sue and over three years after Scuteri's last communications with Maria-Pia.

[52] That may also be why, now that he has won a default judgment, he shows no interest in proving his damages. A default judgment was entered in December. No hearing on damages has been scheduled.

[53] Brooks said he had reached out to Poe in July 2015, during his representation of Roe, and had been told Poe was psychologically unable to speak about the matter. I myself got essentially the same answer in April 2018, when I contacted the lawyer who had represented Poe in the 2014 restraining order proceeding.

2.    Evidence of my own victimhood was also nonexistent.

    a.    On any fair-minded reading, the voluminous written correspondence between me and the women was the record of three people who loved each other and wound up hurting each other a great deal.

    b.    The women had deceived me about Maria-Pia's hookups with other men, but I had deceived them about my bond with Jennifer. The deceptions were wrong, but done out of a desire not to lose each other. They were my "victims" as much as I was theirs.

    c.    The proper venue for resolving our differences was something like divorce mediation. We needed family lawyers, not scorched-earth criminal lawyers like Brooks and Cooper.

**My Mindset.** Had I looked at the situation with a cool eye, I would have seen these problems. But I did not have a cool eye, or a clear head, for three reasons.

First, I was in bunker mentality. My legal dispute with the women was exploding; Harvard had suspended me; my life seemed to be falling apart. I was frightened and alone, speaking to essentially no one about the situation but Jennifer and the lawyers.

Second, I was in an echo chamber. Like Jennifer, the lawyers — particularly Cooper — had obvious motives to encourage me to think of myself as one of a number of victims.[54] I had an obvious motive to believe them, because the existence of other victims would strengthen my own position in court and at Harvard. In this echo chamber, the party line was that the other men and I were victims.

Third, I was frankly consumed by jealousy and feelings of sexual betrayal. I was Othello; Cooper was Iago; and the Brooks letter was the handkerchief. I did not know what I believed anymore, and was ready to believe the worst. I am furious at the way I was used and manipulated by Cooper in his attempt to extract money from the women on behalf of his client.[55]

---

[54] Cooper's client Scuteri had much to gain from the pressure my own lawsuit exerted on the women, as well as from the prospect of my serving as a witness in his lawsuit.

[55] I contacted Cooper in the fall of 2017 with limited knowledge of the Scuteri matter. Cooper represented me for the next several months, and in the process obtained a substantial amount of information from me about the women and what they had shared with me about the Scuteri matter. When my litigation against the women erupted in the spring of 2018, Cooper declared he could no longer represent me citing a potential conflict, owing to his representation of Scuteri. Since this supposed conflict had been there all along, I can only conclude that he had not really wanted to represent me in civil litigation at all, and had taken the engagement primarily in order to obtain information from me for the benefit of his long-time client Scuteri. I also believe that Cooper's work with your reporter to trash the women and seek groundless criminal investigations of them is motivated by his desire to put a smoke screen over Maria-Pia's credible accusations that Scuteri raped her. I will say further that Cooper's aggressive litigation tactics against the women have been calculated to prevent an adjudication on the merits of the Scuteri case, which I believe he and his client are desperate to avoid because it would involve airing that accusation.

22

### D.   My Approach to Your Reporter

I contacted your reporter on June 24, 2018, told her my story, and sent her a long document I had just completed — my written submission for the Title IX matter pending at Harvard, in which I set forth my understanding from Brooks and Cooper about what had happened to the other men. The submission effectively called the Title IX complaint against me an act of extortion, which I thought to be true then but no longer believe.[56]

Today, the submission reads as though it was written in captivity, from a cell with no windows, by a man who has lost all contact with reality. Its author begins by describing himself as a victim of a "protracted campaign of fraud, extortion, and false accusations," and goes on to tell a story that certainly makes it *seem* that way. It is told with utter conviction, and appears to be supported by the documents that have been selectively quoted as evidence.[57] Did he really believe it? Was he trying to please his captors, whoever they were?

I have no idea. All I know is this: as an account of what really happened between me and the women, of how we felt about each other and what was motivating us, that man's story is unrecognizable. If he thought he was telling *my* story, his captors had surely brainwashed him.

## III. YOUR REPORTER'S CONDUCT

I approached your reporter in search of an investigative journalist who could get the truth out about these women. My purpose in contacting her was to get her advice, and possibly a referral; I did not think of her as an investigative reporter.[58] But when she proposed covering the story herself for *New York,* the idea seemed reasonable to me. Your reporter appeared to be sensitive to gender, LGBT, and racial issues, a quality that I considered important to getting the story right; she said she would do a thorough and conscientious job; if the editors at a reputable outfit such as *New York* trusted her to cover the story responsibly, so did I.

---

[56] Mischa's Title IX complaint against me was neither an act of fraud and extortion nor an abuse of process. However, I no more sexually harassed Mischa than she and Maria-Pia extorted me. While I can not get into her thoughts, I can readily see how — in the heat of conflict — she could genuinely believe in charges against me that were not true and that she herself would not have believed under less stressful and adversarial circumstances. I can readily see this because I was led to believe in charges against her that were not true, as I myself would have recognized absent the fraught circumstances that kept me in an echo chamber.

[57] Any reasonably objective reader of the documentary evidence would have greeted this account with skepticism, if not outright incredulity, and would have cross-examined its author closely. None of that happened with your reporter, who merely amplified my fantastical perceptions of the situation, and preferred not to address the multiple obvious contradictions in the narrative.

[58] We were Facebook friends, came from the same hometown, and had an old friend in common. I had never communicated with her before, but frequently saw her posts on Facebook and could see that she had a lot of journalistic connections.

For the next eighteen months, we were in frequent, often daily, contact as she worked on the articles and then began work on her book. We became friends and collaborators. I had never worked with an investigative journalist before, and frequently told her I was relying on her to tell me the rules of the road and to make sure we abided by them. I trusted that she was doing a professional job. Only after our contacts became less frequent, starting around the New Year, did I begin to realize how thoroughly I had been defrauded and exploited.

No *professional* journalist — least of all one with the gender-LGBT-racial sensitivity I thought your reporter possessed — would have failed to turn a *very* skeptical eye toward this remarkable story I'd brought her about these "predators" and their "trail of victims." Such a journalist would have seen the evidentiary problems regarding the other men, the emptiness of the "extortion" charge, the reliance on innuendo. She would have seen how self-serving my own little tale of victimhood was, how contradicted it was by the voluminous correspondence I'd had with the women. She would have seen seen how the demonology surrounding these women was being fueled by prejudice, and how it was being exploited by lawyers who had a lot to gain from such a sensational case. In short, she would have seen a witch hunt in the making, and pushed back.

But this this project was never about journalism. It was about creating a "true-crime" narrative — which is how your reporter herself described the finished lead article[59] — that could be expanded into a book to rival her late friend Michelle McNamara's *I'll Be Gone in the Dark: My Obsessive Quest for the Golden State Killer.* She mentioned that book in our very first conversation, and many times afterward, with a combination of reverence and envy. Her late friend's book had helped catch a serial predator and put him in jail. Your reporter was going to match the feat.

I had given her the perfect characters. For True Crime, what could possibly match a salacious story about two man-hating, serial-victimizing, sexually deviant, overeducated Parisian women at Harvard — one of whom, for heaven's sake, is a *trans woman of color*? It was almost too good to be true. The opportunities for exploiting misogynistic and transphobic stereotypes, along with the narrative strategies of the slasher-film thriller, were endless. If she could get these women prosecuted, the calls from Hollywood would never stop pouring in.

From the start, your reporter was out to show that these women were waging a "campaign of fraud, extortion, and false accusations" against me and other men — words *I myself* had written in my Title IX submission days before meeting her, which she lifted and presented as fact in the lead article a year later.[60] Her work on the articles was one long exercise in building a case

---

[59] Email 7/26/19.

[60] That formulation appeared in the first paragraph of my personal statement in the Title IX proceeding against me, which I submitted on about June 20 and gave to your reporter when I contacted her on June 24. The lead article article incorrectly attributes the words to my lawyer. They are in the opening paragraph of a document that explicitly names me as the author.

to that effect, and in helping others do the same, with no regard for the boundaries that normally separate a reporter from her sources and story.  Thus, she overcame Jennifer's reluctance to talk to her by assuring that she hoped to "help bring the two to justice."[61] She spoke glowingly of Brooks and Cooper, rejoiced at every favorable development in the litigation against the women,[62] steered sources their way to serve as witnesses,[63] and urged sources to hire them to bring cases of their own against the women.[64] She rooted for me in the conflict at Harvard, and suggested materials to submit and arguments to make in my defense.[65] She repeatedly proposed telling the Title IX investigator about the women's work with other journalists, urging me to say it constituted impermissible harassment or retaliation on Mischa's part.[66] She supported efforts to interest the police in the women, and was disappointed when the efforts failed.[67]

Precautions to ensure the integrity of the reporting process were ignored. Your reporter repeatedly shared the off-record confidences of other sources.[68] She told her sources what other sources were saying, contaminating purportedly independent accounts.[69] She asked me and Jennifer to help her evaluate the reliability of accounts of other sources.[70] She asked me for my interpretation of evidence and for my legal assessments; I was simultaneously her subject, source, fact-checker, editor, and legal consultant.[71] She incessantly shared her own opinions on the people she was writing about, on the sources she was speaking to, and on the stories she was hearing.

For your reporter, sources are instrumentalities for building her preferred narrative. I cannot count the number of occasions she pushed me to see the women in the worst possible light, as when — to take a single example — in response to my wondering aloud why Maria-Pia

---

[61] Email 8/9/18.

[62] Text message 12/11/19.

[63] Text message 8/27/19 ("The good news is that [Anthony] got in touch and I put him in touch with HC").

[64] Text message 9/10/19.

[65] Email 7/26/18; email 8/23/18; email 12/6/18; text message 12/20/18; email 11/7/19.

[66] Email 1/18/19; text message 8/8/19; email 8/10/19; text messages 8/14/19.

[67] Email 11/14/18; email 12/6/18; email 12/11/18.

[68] To give one example of many, source AM — an Olympic athlete — approached her in strict confidence, as she told me on numerous occasions. Text message 8/27/19 ("I wish I could put you in touch w swimmer dude earlier but I worry about him ghosting me"). She told me the details of his account, including very intimate ones, along with enough identifying information that I easily guessed his identity.

[69] For example, she repeatedly made clear she was shopping accounts back and forth between me and sources connected to Andrew and also among men who approached her after the lead article came out.

[70] For example, she used us to evaluate the stories of all of the individuals described in the followup article.

[71] Email 8/24/19 ("it's a good think I know a civ pro prof to consult!").

25

had first approached me, she answered simply: "She is a predator."[72] She did not care about challenging the sources who gave her stories that suited her; for example, she never confronted Scuteri (referred to as John Doe in the lead article) on the subject of Maria-Pia's credible accusations of sexual assault against him. Your reporter chased sources who offered material with which to trash the women, while showing no interest in speaking to sources who might say something favorable about the women or complicate the narrative.[73] Sources who supported the narrative were reliable, no matter how suspect their accounts or how little evidence they provided.[74] The more extreme the account of the women's perfidy, the better. A source who spouts anonymous online vitriol about the women was a "good person" because she is a friend of Andrew's sister Margaret;[75] a source who resisted your reporter's effort to cast him as a victim is thereby untrustworthy, and must be taking orders from the women.[76]

The project has been governed by the conspiracist's mode of reasoning. Any testimony against the women, no matter how far-fetched or dubiously sourced, is proof of their villainy. Any testimony in the women's *favor*, by contrast, is not only automatically suspect; it actually *confirms* their villainy by demonstrating the power they have over what others think and say. Searching out and speaking to people with a favorable opinion of the women would have served no purpose; it would only have demonstrated how successfully the women disguised themselves to such people. Likewise, Andrew's apparently happy relationship with the women, now in its tenth year, reveals how completely they take possession of men's minds. The occasional

---

[72] Email 3/3/19.

[73] I repeatedly reminded her to contact source SA, one of the few relatives Mischa had talked about being in touch with when I knew her. Your reporter somehow never found the time.

[74] She often told me that she considered a certain source MS to be very dishonest, but continued working with him as he fed her damaging "information" about the women. She broke contact only when he started asking her too many questions, which suggested to her that he was using her for ulterior purposes.

[75] Text message 8/8/19.

[76] Here I must recount the example of Joshua Holt, who approached us after the lead article appeared. (Email 7/28/19.) He sent your reporter 50 pages of intimate text correspondence between himself and Maria-Pia from the time of their relationship, which she immediately forwarded to me to evaluate. (Email 9/10/19.) For the next few months, she frequently divulged to me and Jennifer his confidential off-record communications with your reporter. She was pushing him to see himself as a scam victim and to file a lawsuit against Maria-Pia, preferably with Cooper or Brooks, and sought our input on this. (Text message 9//10/19.)

When Holt complained to *New York* about your reporter's conduct, she immediately turned against him, and declared to me that he was in fact an impostor working on Mischa and Maria-Pia's behalf. That idea is contradicted by two facts: (1) The 50 pages of correspondence were unquestionably authentic, and could only have come from the man who had indeed been corresponding with Maria-Pia at the time he dated her; and (2) he had no idea who was currently representing the women, instead relying on my own out-of-date information to falsely claim that he had interacted with their lawyer.

Until Holt's "defection" she had told me his story was going to figure prominently in her book, as evidence of Maria-Pia's desire for a "normal" (Mischa-free) relationship. As soon as he complained about her sharing his off-record confidential communications and efforts to distort his story, she declared that he was a fraud.

objections I voiced to your reporter about her dark picture of the women showed that they still had a hold on me.[77]

Your reporter never got the women's side of the story, because she did not want to. Following an off-record phone call with Mischa in October 2018, she told me that she had no desire to speak to her again. She had not believed a word Mischa had said, making further further communication pointless. Mischa, she said later, was "quite the performer" who had "delivered a late-era Streep" in the conversation.[78] Of course, she provided no explanation or basis for these extreme and offensive statements about another source. After the articles came out, she gloated that no reporter or publication would help them tell their side of the story, because "everybody knows they are liars and grifters."[79]

This is not just business for your reporter; it is personal.  She has never hidden her disdain for these "truly awful" women.[80] She is openly envious of their intelligence and academic achievements, which she denigrates with groundless conjectures that they are not real. Thus, has Maria-Pia is not "smart" enough to have the physics degree she earned,[81] and Mischa may not really be enrolled at Harvard at all.[82] Of course, the evidence shows that Maria-Pia does in fact have a physics degree and Mischa is in fact enrolled at Harvard. The women have "delusions of grandeur,"[83] which are being punctured now that your reporter has exposed them for the frauds that they are: "They believe they're smarter than everyone and gave themselves the highest challenge by preying on people in the intellectual epicenter of the country. They thought they could outsmart everybody. And that is the painful truth that they are having to face right now."[84]

Your reporter's antipathy toward Mischa is boundless. Notwithstanding her self-proclaimed status as a trans ally, she has trafficked in the crudest transphobic stereotypes to describe this woman she is bent on exposing as a fraud and impostor, a leach who sucks the life and productive energy out of others. In the early months of our work together, your reporter saw Mischa as the weak and ineffectual dependent of Maria-Pia, who had "turned Mischa into the

---

[77] Likewise, my approach to you this spring demonstrates the same thing.

[78] Email 7/28/19. This is a good indication of why the women were well advised not to cooperate with your reporter, who had no intention of fairly evaluating and reporting what they shared with her.

[79] Email 8/10/19.

[80] Email 7/7/18.

[81] Email 2/22/19.

[82] Email 9/10/19.

[83] Text message 9/14/19.

[84] Text message 9/14/19.

conniving person she is now."[85] Mischa was "zaftig"[86] and "lazy";[87] other people did the "lion's share of her work"; Maria-Pia used "every man in her path" to prop up her helpless companion.[88] Mischa could not stand on her own feet at Harvard, and was now trying to "establish herself as a writer" by passing off other people's work as her own.[89] Coming across an an op-ed Mischa published in *The Guardian* in the fall of 2018, your snidely remarked that Mischa had apparently been "busy"; finding another article by Mischa in in *Slate* a few months later, she said: "I wonder who is writing for her these days."[90]

Your reporter's words took a darker turn in March 2019, when she finally connected with Andrew Klein's sister Margaret. As your reporter well knew, Margaret was the person who had called the FBI in 2013, telling the bureau that the *woman* who had "brainwashed" Andrew into marrying her might also be the *man* who had brainwashed the Tsarnaev brothers into committing mass murder.[91] Many reporters would be alarmed by such deranged bigotry coming from a source, and would want to hold the source at arm's length. But not *your* reporter, who immediately pronounced Margaret to be a "lovely" person, and promised to keep me posted of their interactions.[92] Since then she has become very close to Margaret, who has become her partner in constructing, in Technicolor, a far more sinister, monstrous figure out of Mischa — a demonic caricature ideal for purposes of your reporter's True Crime enterprise, as well as for her and her new friend's personal vendetta against Mischa Haider. Your reporter's transphobia has come out in the open, along with her patent malice toward this particular trans woman of color whom she finds so threatening.

Mischa Haider only *appears* weak and helpless. In fact, like the Jew of antisemitic tracts, she wields control over everyone around her. Her family — Maria-Pia, Andrew, the three children — is not a family at all, it is a cult, presided over by the trans woman with satanic powers who snatches bodies and colonizes minds. Andrew is there because she "stripped him of his autonomy and his personality and his connections to everyone in his life."[93] Maria-Pia is

---

[85] Email 2/21/19.

[86] Email 1/11/19.

[87] Email 11/28/18.

[88] Email 11/28/18.

[89] Email 11/28/18.

[90] Email 1/24/19. I worked with Mischa for a long time, in a professional capacity and seen her work and her writing. She is truly brilliant, a gifted writer, and "lazy" is just about the last word anyone who knows her would use to describe her, both professionally and as a mother. Your reporter's baseless aspersions are the figments of a shallow and insecure imagination.

[91] This is in private investigator Bob Long's report of May 11, 2018, which your reporter has had since early in our working relationship and has frequently discussed with me.

[92] Email 3/3/19.

[93] Text message 8/29/19.

there because Mischa "also did" this to her, after which she "dropped everyone in her life."[94] I myself was nearly sucked in, but escaped Andrew's fate.[95] Mischa is a "Davida Koresh" who is "just too lazy to actually have a coherent vision for her cult" because she "can't get past her victim thing."[96]

Your reporter *knows* all this nonsense to be true. She just knows it, without having done any reporting. She has never met Mischa, has never spent a moment with her family, has never spoken with any of her family members, has never spoken to anyone (other than me) who has spent any time with her family. Armed with the "knowledge" that blind prejudice provides, she has no need to gather facts and evidence — which in any event would support her thesis, no matter what they revealed. If they contradicted her thesis — if, for example, it were to emerge that this family is no less "wholesome," healthy and loving than any other — it would only prove how thoroughly the women had hidden the truth, underscoring the cult leader's control over others.

This trope — portraying trans individuals as "cult" leaders who brainwash normal, healthy individuals into joining their ranks — is a common slur, figuring prominently in the folklore of transphobia.[97] It is front and center in your reporter's vision for her book-in-progress. To help me understand what Mischa did to Andrew and nearly did to me, she has passed on to me a book recommendation from Andrew's sister, Margaret: *Terror, Love & Brainwashing: Attachment in Cults and Totalitarian Systems.*[98] Discussing a possible television series based on her work, your reporter proposed that the working title "Untitled Gullible Man Project" be replaced with the working title "Asshole Trans Cult Leader Project."[99]

This is not a family but a cult, and Mischa is not a wife and mother but a sinister illusionist. Your reporter disparages Mischa's role as mother to three children and wife to Andrew, joining the chorus of transphobes who cannot believe that a trans woman is actually capable of mothering and being loved as a mother by her children, or that a cis man could genuinely be in love with and attracted to a trans woman and could have a healthy marriage with her. After reading Mischa's article about the prejudice and disbelief she experiences as a trans mother, your reporter says the article overstates Mischa's actual parental responsibilities, and surmises that she

---

[94] Text message 8/29/19.

[95] Text message 9/30/19 ("So basically all the shit that they were pulling on you they had pulled on Andrew but on a whole other level.").

[96] Text message 8/29/19.

[97] For example, "I've Lost Two Kids to the Trans Cult," https://www.christianpost.com/news/ive-lost-two-kids-trans-cult-i-want-them-back-anguished-mom-shares-her-journey.html.

[98] Text message 10/18/19 ("Margaret wanted me to pass on a book recommendation to you that she says has really helped her a lot").

[99] Text message 8/29/19.

is taking credit for the parenting done by others in her household.[100] To your reporter, Mischa's ensnarement of Andrew was "breathtakingly awful";[101] the women used sleep deprivation and other brainwashing techniques to sever him from friends and family; he remains with Mischa because he is trapped in a "fugue state" from which she hopes her work will "awaken" him.[102] Your reporter will brook no dissent from me:

> BH:    Rereading those text messages among the three of them from 2016 and 2017. Don't underestimate Andrew's agency.
>
> KB:    He has been weaponized yes. Been thinking about that lately
>
> BH:    No, no. You need to reread. He is leaning on Mischa hard. To get me out, to take the LSAT, other things. He is not just taking orders, he is giving them. [ … ]
>
> KB:    Yes and telling them what they want to hear. And been programmed.[103]

This exchange is typical of many in which my efforts to complicate or qualify your reporter's narrative were dismissed out of hand.

To your reporter, nothing is real about this impostor. The street harassment Mischa experiences as a trans woman is nothing but a "dark fantasy."[104] The death from AIDS of a beloved partner, movingly recounted in an essay she published, is pure invention.[105] She conceals everything about her true identity — her parentage, her ethnicity, her names, her birthplace. Your reporter, bent on unmasking her, has made it her mission to track down details from her past, apparently oblivious to the reasons that trans individuals do not publicize these things. Your reporter ignores the real threats and dangers a trans woman may be exposed to by invading her private life, her past relations, her former partners, dead-naming her in the process to obtain any salacious details she can procure.

But exposure is not enough for your reporter. That is the reason she called my and Brooks' attention to the recent federal prosecution of a "kind of a cult leader" in New York for "psychological manipulation" and urged Brooks to consider seeking comparable federal charges

---

[100] Email 7/17/19. I will not rebut all of your reporter's vicious delusions, but I must say something about this one. I know firsthand Mischa's dedication as a mother and devoted immersion in her children's upbringing, and once wrote about it publicly.

[101] Text message 8/28/19.

[102] Text message 9/14/19. Once again, this oft-repeated idea of hers, no less vicious than her claim about Mischa's motherhood, is also completely disconnected from the reality of Andrew's life with Mischa as I myself often observed it.

[103] Text message exchange 12/21/19.

[104] Email 3/7/19.

[105] Email 3/7/19.

against Mischa and Maria-Pia.[106] The True Crime enterprise really requires the women to be charged with a crime — preferably a sensational one, and the sooner the better. Law enforcement authorities do not appear to appreciate the gravity of their offenses or the urgency of putting the women away for a long time. Why *shouldn't* your reporter get her sources to give them a little nudge, as she continues her "obsessive quest" for a quarry that will outdo Michelle McNamara?

Your reporter has been hoping to see the women prosecuted and imprisoned since the day I first contacted her, when she said "I hope they rot."[107] Better still, she would like their prosecution and imprisonment to be the product of her own crusade against the women. Thus, she made sure to inform Cooper and Brooks of contacts from sources who might serve as witnesses against the women. She encouraged sources who might qualify as victims to retain one of the lawyers. She encouraged me to call the police about what she hoped were possible grounds for prosecution. As it became clear to her that authorities were not interested in prosecuting the women because they had not committed any crimes, she began proposing wild and nonsensical legal theories to me and my lawyers. She is desperate to see them convicted and imprisoned.

Her reaction to the larceny charges mistakenly brought (and now dropped) against the women[108] reveal how unhinged her quest for "justice" has become. She encouraged me to call the police about the bank withdrawals in question, thrilled at my discovery — "Wow. So there's proof"[109] — of something that might get them prosecuted.[110] She was delighted to see charges brought and arrest warrants issued against the women, who were never even notified of the proceeding.[111] She relished the prospect that, if they returned to the United States while the warrants were pending, they would be taken into custody by federal law enforcement agents; she knew full well that this would expose Mischa to violence and potentially life-threatening danger, and was glad of it.[112] She was thrilled to learn that the pending warrants were deterring the

---

[106] Email 2/12/20, sent to Brooks and me.

[107] Text message 6/24/18.

[108] In March 2019, the Middlesex District Attorney's office charged the women with misdemeanor larceny, following my discovery that they had made transfers from my bank account that I did not recall authorizing. In a February 2020 filing in the civil litigation between us, the women's counsel pointed out I had in fact given the women authority to make the transfers. I notified the Middlesex DA of my mistake, and have recently learned that the charges were dropped and the associated arrest warrants recalled.

[109] Email 12/6/18.

[110] A more responsible reporter would have asked me about the circumstances of the withdrawals, and would have floated the possibility that I had forgotten authorizing them. But not your reporter, who unfailingly encouraged me to see anything the women had done in the worst possible light.

[111] The women were in France when the charges were brought and were never notified to appear in court. When they failed to appear at their arraignment in April 2019, the Cambridge District Court issued default arrest warrants for them, which they learned about only several months later.

[112] In phone conversations with me, she often gloated about the mistreatment Mischa would face at the hands of ICE officials under the Trump administration.

women from returning to the United States to defend themselves against the groundless proceedings that had been brought against them; complimented Howard Cooper for exploiting this; crowed when Cooper's strategy resulted in a default judgment against the women in Jay Scuteri's case; and looked forward to seeing the same strategy result in a default judgment against them in my own case. Her unconcealed delight at these serial injustices and life-threatening dangers for the women — all over a few hundred dollars that I (mistakenly) thought the women had taken without permission *during our relationship*[113] — now leaves me speechless.

Just consider. After the warrants were issued, the women faced a stark choice: fly to the United States and risk Mischa's life in the custody of Trump's border security agents, or stay away and forfeit the chance to defend themselves in court. They faced this choice precisely because Mischa is a trans woman of color. A pricey lawyer promptly exploited this to procure a judgment against them on behalf of a wealthy white man the women had accused of rape. A clearer case of the sheer rot afflicting our justice and law enforcement institutions — ordinarily of such concern to the editors of *New York* — can hardly be imagined. Your reporter was not troubled by this. She was overjoyed by it.

*New York* can take credit for the legal obscenity I have just described. In November 2019, the women sought to have the warrants recalled on the ground that they had not been properly notified of the criminal proceeding; Judge Sragow of the Cambridge District Court denied their motion, making fairly clear that she had read your reporter's articles. In the civil litigation, the women sought an extension of time arguing that entry of a default judgment was unconscionable under the circumstances; Judge Green of the Middlesex Superior Court denied their motion, after Cooper called her attention to your reporter's articles in his opposition papers.

Your reporter also hopes to help Margaret, her friend and fellow fabulist, pry Andrew loose from the women so he can resume a healthy, normal, un-brainwashed life. In late 2019, I told her that Andrew was scheduled to appear for a deposition in Boston in January 2020. She duly relayed that to Margaret, and later told me that Margaret was considering plans to intercept him there and dissuade him from returning to France. Your reporter also hopes that when he does eventually free himself from the women, he should take "those poor kids" with them.[114] Because causing a trans woman to be stripped of her three children, along with her losing her husband, is just the sort of thing *New York* wants to be known for.

Let me be clear about this. For your reporter, breaking up this family and wrecking these women's lives is not just some tragic by-product of her relentless search for the truth. It is her *objective*. As they say of Trump, the cruelty is the point. This project has never been about the

---

[113] The bank transfers occurred in July 2017, just after our return from Canada.

[114] Text message 8/29/19.

search for truth; it was always about making these women "rot," and then watching the credits roll.[115]

With *New York*'s help, she has had considerable success. Though the family remains intact, the articles have essentially destroyed their lives, and irreparably damaged the lives of their children. The world has lost the voice of a brilliant writer and commentator on trans rights, gender equality, and other political subjects. Trans girls have lost the rarest of role models — a trans woman in a loving marriage to a cis man, only mother to her three children, earning a PhD at Harvard. That is the achievement of the individuals responsible for the publication of these shameful articles.

## IV.  THE ARTICLES' MISREPRESENTATIONS

### A.    Overview

The lead article was primarily about my relationship with the two women, along with short accounts about three other men I had brought to your reporter's attention — Scuteri (referred to as John Doe in the lead article,) Poe, and Roe. In addition to being the main source for the story about my own relationship with the women, I was the only source for the stories about Poe and Roe. Your reporter never spoke to Poe or Roe or anyone connected to them. None of this is disclosed to the reader.

Your reporter never confirmed with them, or anyone connected to them, the accuracy of her account; she never asked these individuals whether her account matched their own perceptions or understanding of events; she never got their permission to publish her account. She relied entirely on written materials I had given to her, along with my own interpretation of the materials. I, the source, have never spoken to either men and have no idea what they themselves think about any of this. None of this is disclosed to the reader, either.

As for Scuteri: your reporter did indeed speak to him, and has repeated his accusations against them. But she inexplicably forgot to mention one thing: the women have publicly accused this individual of having raped Maria-Pia. On what conceivable basis would you print his accusations against the women, but not their accusation against him? What responsible journalistic outfit would *ever* give such a one-sided account of a dispute?

In short: your lead article consists of one story (mine) whose main source has retracted; two stories (Poe and Roe) that are completely uncorroborated; and one more (Doe) whose one-sidedness constitutes journalistic malpractice.

---

[115] Text message 6/24/18.

33

The result of this farce is pure defamation. The lead article creates a deeply false portrayal of these women as serial predators who terrorize men and shake them down for money. The false light generated by this portrayal is then magnified by the second article, in which a mostly inconsequential series of alleged encounters on the street becomes "proof" of the predatory view of the women developed by the first article. Combined, the articles deceive readers into believing highly inflammatory charges on the basis of what is, on inspection, essentially nonexistent evidence — charges that, I repeat, are completely false. This is a small-scale version of what despots and to create public enemies out of the unpopular groups and marginalized people. It is not journalism.

**B.     Lead Article**

**1.     My Story**

As I have stated before, the magazine's story about me converts a complex relationship among three people into a *Fatal Attraction*-style thriller of crazed females tormenting a hapless man and his family, a fiction having no relation to the truth. In a subsequent letter, I will give a detailed, point-by-point refutation of the story; here I will just summarize the problems.

1.     The article's claim that I was seduced into the relationship is completely false. From the beginning, I spent as much time chasing Maria-Pia as she did me. I drew her in with the false representation that my attachment to Jennifer would pose no barrier to a relationship. The fact is, I was no more a "mark" than were the women, who felt deceived and manipulated because my representation was false.

2.     The claim that I was the victim of a paternity trap is also utterly false. I would have wanted to be with the women even if the pregnancy had never happened. I am convinced Maria-Pia told me I had caused the pregnancy because she knew I would leave immediately if I found out that another man might have caused it. Anyone who reads the 2000 or so pages of text message traffic between the three of us can see that the baby played essentially no role in the relationship.

3.     The portrayal of my relationship with Mischa is misleading, offensive, and transphobic. I was in love with her; our love was romantic; it was not sexual because she is asexual. The article's insinuations that I was somehow used in this relationship is nonsense, and deploys bigoted stereotype that trans women are somehow unlovable and unattractive. This aspect of the article simply enrages me.

4.     The claim that the women sought to separate me from my family, or to part me from my money, is nonsense. As I said before, they simply did not want to be mistresses, and resented the fact that I was effectively asking them to financially subsidize Jennifer — who rewarded their overtures to her with unrelenting hostility, and did all she could to sabotage the relationship.

5.      The claim that this relationship was a scam, or was any less genuine on the women's part than on mine, is contradicted by the written correspondence among us, which your reporter and the article's editors show little sign of having read.

6.      The claim that Mischa's Title IX complaint was an act of fraud, extortion, and abuse of process is false.[116]

Scheming females, hapless man, defenseless wife and children — your reporter wanted a made-for-Netflix narrative. That is why, days after declaring that this was the most difficult story she had ever reported, she gushed at the prospect of a "nice bidding war" in Hollywood — "great news for us, drives up the price" — for the movie and TV rights.[117]  To her dismay, the bidding never materialized. Meanwhile, I have searched without success for evidence that she had ever before reported a story, difficult or otherwise.

### 2.      Poe, Roe and Scuteri (Doe)

These men create the "series" that, in the lead article's telling, make the women "serial" predators who shake men down for money. This part of the article is outrageous, as I am going to take some pains to show here.

To recap: I was the one who informed your reporter about all three of these men, having gotten stories about them from my lawyers Brooks and Cooper. Both of these lawyers had built up a narrative that the women were serial grifters. This position was expedient to them for purposes of advocacy; both are criminal lawyers, and are accustomed to using "scorched-earth" tactics against adversaries. (Cooper also had a pronounced, palpable antipathy toward the two women.) They had no trouble convincing me of their view of the women, which was also being pushed on me by Jennifer. They were my echo chamber, as I've suggested, which your reporter promptly joined.

I must emphasize how profoundly this echo chamber affected my own perceptions. My life seemed to be falling apart; I was stuck at home, talking to almost no one but your reporter, Jennifer, and the lawyers. I lost the reality check that comes from communicating with people with different viewpoints. I became radicalized, developing an extreme view of the women that bore no relation to my actual experience with them. From then on I interpreted each bit of information in the worst possible light. Your reporter was instrumental in this process; any time I wavered in my view of the women as predators, or suggested that it could be simplistic or wrong,

---

[116] As I said at the end of part II above: I no more sexually harassed Mischa than she and Maria-Pia extorted me. However, I can readily see how — in the heat of conflict — she could genuinely believe in charges against me that were not true and that she herself would not have believed under less stressful and adversarial circumstances. I can readily see this because I was led to believe in charges against her that were not true, as I myself would have recognized absent the fraught circumstances that kept me in an echo chamber.

[117] Bolonik email 8/15/19.

your reporter pushed me back to the party line. Looking back, I am reminded of news stories about the online radicalization of "incels," members of forums such as 4chan, and other disciples of conspiracy theories and extreme ideologies.

I will add that this extreme view of the women has the same viral quality — the same potency and contagiousness — as those virulent forms of online misogyny. It is easily harnessed by people who have something to gain from demonizing the women, and unfortunately finds a receptive audience in all too many readers and listeners bearing conscious or unconscious biases, for whom these strange, unconventional women are both a source of entertainment and confirmation of those biases. Your reporter has shamelessly exploited this situation out of a variety of motives — self-promotion, professional jealousy toward Mischa, and a deep-seated animosity toward Mischa that has grown into what, as I've suggested, can only be called a personal vendetta. The *New York* articles have become the principal vehicle for the viral spread of the false view of these women that has no more basis in reality than the other delusions and conspiracy theories accepted as fact in 4chan and similar fever swamps.

That is the process by which Roe, Poe and Scuteri have become part of these women's mythical "trail of victims," and central components of the demonology surrounding the women. Let us look at the falsehoods and evidentiary gaps in this "trail of victims" picture.

### John Poe

First, your reporter never spoke to this individual or anyone connected to him.

- She relied entirely on material I had given her and my interpretation of it.[118]
- I myself have never spoken to this individual or anyone connected to him.
- The published account was unsourced, and made no use of publicly available documents (of which there are none).
- The reporter obtained no corroboration of the account and does not have this individual's permission to publish it.

Second, the sole document on which the entire published account is based is the transcript from the 2014 proceeding in which Maria-Pia sought a restraining order against Poe.

- The proceeding was impounded by the courts in 2016, making all records from it unavailable.
- The transcript is uncertified and is not an official court document. Your reporter got it from me, and I got it from Doug Brooks.
- Neither she nor I had any way of verifying its accuracy or completeness.

---

[118] This was a matter on which your reporter repeatedly consulted me, not only for my perspectives but also for my legal analysis to inform her reporting.

Third, the published account is based entirely on Poe's testimony in the transcript, which the published account presents as fact.

- In this proceeding, Poe was represented by counsel but Maria-Pia was not.
- Poe was not cross-examined by anyone, and the judge asked essentially no questions.
- The reporter presents this un-crossed testimony as fact, without ever having spoken to him or anyone connected to the events in question.
- There were four witnesses at the proceeding — Poe, Poe's then-girlfriend, Maria-Pia, and Mischa. Your reporter has not spoken to any of them, or to anyone else with knowledge of what happened.

Fourth, your reporter's account is contradicted by the very document on which she relies.

- The article suggests that the woman named Jacqueline Lescarret does not really exist, implying that she is a fabrication of Maria-Pia and Mischa's. In fact, Poe and his lawyer repeatedly state that Poe has met Lescarret in person on numerous occasions.
- The article states that Maria-Pia's request for a restraining order followed Poe's request for a restraining order against Lescarret, implying that Maria-Pia's request was an act of retaliation.[119] In fact, the document makes clear that Poe sought his restraining order three days after Maria-Pia began the proceeding against him.
- The article states that the baby born in 2011 could not possibly be the product of Poe's encounters with Maria-Pia because the last such encounter was in 2009. In fact, the transcript says quite clearly that they were last together in 2011.
- All three of these assertions in the article are used by the reporter as dramatic indications that Maria-Pia and Mischa are brazen fraudsters and manipulators of the legal system. In fact, all three are the imaginings of someone who has simply not read the document she is reporting on.

Fifth, the published account falsely implies that the court rejected Maria-Pia's assertion that Poe had sexually assaulted her five years earlier.

- The entire focus of the hearing was on whether Poe's threatening words toward Maria-Pia, as reported by Mischa, posed a sufficient danger to warrant extension of the restraining order.
- The court denied the restraining order after it became clear that Poe had not seen Maria-Pia in years; that he had not spoken with her in nearly a year; and that his primary interactions in the episode had been with Lescarret and Mischa.
- Maria-Pia's assault accusation was scarcely discussed at the hearing; it was not adjudicated by the court; and the judge expressed no view about it.

---

[119] It does not explain how he could have brought this proceeding if Lescarret did not exist.

- In addition, the judge made no credibility findings and gave no indication that he disbelieved anything the women had said.

Sixth, I have obtained new information that further undercuts the account offered in the article.

- A third-party bank subpoena has revealed that Maria-Pia had transferred to Poe at least $10,000 a few years before the $11,000 payment he claimed to have made to Maria-Pia via Lescarret. This contradicts the idea that he was somehow being defrauded and extorted into paying them money.
- Poe sent Mischa a number of warm communications, including a hand-written Mothers' Day card, in the period after the restraining order proceeding. This is hardly compatible with the idea that he viewed himself as a victim of Maria-Pia and Mischa's.

Finally:

- Poe has resisted all of my attempts, as well as your reporter's attempts, to contact him.
- At the time of the conflict Poe sought a restraining order against Lescarret, but not Maria-Pia and Mischa, further contradicting the idea that they were menacing him in some way.

In view of all this, I cannot see how anyone could believe it is journalistically responsible to portray Poe as the victim of fraud, extortion, false sexual assault accusations, or indeed anything else, at the hands of these women.

Please note: Poe's is the *only case in which one of the women's purported victims paid them money or even was asked to pay them money.* It is now clear that he paid them money to repay Maria-Pia for money she had given him. None of the other men in the articles was ever asked for money.[120]

### Richard Roe

First: once again, your reporter never spoke to this individual or anyone connected to him.

---

[120] As I noted before, Anthony of the followup article confirmed to me that Maria-Pia never suggested she wanted money from him. Roe and Scuteri's lawyers (Brooks and Cooper, respectively) have confirmed to me that neither man was asked for money.

- She relied entirely on material I had given her and my interpretation of it.[121]
- I myself have never spoken to this individual or anyone connected to him.
- The published account was unsourced, and made no use of publicly available documents (of which there are none).
- The reporter obtained no corroboration of the account and does not have this individual's permission to publish it.

Second, the documents on which the entire published account is based are purported text correspondence between Roe and Maria-Pia, and email correspondence between Roe's lawyer, Doug Brooks, and Maria-Pia's lawyer, Ruth O'Meara Costello.

- Your reporter got them from me, and I got them from Doug Brooks.
- Neither she nor I had any way of verifying their authenticity or completeness.
- Your reporter did not speak to either party to the purported text correspondence to check whether it was authentic, altered, or taken out of context. In addition, she did not get their permission to use it.
- Your reporter did not reach out to or speak to Costello to corroborate the authenticity or completeness of the email correspondence and to verify that it was not altered or taken out of context.[122]

Third, the published account is based entirely on my interpretation of the purported text correspondence between Roe and Maria-Pia, and email correspondence between Brooks and Costello, and on what Brooks had told me about it.

- To resolve the conflict between Roe and Maria-Pia, Brooks had demanded that Maria-Pia sign a confidentiality agreement which he drafted and presented to Maria-Pia for her signature. Maria-Pia signed it but Roe did not. My understanding is that most people would view this agreement as legally binding under these circumstances.
- So far as I am aware neither of the parties to the conflict has ever said anything about what happened between them. The only person who has spoken about it was the lawyer who pressured Maria-Pia to sign an agreement silencing her.
- I think it is highly troubling for any journalistic outfit to publish, under such circumstances, the lawyer's account of what happened between the parties. The lawyer has in effect engineered a situation in which he considers himself free to tell his version of the story, while Maria-Pia exposes herself to liability if she even opens her mouth about it.

---

[121] This was a matter on which your reporter repeatedly consulted me, not only for my perspectives but also for my legal analysis to inform her reporting. Not only was I her source and giving her my thoughts, but I was also her expert legal consultant. And I think it's obvious the ethical problems that arise.

[122] Your reporter kept me apprised of the lawyers she was speaking to and most certainly would have told me if she had spoken to Costello

Fourth, the article falsely implies that Maria-Pia sought money from Roe.

- Brooks has confirmed to me that Maria-Pia never asked his client for money.
- In her correspondence with Brooks, Costello emphasizes (without objection from Brooks) that Maria-Pia has made no demands for money.
- In the text correspondence, Maria-Pia makes no demand for money. Once the conversation between Maria-Pia and Roe becomes adversarial, Maria-Pia tells him that he ought to get a lawyer and that any further communication should be through lawyers. This is not the behavior of someone seeking to defraud or extort someone with a groundless paternity claim.

Finally, as I described in Part II above, the Brooks letter — on which my understanding of the Roe story was based, and passed on to your reporter — was completely misleading.

- The letter portrayed the Roe case as one of a series of "extortion schemes."
- The instances he gave of such "schemes" — involving Poe, Andrew, and the unnamed man on Tinder — contained no evidence of extortion.
- The letter misleadingly implied that there was such evidence, in order to create the impression that Maria-Pia's interaction with Roe — a legal nonevent — was the beginning of another such scheme.

Here again: In view of all this, I cannot see how anyone could believe it is journalistically responsible to portray Roe as the victim of fraud, extortion, or indeed anything else of legal significance.

### Jeffrey "Jay" Scuteri (John Doe)[123]

The more you look at your coverage of this man, the more disturbing it becomes.

First, it is very troubling that your article allows *him* to remain cloaked in anonymity, given that your reporter made clear to me that there was "no way" she would ever grant Maria-Pia and Mischa's request to remain anonymous.[124] *Your article grants anonymity to a credibly accused rapist, while naming his victim without her consent.*

Second, the published account entirely omits an all-important fact: in Scuteri's lawsuit against them, the women have alleged that he raped Maria-Pia.[125] It is truly astonishing that your

---

[123] As I have indicated before, I name this individual here because he has filed a lawsuit in his own name that is a matter of public record.

[124] This seems to me a good indication of how little interest your reporter had in producing a balanced story or in securing the women's trust and participation.

[125] This is in their pleadings, which are publicly available, and your reporter is well aware of it.

article includes Scuteri's accusations against the women, but *excludes* their accusation against him and *does not ask him to answer it.*

- The omission creates an unfairly one-sided picture of the dispute between Scuteri and the women, and conceals a motive he has to lie about what happened.
- It also deprives the reader of information essential to evaluating your claim that the women have falsely accused others of sexual assault.
- Your article essentially "convicts" the women of making false sexual assault accusations against Poe, whom your reporter never spoke to.
- Here we have, in Scuteri, a man they have accused of sexual assault, whom your reporter spoke to. Did your reporter ask him about their accusation? What did he say? Is there any evidence bearing on the question?

The omission of the sexual assault allegation, and your reporter's refusal to look into it and report what she found, can only be called journalistic malpractice.

A question: would it have been acceptable to print the women's sexual assault accusation against Scuteri, without printing the accusations he has made against them? If not, why was it OK for you to print *his* accusations but not *theirs*?

Third, the fact of that allegation may help explain some otherwise inexplicable behavior of Scuteri's, who — as I noted in part II above — seems very reluctant for the evidence in this case to be aired in court.

- He and Cooper began threatening the women with a lawsuit in March 2016. There were negotiations that spring between Cooper and the women's lawyer Costello, which apparently quickly broke down.
- Scuteri did not file suit after negotiations broke down. He remained reluctant to sue even after I contacted Cooper with my own story in the fall of 2017, and after I alerted Cooper to the Brooks letter in the spring of 2018.
- He finally brought suit a couple of months after I filed my own lawsuit, when it would have been apparent to him that he and the women were likely to be deposition witnesses.
- Cooper stated to me that his strategy was to seek a judgment in his client's favor with no trial or adjudication on the merits.

41

- Now that he has won a default judgment, Cooper and his client show no interest in scheduling a hearing to prove his damages,[126] a hearing at which evidence of the sexual assault would likely emerge.

Fourth, the evidence available to me supports the sexual assault accusation.

- Maria-Pia has alleged that Scuteri raped her in the encounter that had been initiated by him. She reported it to Mischa and Andrew the day it occurred; the following day she and Mischa reported it to a friend — FG, a former police officer — to seek his advice.

- Contrary to the inflammatory and groundless suggestion in the lead article and by your reporter that Maria-Pia has a history of making false rape reports, there is no evidence of this.[127]

- Mischa disclosed to me on several occasions in 2016 and 2017 that Scuteri had sexually assaulted Maria-Pia.[128] These conversations occurred during our relationship, when she had no reason to lie to me about such a thing.

- Maria-Pia disclosed to me in the summer of 2017 that Scuteri had raped her. She also had no reason at that point to lie to me about this.

---

[126] As noted above in part III, Cooper exploited the arrest warrants against the women to secure a default judgment against them in the Scuteri litigation. His strategy succeeded because Judge Sragow of the Cambridge District Court (who in May 2020 ordered the mistaken charges to be dismissed at the DA's request) declined to recall the warrants despite the fact that the women had not received proper notice of their arraignment, and because Judge Green of the Middlesex Superior Court declined to give them a time extension despite the manifest danger Mischa would face as a transgender woman of color if she were to be detained by federal law enforcement while entering the US with the default warrants in place. Both judges were highly dismissive of the women's legal positions, and both judges had rather clearly read your reporter's articles and, like many, had been influenced by the false light to assume the women were villains. *New York* can therefore take credit for assisting Cooper's exploitation of the Trump ICE's prejudice toward transgender women of color to secure a victory for his client while avoiding a ruling on the merits of Maria-Pia's rape accusation against the client. Your articles have now severely impaired the women's ability to receive due process even in courts.

Once again, one would ordinarily expect *New York* to express outrage at the manifest injustice of putting a transgender woman of color to the choice between risking her life in the hands of federal border control agents or giving up her right to defend herself in Scuteri's lawsuit — all because of a (mistaken) misdemeanor charge. The episode should be part of the national debate we are having over the harms endured by vulnerable minority groups through our law enforcement and court machinery. That the misdemeanor charges were ever filed in the first place can be chalked up to my misguided relationship with your reporter, who never failed to share her view that the women were "grifters."

[127] As I discussed in part II.C above, the police have credited the complaints she has made about men harassing and threatening her. I am not aware of a single instance in which the police have disbelieved a complaint she has made to them, about sexual assault or anything else.

[128] She did not tell me his name, and said little about the circumstances beyond telling me that he was threatening groundless litigation against the women and was represented by Howard Cooper.

- FG, the former cop, has recently confirmed to me that the women spoke with him the day after the second encounter, and told him a man had sexually assaulted her the previous day; that Maria-Pia was distraught and unsure what to do; and that he advised her to at least file a report with police in order to document the episode; and that he had a followup call with Maria-Pia a few weeks later, in which she said she did not want to pursue the Scuteri matter with law enforcement because she was pregnant and there was a chance the pregnancy resulted from that encounter.

Fifth, the evidence available to me casts serious doubt on Scuteri's account, which the article presents as fact.

- Though Maria-Pia appears to have initially approached Scuteri, which led to their encounter at the Taj Hotel,[129] it was *he* who contacted Maria-Pia several weeks later after this encounter to ask her if she was in town and wanted to meet again.
- This encounter — *initiated by Scuteri* — was the one after which Maria-Pia contacted him to say she was pregnant; it is also the one in which Maria-Pia alleged Scuteri raped her and filmed her.
- None of this is disclosed in the article, presumably because it undercuts Scuteri's story that the women targeted him in a scheme.

Further:

- Before Scuteri's first encounter with Maria-Pia, he met with her and Mischa for a drink.[130] During that drink, Scuteri took one or more surreptitious photos of Mischa.[131] Why would he take and retain such a picture of *Mischa* over a casual drink?[132] This is creepy, predatory behavior directed at a trans woman, which should not be lost on anyone. What was he planning to use the photo for? Any number of dark possibilities come to mind.
- Aside from raising questions about his credibility as a source, the surreptitious photograph is obviously strong substantive evidence supporting Maria-Pia's contention that Scuteri secretly filmed their second sexual encounter and then threatened her with disclosure of the video.
- We all know that women are targets of revenge porn far more often than men. Scuteri has evidenced his propensity to take surreptitious photographs and retain

---

[129] This encounter was uneventful.

[130] This is undisputed by the parties in the litigation.

[131] This emerged in the Title IX proceeding, whose investigator stated in her report that Cooper had provided her with a photo of Mischa and had explained that Scuteri had taken it without Mischa's knowledge during the drink. A copy of the photo is in the Title IX record.

[132] If Scuteri had some qualms about the encounter, they certainly did not prevent him from going up to her room after the drink or reaching out to see her again a few weeks later.

them for no reason. In contrast, there is no evidence that Maria-Pia and Mischa have ever done such a thing.

- None of this is disclosed in the article, presumably because it discredits Scuteri and his story.

In sum:

Jay Scuteri raped Maria-Pia. This seems clear to me.

The above evidence not only undercuts Scuteri's story about being "victimized" by these women; it strongly suggests that he victimized *them* by sexually assaulting Maria-Pia and threatening them with the circulation of revenge porn.

The evidence therefore casts serious doubt on the article's entire thesis that the women are predators who pretend to be victims.

*New York* has failed to disclose any of that evidence. Indeed, it has failed to alert the reader *in any way* to the women's side of the story, which is detailed in their public filings in the litigation.

This is simply outrageous.

It is my belief that I was in effect used by Howard Cooper to help him create a smokescreen over Maria-Pia's highly credible rape accusation against his client. *New York* has allowed itself to be used in the same way.

## C.    The Followup Article

I will comment briefly on these vignettes, which say more about the individuals responsible for producing these articles than they do about their subjects.

1.    The Aaron Holman story: This made-up story[133] seeks nothing more than to ridicule women for stepping out of traditional gender roles.

2.    The Steve story: When this individual contacted Bolonik in August 2019, her editor Genevieve Smith wrote to a colleague: "Kera talked to another guy who dodged a bullet."[134] I would love to know what "bullet" was dodged in this made-up story,[135] whose purpose is to imply that there is something wrong with the kids having a trans mother, that the

---

[133] Mischa does not drive, as I well know, and neither of them would ever be so boorish as to catcall someone.

[134] Bolonik email 7/25/19. Bolonik forwarded me Smith's note, along with her correspondence with the man, including his name (Scott Woodbury) and his email address, and said I could pass it on to my lawyer Brooks.

[135] Maria-Pia would never hide from anyone, much less a relative, that Mischa was the mother of their children.

women know they have to hide this, and are willing to do manipulative and deceptive things to avoid being found out.

3.     The Jordan story: If true, establishes that Maria-Pia was "forward" with a man and insistently sought his attention. This is surely powerful proof of guilt, because only men are allowed to act that way; if a woman does it, there is something sinister afoot.

4.     The David and Carl story: When the source contacted Bolonik, she forwarded his email to me for my opinion. Here is my colloquy with her:

BH:     There's a problem with the date though. In fall 2015, she was visibly pregnant. I wonder if he means the spring.

KB:     I just asked him about that after getting the email. I said, wait she would have been pregnant. Waiting to hear back. He did say it was late at night, he may not have noticed. Was she huge at five, six months?

BH:     I wonder if he still has the texts. If he or others really want to be helpful, they could get cell phone records to pin down dates.

KB:     He says he doesn't have the texts anymore but maybe his friend does. He said he realizes it must have been summer now because it happened before his Sept 1 2015 move.

After conferring with his friend they remembered it was April/May 2015.[136]

The article simply says that this non-story occurred "in the Spring of 2015." Take this little exchange, and the published result, as an indication of your reporter's professionalism and integrity.

5.     The childhood friend story: This individual's mother contacted me; I passed the note on to your reporter who then contacted the individual, and alleged childhood friend. The article refers to no evidence provided by the individual to support her story, and cites no corroboration. The story itself is implausible and completely at odds with everything I know about Mischa: she is asexual; she vocally opposes attaching value to physical appearance;[137] she would never participate, or encourage participation, in hook-up culture.

This anecdote showcases the indiscriminate sexualization of trans women that (like their indiscriminate portrayal as cult leaders) is central to the vocabulary of transphobia. Equally

---

[136] Bolonik email 7/27/19.

[137] As a reader of our text message correspondence would know, she made that position abundantly clear to me more than once.

noteworthy is the anecdote's stereotype-laden claim that Mischa "corrupted" Maria-Pia. Here we have, in a nutshell, the narrative your reporter is developing: Maria-Pia and Andrew were both leading normal lives until Mischa came along to recruit them into her cult, transforming Maria-Pia into a nymphomaniac and Andrew into a "lab rat"[138] who has been conditioned into believing he is Mischa's husband.

6.     The Anthony story: Oddly, the article neglects to say whether Maria-Pia ever sought money from this man.

Given what she had written in the lead article about fraud and extortion schemes, and the women's use of money demands to control and manipulate men, it is intriguing that your reporter did not ask this man about it — and (if she did ask) that she did not tell the reader the answer he gave.

As you can see from the "David and Carl" exchange immediately above, your reporter has no problem asking sources questions (or feeding them answers) about minor details like the date of an encounter with the women. When Anthony contacted her immediately after the lead article came out, she had a perfect opportunity to test the thesis of the lead article. The money question is not, after all, a minor detail, but central to the claim that these women are serial extortionists.

Did it really not occur to your reporter to ask him? Or did she just not like the answer he gave?

## V. CONCLUSION

A few months ago, when I was starting to have doubts about the trial, conviction, and execution — in nearly every sense but the literal one — of these two women, I myself asked Anthony whether Maria-Pia had sought to get money out of him.  His answer, of course, was no.[139]

This was shortly after my realizations that my "bank theft" accusations against the women, which had led to criminal charges, were simply false. They had emerged from my discovery, in 2018, of some withdrawals the women had made from my account — which, courtesy of my echo chamber, I promptly construed in the worst possible light. As I have said, your reporter was thrilled at this discovery of "proof" of crime, encouraged me to report it, and

---

[138] Text message 9/14/19

[139] I also asked him whether she had accused him, or threatened to accuse him, of sexual assault. The answer was no.

I should add that of the men discussed in the articles, he is the only one with whom I have had direct communications.

was pleased to see charges brought. There was only one problem: I had authorized the women to use the account, and they put more money into it than they took out.[140]

These serial extortionists never seem to get around to actually *extorting* anyone.

Which can be a real problem for a couple of articles that are basically an extended riff on private investigator Long's vision of a "deviant scheme to extort money from young men for purposes of financial gain." That is why, like the 2015 Brooks letter on which they are based, the articles conceal their sourcing, misrepresent the evidence, and deceive the reader into believing in a nonexistent case against the women. This is about creating criminals, not exposing them.

Look at the trajectory of this false narrative. The ludicrous imaginings of Andrew's relatives lead to the P.I.'s "deviant scheme," which leads to the pseudo-facts of the Brooks letter, which leads me to write of the women's "campaign of fraud, extortion and false accusations," which leads to the two articles built around that very phrase, which leads to a forthcoming book whose main source will be none other than — Margaret Klein, the first to intuit that Mischa, dark-skinned trans cult leader and brainwasher of men, just may have masterminded the Boston Marathon bombing. This would all be funny, if it weren't ruining the lives of real people.

The stories of these women's supposed predations, as I suggested before, have a snowballing effect. Once you "know," or think you know, that they preyed on one person, it becomes much easier in the next case to read ambiguous (or nonexistent) evidence as proof that they did the same thing to someone else, which makes it still easier to draw the same conclusion in a third case, and so on. Pretty soon, everything they do is suspect, and every scrap of information about them further confirms their guilt.

This is the logic of every witch hunt, and it is on full display here. In the lead article, the reader "learns" of four victims, without being aware of any of the problems — such as the total lack of supporting evidence — I have identified. Then, in the followup piece, the reader encounters a half-dozen more stories, most of them completely innocuous, all of which (when combined) acquire a sinister glow in light of the "knowledge" from the original article. The reader now has an airtight case of two serial predators who remorselessly prey on unsuspecting men.

I need hardly point out how easily such a narrative sells (literally and figuratively) when it is about two nonconforming women, one of them a trans woman of color. An alarmingly large part of the public is eager to read "sinister" and "criminal" into practically anything they do (even using the bathroom, to recall the panic over trans women that swept the country four years ago). The false light cast by this work is therefore far more damaging for women like this than it would be for cis white people, who enjoy every benefit of the doubt in the public mind.

---

[140] As noted before, this was pointed out by their lawyer in a February 2020 filing in the civil litigation.

The upshot for these women is not hard to imagine. People from their past will reevaluate whatever favorable impressions they may have had. People in their present and future will want nothing to do with them. People who harbor prejudice against them will see their bigotry validated. People who consider them enemies will use the articles to hurt them. People who want money from them will use the articles as templates for blackmail. People will refuse to allow their children to play with the women's own children. And so on.

I cannot and will not lend my name to this travesty any further. I do not see how those associated with the magazine and its parent company — which includes some of my journalistic heroes — could want to do so either. For that matter, I do not see how any lawyer for a responsible media outlet could want to do so. You, your clients, and your parent company should take the steps necessary to ensure that this disaster does not happen again.

Kera Bolonik was unqualified to write this article, and should never have been assigned it. Beyond that, she has used it for purposes completely antithetical to the magazine's mission. The more she seeks to "unmask" Mischa by probing into her childhood, seeking salacious details about her pre-transition life, and deadnaming her to potential sources, the more your reporter reveals that she, not Mischa Haider, is the real imposter. Your reporter is falsely posing as a feminist, as a trans ally, as an ally to people of color, and as a journalist. Now that she has done very serious damage to innocent lives, her influential and well-connected friends may tempted to cover up for her. They should resist the temptation. Her behavior, as I have demonstrated above, is inexcusable.

In closing, I would like to call attention to some of the harms these articles have caused, and are continuing to cause by remaining online. There is, first, the matter of the articles' impact on the lives of the women and their children. Just think for a moment about the four year-old boy who serves as the hook in your shameless "paternity trap" fiction. Has anyone associated with the magazine considered the effect these articles will have on his future? Were the clicks worth it?

There is, second, the matter of understanding the truth about the women's activism that, as I have suggested before, lies at the center of this story. Their "personal is political" stance has driven many of the events that have been so misunderstood by so many. Even many progressives will probably consider these women's values and ideas — their position that no degree of enabling of misogyny should be tolerated, their radical view on women's sexual agency, and their unconventional views on family structure — to lie too far outside the box. Far from being criminals or cult members, they simply have an unwavering and intense commitment to bringing change in unconventional and disruptive ways. That should be the subject of constructive and respectful discussion. Maybe these Weird Sisters' ideas will one day be mainstream. *New York* should not be demonizing them.

There is, third, the matter of Mischa Haider's voice and public presence. In this moment of collective reflection and calls for action against the oppression of those who are marginalized, it

48

is both tragic and infuriating to see what these articles have done to the life and reputation of a transgender mother of color — particularly this one. As I have said before, the example she sets — her loving relationship with her husband, her being mother to her three children, her intellectual and literary contributions and accomplishments — should make her a role model and inspiration for trans girls. It is her achievements and ideas that should be featured in your publication, not the false and dehumanizing pulp currently being circulated.

*New York* devotes much of its energies to calling out systemic racism and related injustices. It is therefore an intolerable irony that the magazine has silenced this extraordinary trans woman's budding voice in the way that it has: by publishing a false story that deploys every negative stereotype in the book to portray her as a serial victimizer of white cis people — a fictional tale coming from the false accusations of bigoted cis white people, written by a cis white woman posing as a journalist. It is as though the magazine were trying to enact every form of injustice that it normally opposes.

As I said before, some of those copied here are journalistic heroes of mine. I hope they encourage the magazine to do the right thing. As events in the past few days show, there is thankfully little appetite for attacks on marginalized people masquerading as free speech. It is writers like Mischa Haider who should be invited by *New York* to tell their stories if they choose to, or to offer insight on the issues we face at this troubled time. It is writers like her who should be publishing books about their lives if they wish to. That Mischa's voice has gone silent while Kera Bolonik reaps the rewards of True Crime character assassination is a sad illustration of the way our society keeps marginalized people from authentically telling their own stories. That cannot be what *New York* wants to be known for.

I will say it again. The only decent thing for your publication to do is take those articles down, find a way to address the harm they caused, and investigate this travesty honestly and thoroughly so that it never happens again. Transparency, integrity, and accountability: those should be your principles. Not clickbait, cronyism, and cover-ups.

Sincerely,

Bruce Hay

49