UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BRUCE HAY

                Plaintiff,

      v.

NEW YORK MEDIA LLC,
KERA BOLONIK,
and
DAVID KORZENIK,

              Defendants.

Civil Action No. 1:20-cv-6127

**FIRST AMENDED COMPLAINT**

**Jury Trial Demanded**

## INTRODUCTION AND OVERVIEW

1.      For the half-century since its founding in 1968, *New York* Magazine ("*New York*" or "the Magazine") enjoyed an international reputation for publishing first-rate investigative journalism, particularly on subjects related to civil rights. The Magazine has an illustrious record of exposing, and speaking out against, prejudice directed at unpopular groups, including discrimination based on race, gender, sexual orientation and the like. It has an equally illustrious record of exposing, and speaking out against, police misconduct and the abuse of law enforcement authority. These are things on which the Magazine's "brand" has been built.

2.      Like many news organizations, *New York* has suffered severe financial problems in recent years, putting the Magazine's survival in serious doubt. The present internet-based media environment, dominated by short attention spans and vanishing barriers between fact and fiction, holds few rewards for serious journalism. After several years of mounting red ink, with paid circulation declining from 1.8 million in 2017 to under 500,000 currently, Defendant New York

1

Media LLC ("New York Media")  — owner and publisher of *New York* Magazine — was sold to another company in September 2019. In waves of cost-cutting efforts, it has laid off many of its writers and editors.

3.　　These economic pressures have created temptations for New York Media to relax its journalistic standards and to use *New York* as a platform for "sensational" stories that will garner immediate attention and generate money quickly. The present case illustrates the catastrophic degree to which New York Media has succumbed to that temptation — trashing a great Magazine's hard-earned reputation, wrecking innocent lives, and trafficking in the virulent prejudices that *New York* made its name resisting.

4.　　Plaintiff Bruce Hay is a professor at Harvard Law School, where he teaches Civil Procedure and related subjects. In 2018, he found himself in an escalating legal conflict with two women he had loved — Maria-Pia Shuman, a cisgender white woman, and Mischa Shuman, a transgender woman of color ("the Shumans"), who are married to each other. Plaintiff had been very close to the Shumans until 2017, when a painful rupture — facilitated by individuals who had an interest in driving them apart and stoking conflict between them — made them bitter adversaries in court and in Title IX proceedings at Harvard.

5.　　In July 2018, Plaintiff entered into a contractual agreement to work with New York Media, and with Defendant Kera Bolonik, on an article for the Magazine about his dispute with the Shumans. Under the agreement, Plaintiff promised his exclusive cooperation with the Magazine on the article, while New York Media and Bolonik promised to comply with  the high standards of professional investigative journalism long associated with the Magazine.

6.　　Plaintiff then worked closely with Bolonik and Defendant New York Media — along with Defendant David Korzenik, counsel to New York Media — for many months, acting

not only as a source but as a fact-checker and legal consultant, doing everything he could to make possible the responsible piece of investigative journalism they had promised him. He also gave up — at the insistence of Bolonik and her editors — the opportunity to have such a piece done by the *New York Times*, which had repeatedly expressed interest in covering the story before Plaintiff agreed to work exclusively with Defendants.

7.      Defendants did not produce the responsible piece of investigative journalism they promised, and made no real attempt to do so. Instead, they seized the opportunity to produce a sensational "True Crime" story, replete with vicious transphobic and misogynistic stereotypes, portraying the Shumans as scheming, deviant *femmes fatales* preying on a series of men, and Plaintiff as their credulous, hapless victim.

8.      This had been Bolonik and her editors' vision of the project from the start, and remained so throughout. The idea was that such a salacious "True Crime" story would quickly win wide circulation and notoriety, leading to a book and movie and/or television series — which would bring money to the cash-strapped *New York* and name recognition to the unknown Bolonik.

9.      *New York*'s editors knew that Bolonik, who had no experience as an investigative reporter, was unqualified to perform the task of serious investigative journalism that had been promised Plaintiff. They looked the other way as she violated the protocols of investigative reporting, flouted the interpersonal boundaries normally observed by professional journalists, and exploited her position to sexually harass and seek inappropriate emotional and romantic intimacy with Plaintiff. They ignored the red flags raised by the project's principal editor and supervisor, who — shortly before leaving for greener pastures in the spring of 2019 — started to have second thoughts about the project and warned that Bolonik's article, then in the editing stages, did not meet *New York*'s standards for responsible and accurate reporting. They published the article not

3

because they considered it to be sound journalism — which they knew it was not — but because they expected it would make a splash, which it did.

10.     Bolonik's article, entitled "The Most Gullible Man in Cambridge," appeared in the July 22, 2019 edition of *New York* Magazine, and also in the July 23, 2019 edition of New York Media's online journal *The Cut.*

11.     The article — a *Fatal Attraction*-inspired piece of pulp fiction masquerading as journalism, featuring two deranged, predatory women who menace a Harvard Law School professor and his family — caused exactly the sensation desired by its creators. It lit up the internet. It became one of *New York*'s "most read" stories, because — as described by the Magazine's features editor, Genevieve Smith, who oversaw the article's publication — it consisted of "wild storytelling that blends reporting with craft."  Calls from Hollywood started pouring in, and Bolonik's literary agent began auctioning the rights to publish a book-length version of the article.

12.     As the article went viral, Bolonik heard from several readers with negative stories to tell about the Shumans. These led to the publication of a followup Bolonik article entitled "The Harvard Professor Scam Gets Even Weirder," which appeared in the August 8, 2019 issue of *The Cut.* Relying almost entirely on innuendo and dark stereotypes, it added color and depth to the first article's salacious fictional portrayal of the Shumans as sexually deviant predators and Plaintiff as their clueless, gullible victim.

13.      Had Defendants actually honored the contract with Plaintiff, and produced the responsible piece of investigative journalism they had promised him, this all would have turned out very differently. A truly professional investigative work — of the sort *New York* used to pride itself on publishing — would have revealed that far from being the predators portrayed in the article, the Shumans are the victims of a predatory campaign to demonize them for their gender

nonconformity; that the "criminal" label affixed to them is the product of a prejudice-driven effort to weaponize law enforcement against them; and that they and Plaintiff are complex individuals who loved each other who find themselves locked in a conflict cynically orchestrated by others. The promised work of journalism would, in other words, have been the very opposite of the "True Crime" melodrama with which Defendants have chosen to stain the pages of a once-great Magazine in financial distress.

14.     Since April 2020, Plaintiff has been seeking to correct the record and limit the damage Defendants have caused. In a series of letters to Defendant Korzenik, Plaintiff has called New York Media's attention to the articles' inaccuracies and its reporter's misconduct; he has described these in detail and offered to provide supporting documentation; and he has asked that the articles be removed from circulation, because they fall vastly short of *New York*'s journalistic standards.

15.     Defendant Korzenik's handling of Plaintiff's objections has been as unprofessional as were the reporting and editing of the articles. Instead of addressing Plaintiff's concerns on their merits, Korzenik has sought to discredit Plaintiff with defamatory accusations, and has sought to intimidate Plaintiff with threats to expose his confidences and to publish another negative article about him. When Plaintiff stated that he would not be cowed into silence and would file suit if necessary to get his concerns taken seriously, Korzenik resorted to dilatory tactics in order to run out the statute of limitations. Plaintiff was left with no reasonable alternative but to file the present complaint.

16.     Defendants New York Media and Kera Bolonik have breached the contract that they entered into with Plaintiff. They and Defendant David Korzenik have defamed Plaintiff. Bolonik sexually harassed Plaintiff in violation of the anti-discrimination laws of New York City

and New York State, with the knowledge, ratification and condonation of New York Media. Plaintiff seeks relief for the serious economic and non-economic losses he has sustained as a result.

## PARTIES

17.     Plaintiff Bruce Hay is an individual and a citizen of Massachusetts. He is a professor at Harvard Law School, where he has been on the faculty since 1992.

18.     Defendant New York Media LLC is a privately held Delaware limited liability company whose principal place of business is New York, New York. There is one member of New York Media LLC, which is New York Media Holdings, LLC, whose principal place of business is New York, New York. There is one member of New York Media Holdings, LLC, which is Anup Bagarian, an individual and a citizen of Connecticut.

19.     Defendant Kera Bolonik is an individual and a citizen of New York. Until the fall of 2019, she was employed by New York Media LLC.

20.     Defendant David Korzenik is an individual and a citizen of New York. He is partner at Miller Korzenik Sommers Rayman LLP, and counsel to New York Media LLC.

## JURISDICTION AND VENUE

21.     This Court has jurisdiction under 28 U.S.C. § 1332(a)(1), because the Plaintiff's citizenship at the time of filing was diverse from that of each Defendant, and because the amount in controversy exceeds $75,000.

22.     Venue is proper under 28 U.S.C. § 1391(b), because a substantial part of the events giving rise to the claims occurred in the Southern District of New York.

## FACTS

### Background: The Persecution of the Shumans

23.      This case arises out of the decade-long persecution of two women, Maria-Pia

Shuman and Mischa Shuman ("the Shumans"), for the crime of defying conventional gender roles and expectations.

24.     The Shumans have been married since 2011. Their children were born in 2011, 2013, and 2016. Before moving to France in 2018, they lived for approximately ten years in Cambridge, Massachusetts.

25.     Mischa, a transgender woman of color, is a Ph.D. student in physics at Harvard. Maria-Pia, who is cisgender, is an accountant. They both grew up in Europe, and met in 2001 while attending the elite Imperial College in London.

26.     Both women have extraordinary intellectual achievements, including top academic degrees in physics, the command of several technical disciplines, and fluency in multiple languages.

27.     They are also vocal and uncompromising activists for gender equality, transgender rights, and the protection of marginalized groups — subjects on which Mischa, a gifted writer, has published numerous essays that have attracted widespread admiration.

28.     The Shumans' family structure is unusual.  The two women are lifetime partners and are legally married, but have never been romantically or sexually involved with each other; their romantic and sexual relationships have always been with other people.

29.     Since 2010, Mischa has been in a steady romantic relationship with Andrew Klein, who lives with the Shumans. Andrew is for all intents and purposes is Mischa's husband, though the two are not legally married. They are husband and wife in the old-fashioned sense, monogamous and exclusively committed to each other.

30.     Maria-Pia, in contrast, has had a series of liaisons and relationships with both men and women throughout the marriage. She unequivocally rejects traditional notions of feminine

passivity in relationships. She is not shy about approaching strangers she finds attractive, or about having casual sexual encounters, just as many men do.

31.     Maria-Pia's practice of "playing the field" has exposed her, on a number of occasions, to episodes of sexual harassment and assault that she has reported to the police. It has also led her to confrontations with several men concerning the paternity of the Shumans' children.

32.     Maria-Pia is the biological mother of the Shumans' three children, who do not share a biological father. For all intents and purposes, however, the children's true parents are Mischa and Andrew, whom the children address as "maman" and "daddy."

33.     The Shumans' political commitments and activist mentality extend to their personal lives. They have zero tolerance for transphobia, misogyny, and prejudice against unconventional families, which they have encountered for many years. They will not submit to anything resembling gender-based discrimination or harassment, or sexual violence or exploitation. When they encounter these things, they fight back.

34.     All of the above makes the Shumans seem very odd, and very threatening, to a great many people — because Mischa is a transgender woman with brown skin and Middle Eastern heritage; because Maria-Pia is a sexually aggressive pursuer of both men and women; because they are defiantly unapologetic about who they are and how they live, and do not back down when they are under attack.

35.     Predictably, this has drawn the Shumans into a series of interpersonal conflicts and legal disputes over the years. Equally predictably, it has led some of their adversaries to attempt to brand them as criminals and to weaponize the machinery of law enforcement against them.

36.     Andrew's parents, unable to accept the fact that their son had fallen fell in love with a transgender woman, violently opposed his relationship with Mischa as soon as it began in 2010.

They told people that Andrew had initially been seduced by Maria-Pia, then had been roped in by the women with claims that Maria-Pia had cancer and was pregnant with his child, and finally had been "brainwashed" into falling in love with Mischa. They took extraordinary, increasingly unhinged, measures to "rescue" their son from the Shumans, including enlisting a state trooper friend to frighten Andrew with racist insinuations that Mischa had possible connections to Middle Eastern terrorism. In 2013, Andrew finally sought a restraining order against his parents.

37.      Andrew's sister Margaret also developed a violent hatred of the Shumans, and spared no effort to "free" her brother from their clutches. She spread absurd rumors that they deprived him of food and sleep and forced him to participate in satanic rituals. She particularly hated Mischa, and did not hesitate to exploit nativist and transphobic prejudices against her in potentially deadly ways. During the manhunt for the Boston Marathon bombers in April 2013, the news carried reports that authorities were looking for a possible accomplice — a *man* named Mikhail Allakhverdov, nicknamed Misha, who had supposedly "brainwashed" two young men (the Tsarnaev brothers) into committing the deadly atrocity. Upon hearing this news, Margaret contacted the FBI to report that Mischa Shuman might be the "Misha" the authorities were seeking.

38.      Around the time she became pregnant with her third child in April 2015, Maria-Pia had a casual sexual encounter with a man who shall be referred to here as Richard Roe. Roe engaged attorney Douglas Brooks, who hired former state trooper Bob Long to investigate the Shumans. Long proceeded to dig up whatever dirt he could on the Shumans, much of it coming from the hate-filled imaginations of Andrew's family members, with whom Long identified and sympathized. He spoke to the Shumans' friends and neighbors, giving the false impression he was conducting an investigation for law enforcement authorities. He got his friends on the Cambridge Police Department to seek records from a bed & breakfast Maria-Pia had stayed at, whose

management turned the police away on the ground that they were conducting an unlawful search. Long then wrote a scathing, bigoted report about the women, in which he called Maria-Pia "pathological" and conjectured that she was running a "deviant scheme to extort money from young men." Because he had no evidence to support his conjecture, Long proposed running a "sting operation" with the help of the Cambridge police, the results of which could (Long suggested) be used to extract a hefty settlement payment from the Shumans.

39.     Roe's lawyer Brooks treated Long's groundless conjecture as established fact. Upon receiving Long's report in July 2015, he wrote a threatening letter to Maria-Pia accusing her of trying to target Brooks's client Richard Roe in a "scheme" that was "aimed at extorting money from men whom you falsely claimed impregnated you." The letter stated that from 2012 to 2014, the Shumans had "extorted" money from a man — here referred to as John Poe — with false claims that he was the biological father of their first child, and then had sought a restraining order against him based on "blatantly false" accusations that he had sexually assaulted Maria-Pia and threatened her life. Brooks's accusations were demonstrably false, and the letter offered no evidence in support of them. The letter nonetheless implied that the accusations might expose the Shumans to a criminal investigation. A short time afterward, Maria-Pia and Roe agreed to drop the matter and to enter into a non-disclosure agreement.

40.     Maria-Pia also had two casual sexual encounters in March and April 2015 with a man named Jeffrey Scuteri, in the second of which Scuteri sexually assaulted her. She reported the assault to the police a short time later, but decided not to press charges once she realized she was pregnant. Over the next year the Shumans had a series of heated exchanges with Scuteri and his lawyer Howard Cooper concerning the assault, the paternity of the Shuman child born in 2016, and a video taken of the April 2015 encounter. Cooper, seeking to divert attention from Scuteri's

10

criminal actions, has accused the Shumans of being "radical feminists" who sought to deceive his client into becoming an "involuntary sperm donor." Scuteri's groundless suit against the Shumans, and their counterclaim for the sexual assault against Maria-Pia, remains pending. Cooper has also sought, unsuccessfully, to make a criminal case out of his client's manufactured grievance against the Shumans.

### Plaintiff's Ill-Fated Relationship with the Shumans

41.     Plaintiff lives in Cambridge, Massachusetts, in a house that he shares with his ex-wife Jennifer Zacks. He and Jennifer divorced in 1999, and have not been romantic partners since then. They have, however, continued to share a household, and have two young children, born in 2009 and 2010.

42.     Plaintiff met Maria-Pia in March 2015, when she approached him, struck up a conversation, and agreed to meet him for coffee. They quickly began a romantic relationship, which blossomed in the weeks and months afterward.

43.     Maria-Pia continued to see other men in March and April 2015. By then she knew that Plaintiff had a pronounced jealous streak, and was only interested in sexually monogamous relationships. Fearful of driving him away, she did not disclose to him that their relationship had not been sexually exclusive from the beginning. When she told him in late May 2015 that she was expecting a child, he assumed that he had caused the pregnancy.

44.     Plaintiff and Maria-Pia became increasingly close over the course of 2015. In November 2015, Plaintiff met Mischa, to whom he became equally close, though there were romantic feelings on both sides, the two of them were never sexually involved.

45.     From then on, Plaintiff and the Shumans frequently declared their love for each other and their desire to live together permanently. Plaintiff spent much of his time with them and

their children, and increasingly felt himself to be part of their family. He shared their interests in gender equality and learned a great deal about the subject from Mischa, with whom he became an intellectual collaborator on transgender rights and related topics.

46.     Plaintiff's relationship with the Shumans met with relentless interference from Jennifer, who did not want Plaintiff to be involved with other women. Jennifer was hostile toward the Shumans, strived to prevent Plaintiff from seeing them, and attempted to convince him that they were merely after his money.

47.     The relationship also met with interference from certain friends of the Shumans. They told the Shumans false stories that Plaintiff was a "sexual predator" with a history of assaulting and exploiting women. These false stories led to distrust and tension during Plaintiff's relationship with the Shumans when they confronted him about them. Plaintiff vigorously and truthfully denied the stories, but the Shumans were left with lingering and mistaken concerns that there might be some truth to the stories. Undoubtedly, these concerns and fears on their part affected their perception of Plaintiff's actions and intentions toward them.

48.     These interferences from Jennifer and from the Shumans' friends had the desired effect of creating tension in, and ultimately ending, the relationship. Throughout 2016 and early 2017, the Shumans became increasingly hurt and angered by Plaintiff's tolerance of Jennifer's hostile actions and obstruction of their relationship; by his lavishing virtually all of his emotional and material resources on Jennifer despite her unacceptable treatment of the Shumans; by his efforts to placate Jennifer by hiding from her his relationship with them; and by his broken promises to redress the imbalance and draw sensible boundaries on his connection to Jennifer that would allow his relationship with them to thrive. There were harsh arguments between Plaintiff and the Shumans in which they accused him, with considerable justification, of exploiting them

and hypocritically ignoring his supposed commitment to gender equality and transgender rights.

49.     In December 2016, Plaintiff invited the Shumans over to his home at a time when he thought no one else would be home. When they arrived, there was a confrontation between Jennifer and Maria-Pia while Mischa remained seated in the car. This confrontation was videotaped by Plaintiff's adult son; Maria-Pia asked him to stop filming, leading to a tussle in which Maria-Pia mistakenly believed that she had been kicked. At that point Mischa got out of the car; not knowing what had happened, she assumed Maria-Pia was being verbally and physically attacked because of her relationship with Plaintiff and the pregnancy. Mischa was angry that Jennifer viewed Maria-Pia as, in effect, Plaintiff's "mistress" who had gotten pregnant; her reaction, caught on camera, was to shout that it was "not Maria-Pia's fault" that Plaintiff had gotten her pregnant. Mischa's point was not that Plaintiff had in fact caused the pregnancy; it was that Jennifer should stop blaming Maria-Pia for a pregnancy that (on Jennifer's assumption) Plaintiff had caused.

50.     In discussions of how to finance their future together, Plaintiff suggested that the Shumans help him financially in order to pay off Jennifer's mortgage, an idea they resisted. They also complained that he was not contributing to their shared expenses, forcing them to bear Plaintiff's portion and make up the shortfall. The Shumans noted that he seemed to have the money pay for Jennifer and his own children and expected them to pay for Plaintiff despite their having financial obligations of their own.

51.     Matters came to a head in July 2017, when Plaintiff invited the Shumans to stay at his and Jennifer's house. Jennifer sued to have them ejected, prompting a bitter standoff between Plaintiff and the Shumans. He was angry at them for standing up to Jennifer; they were angry at him for failing to do so; the rift became unbridgeable.

52.     The relationship came to a painful, acrimonious end when Plaintiff and the Shumans broke off contact in late August 2017. Both sides were left feeling hurt and betrayed.

### The Fomented Conflict between Plaintiff and the Shumans

53.     The rupture was applauded by friends of the Shumans, who were aware of the situation and harbored ill will toward their relationship with Plaintiff. After the rupture, they continued to encourage the Shumans to embrace the groundless view that Plaintiff was a serial predator who had victimized them. They successfully urged them to take action against him in court and at Harvard.

54.     The rupture was also applauded by the people advising Plaintiff, who encouraged Plaintiff to take the equally groundless view that the *Shumans* were serial predators who had victimized *him*, and that his relationship with them had been one big scam on their part. His advisers successfully urged him to avoid all efforts at compromise or reconciliation, and to treat the dispute as a matter for courts and the police.

55.     The intense feelings of hurt and betrayal on both sides rendered both Plaintiff and the Shumans highly susceptible to such manipulation. Plaintiff and the Shumans had virtually no communication after their rupture; as their conflict escalated, each side developed increasingly grotesque ideas of the other's behavior and intentions.  On each side, they reinterpreted their history, and interpreted each new development, in the light most unfavorable to the other side — prompting the other side to do the same, in a vicious cycle leading each side to develop a darker, more twisted view of the other bearing no relation to reality.

56.     On Plaintiff's side, this process was aggravated by the fact that he was very isolated in the aftermath of the rupture. He discussed his conflict with the Shumans with no one but a few advisers who, in addition to having personal antipathy toward the Shumans, had  material interests

in convincing Plaintiff that the Shumans were his sworn enemies. Together, these advisers formed an "echo chamber" surrounding Plaintiff, amplifying that idea and driving out all others.

57.     This process was further aggravated by Plaintiff's discovery of "other men" in Maria-Pia's life.  During the relationship, the Shumans' had told him of their disputes with Roe and Scuteri, but had not shared with him the details and chronologies.  Blinded by feelings of jealousy and betrayal, Plaintiff no longer knew what to believe about the Shumans, and was increasingly vulnerable to those who wanted him to believe the worst.

58.     In October 2017, Attorney Howard Cooper told Plaintiff that he and Cooper's client Jeffrey Scuteri (see ¶ 40 above) were both victims of a "paternity fraud." This was pure fiction, designed to enlist Plaintiff in Cooper's effort to discredit the Shumans to cover up his client Jeffrey Scuteri's sexually assaulting Maria-Pia. Cooper had undisguised animosity towards the Shumans. Plaintiff nonetheless trusted Cooper and accepted this false version of events. He accepted Cooper's offer to represent him, not realizing he was in effect being used to protect Scuteri from credible sexual assault accusations.

59.     In December 2017 Cooper, exploiting information obtained from Plaintiff, sought to persuade the Massachusetts Attorney General's criminal division to investigate the Shumans. In February 2018, that office informed Cooper that the evidence did not warrant opening an investigation.

60.     In late March 2018, the Shumans filed a lawsuit against Plaintiff in Massachusetts Superior Court. The complaint contained numerous accusations that the Plaintiff denied; on information and belief the Shumans were persuaded by friends and lawyers to believe the accusations were true.

61.     In early April 2018, Plaintiff engaged Attorney Doug Brooks, who showed Plaintiff

the 2015 letter (see ¶ 39 above) in which Brooks had falsely accused the Shumans of deceiving Andrew about the first child's paternity and about Shuman's health; of committing "extortion" and making "blatantly false accusations" against John Poe and of forming a "scheme" to extort Richard Roe. Plaintiff accepted these assertions about the Shumans as true, wrongly assuming that they were based on sound evidence, which they were not.

62.     From that time forward, Plaintiff mistakenly considered himself  to be part of a "trail" of Shuman "victims," which supposedly included Poe, Roe, Scuteri, and Andrew. As a result of this campaign of misinformation, in early May 2018 Plaintiff filed suit against the Shumans in Massachusetts Superior Court, making allegations of fraud and extortion that Plaintiff incorrectly believed to be true.

63.     On May 7, 2018, Mischa filed a Title IX complaint against Plaintiff at Harvard. The complaint contained numerous allegations of harassment and discrimination that the Plaintiff denies; allegations which, on information and belief Mischa's friends and lawyers had persuaded Mischa (who, like Plaintiff, was in an emotionally vulnerable state) were true.

64.     On May 24, 2018, Plaintiff received a series of text messages, designed to appear as though they had been sent by Maria-Pia, but which came from an unknown telephone number, taunting Plaintiff about the proceedings launched by the Shumans and threatening that his ordeal was just beginning; warning that he would soon be facing accusations from numerous people. The messages read as follows:

> Hey :-)
>
> Having fun?
>
> You should have believed me when I said I was prepared, for everything.
>
> [Morgan] Freeman had 8 accusers.

Find a way to connect if you want a chance to take the last exit before HELL.

I'm honestly not scared, if you think I am.

Couldn't care less. It's sort of fun. I just find a tiny part of me still does care about you. Very tiny, and rapidly shrinking.

Take my word, you ain't seen nothing yet. I promise.

Oh and as to your quest for motives? Don't bother. I just really hate the patriarchy, that's it.

These messages were sent from a spoofed telephone number by someone who was fully acquainted with the escalating conflict and was impersonating Maria-Pia. The Shumans did not know about the messages and had nothing to do with their being sent.

65.    The purpose of the individual impersonating Maria-Pia with the above messages was to further escalate the conflict between Plaintiff and the Shumans. The impersonator was counting on the fact the messages would inflame Plaintiff and discourage him from settling the conflict, which the Shumans were showing signs of wanting to resolve. The impersonator was also counting on the fact that the messages could be used as evidence of criminal extortion, which Plaintiff would (and did) report to law enforcement authorities as well as to Harvard;  the impersonator thus hoped to expose the Shumans to possible criminal prosecution and to disciplinary action against Mischa at Harvard.

66.    Plaintiff and his advisers were fooled into believing that the May 24 messages were indeed sent by Maria-Pia. Had he been more thinking more clearly, Plaintiff would have noticed some obvious indicators of deception: the messages were inconsistent with Maria-Pia's earlier communications; more importantly, it would have been completely against Maria-Pia's interests to send such obviously self-incriminating statements at a time when litigation was pending and the Shumans were being advised by lawyers. But Plaintiff, by then in siege mentality, ignored these obvious signs that the messages were fabricated.

67.     The May 24 messages had the effect desired by their sender. To Plaintiff and his advisers, they were "proof" that the Shumans were unscrupulous predators out to destroy him. Plaintiff gave up on the idea of compromise or reconciliation with them. He reported the threats to law enforcement and to Harvard. In mid-June, his lawyers again approached the state Attorney General's office, encouraging the office to open an investigation of the Shumans.

68.     On June 22, 2018, the state Attorney General's office again informed Plaintiff's lawyers that the evidence did not warrant opening a criminal investigation of the Shumans.

69.     Convinced that the Shumans were determined to ruin his life, and unable to interest law enforcement in his predicament, Plaintiff reluctantly decided to take the story to the press. His hope was that an investigative journalist would "expose" the Shumans for the "predators" that Plaintiff had falsely come to believe they were.

### Plaintiff's Agreement with Defendants

70.     Plaintiff reached out to Defendant Kera Bolonik on June 24, 2018, seeking her advice about taking his story to the press. Plaintiff and Bolonik were connected on Facebook, but had never met or communicated before. They came from the same hometown, and had some old childhood friends in common. Plaintiff contacted her because her frequent posts on Facebook indicated that she was a writer interested in gender issues, and that she had many journalistic connections.

71.     Plaintiff had been agonizing for some weeks about whether, and how, to obtain press coverage of the story. He was worried not only about the embarrassment that press coverage would bring him and his family, but about the danger that the story would be covered in an irresponsible manner that would fuel misogynistic and transphobic stereotypes. The latter concern had led him to reject two New York-based journalists whom he had been intermittently

18

communicating with for several weeks. Plaintiff had few connections to the world of investigative journalists, and was unsure how to find the right one. Bolonik's apparent combination of qualities — her interest in gender issues, professional ties to journalism, and personal ties to old friends of Plaintiff's — made it seem to Plaintiff that she was someone he could safely confide in and trust to render sound advice.

72.     In their exchange (which was conducted on Facebook's text messaging application) of June 24, 2018, Plaintiff told Bolonik that he believed he and several other men had been victimized by the Shumans; that he was now in a sharp conflict with them that had left him very badly shaken emotionally; that his personal and professional life were in a state of upheaval; and that he was looking for a journalist who could cover the story responsibly. He shared with Bolonik his recently completed written statement in the Title IX proceeding, which asserted — sincerely but mistakenly — that he was the victim of a "campaign of fraud, extortion, and false accusations" by the Shumans. The written statement also set forth Plaintiff's mistaken understanding, acquired from Brooks and Cooper, about what the Shumans had done to Poe, Roe, and Scuteri.

73.     Bolonik immediately expressed sympathy for Plaintiff and outrage at what the Shumans — whom she called "grifters" and "predators" who should "rot" — were doing to him and other men. She agreed that the story called for a responsible reporter who was sensitive to gender issues, and proposed that she herself cover the story herself for *New York* Magazine, where she had been employed for some years as a writer and editor. She concluded the June 24 exchange by saying she would pitch the story to her supervisors at the Magazine, and would get back to Plaintiff.

74.     Still unsure what to do, Plaintiff contacted and shared his story with Jodi Kantor, an investigative reporter at the *New York Times* ("the *Times*") on June 26, 2018. Kantor told

Plaintiff that the story was highly newsworthy and suitable for the *Times*, but that she herself was too busy to take on the story. She told Plaintiff that she would see whether one of her investigative reporter colleagues at the *Times* colleagues had time to take on the story. On July 6, 2018, Kantor wrote Plaintiff that she was still searching for an available colleague at the *Times*, and that she would be in touch.

75.     In a phone conversation on July 6, 2018, Bolonik told Plaintiff that her pitch had been accepted by her superiors at *New York* Magazine, and asked him to agree that he would work exclusively with her and the Magazine on a story that would appear in the Magazine. Upon hearing Plaintiff describe his communications with Kantor, Bolonik told Plaintiff that he should work with Bolonik and *New York* rather than with a reporter at the *Times*.

76.     In that July 6 phone conversation, Bolonik made the following promises to Plaintiff in exchange for his promise to work exclusively with her and New York Magazine: (1) that the investigation and the reporting of the story by her and the Magazine would be professional, in that she would bring to bear her experience and the long experience of her editors and colleagues at *New York* Magazine in investigative reporting to ensure that the story was up to the customary ethical standards of long-form investigative journalism; (2) that her investigation and reporting of the story would be thorough, in that she and the Magazine would diligently investigate and review the evidence carefully to ensure that the story was accurate and presented in a fair and impartial light, (3) that the investigation and reporting of the story by her and the Magazine would be sensitive to the delicate gender issues raised by the story that Plaintiff and Bolonik had discussed at length, given the negative social and political climate towards transgender people, because — though Plaintiff was very upset and angry with the Shumans — he wanted Bolonik to avoid misogynist and transphobic tropes harming women and transgender people generally, and 4) that

as a source who was opening up about a painful episode in his private life, Plaintiff would be treated with the utmost professionalism and respect by Bolonik and *New York* Magazine.

77.    In return for and in reliance on Bolonik's promises, Plaintiff agreed to cease communications with the *Times* and other media outlets about the story and to work exclusively with Bolonik and *New York* Magazine.

78.    As an agent and employee of New York Media, Bolonik had the authority to enter into this agreement on the Magazine's behalf. Moreover, she had been specifically authorized and instructed by her then-editor and supervisor Laurie Abraham at *New York* Magazine to negotiate the agreement with Plaintiff.

79.    In reaching this agreement, Plaintiff placed great weight on the fact that *New York* is a widely respected publication with a distinguished history of investigative reporting on issues relating to gender, race, and civil rights. The Magazine's willingness to assign such an obviously delicate story to Bolonik was, for Plaintiff, a strong indication that she was up to the job. Moreover, Plaintiff took it for granted that the Magazine's editors would review her work carefully, and would publish it only after ensuring that it met the highest journalistic standards. He knew next to nothing about Bolonik's work history except that she was employed at *New York,* and was unaware that she had no experience as an investigative reporter.

80.    From that time forward, Plaintiff repeatedly reminded Bolonik that he expected her to produce a piece of investigative journalism that was truthful and accurate, and that he would do his best to help her produce it. He also repeatedly told her that he had only very limited experience with journalism, and that he was counting on her to comply with the procedures and ethical rules applicable to sound investigative reporting, of which he had only rudimentary knowledge. Bolonik repeatedly assured Plaintiff that she was scrupulously adhering so.

21

81.     Six months into Bolonik's reporting, in January 2019, Plaintiff had an extended phone conversation with her then-editor and supervisor Laurie Abraham, who had been involved in commissioning Bolonik to write the article and had principal responsibility for overseeing it. Abraham informed Plaintiff that in addition to being an editor she was trained as a lawyer, having attended Yale Law School. She assured Plaintiff that she was closely following Bolonik's work on the story, that Bolonik could be trusted to report it thoroughly and professionally, and that the published final product would meet the highest journalistic standards.

82.     In reliance on these promises and expectations, Plaintiff exposed the most intimate details of his life to public view via the Defendants. He gave Bolonik and her editors all of the relevant information and documents that he could, answered their questions and recounted his perceptions of events as accurately as he could, and did everything else in his power to make their work easier.  Following publication of the resulting article in the summer of 2019, he helped Bolonik and New York Media promote the article and defend it from legal attacks; helped Bolonik explore movie and TV deals based on the article; and helped Bolonik begin work on her book based on the article.

83.     Also in reliance on these promises and expectations, Plaintiff gave up the chance to have the story investigated and reported by journalists at other publications. Upon agreeing to work with Bolonik, Plaintiff kept his promise to cease communicating with the *New York Times*, and ended his search for a reporter. Thereafter, on several occasions during Bolonik's reporting, Plaintiff was contacted about the story by reporters from other news outlets. Bolonik and her editors advised him that he should continue to uphold his end of the bargain by turning away all such inquiries without comment. He did so, which led the inquiring reporters to abandon the story.

84.     Bolonik and her editors were fully aware of these acts of reliance on Plaintiff's part,

and vocally encouraged, ratified and condoned them.

## What Professional Journalism Would Have Revealed

85.     Had they reported the story according to the standards of professional investigative journalism, Defendants' published coverage of the story would have revealed a number of facts to the reader.

86.     First, it would have revealed that Plaintiff's relationship with the Shumans was not a scam on their part, and that there was no credible evidence that the Shumans had sought to commit fraud or extortion against him or anyone else — despite Plaintiff's sincere belief to the contrary, held at the urging of his advisors.

87.     Second, it would have revealed that Plaintiff was tragically mistaken about the Shumans; that the false picture he had formed was the product of his escalating conflicts with the two women, stoked by third parties with ulterior motives; that far from being the "predators" he supposed them to be, the Shumans were the victims of a campaign of lies directed at them, fueled both by prejudice and by the cynicism of those willing to harness it to their own advantage.

88.     Third, it would have revealed that the campaign to falsely portray the Shumans as criminals, and to weaponize law enforcement against them, had been snowballing for years — in the enlistment by Andrew's parents of a Massachusetts state trooper to scare Andrew with suggestions that Mischa had connections to Middle Eastern terrorists; in Andrew's sister Margaret's attempt to have the FBI arrest Mischa as a suspect in the 2013 Boston Marathon bombing; in former state trooper Bob Long's effort to dig up dirt on the Shumans with the help of his friends in the Cambridge Police Department; in the demonstrably false accusations contained in Brooks's 2015 letter to the Shumans, based on Long's groundless conjectures; in Howard Cooper's unsuccessful attempts to launch a criminal probe against the Shumans, for use as leverage

against them on behalf of his client Jeffrey Scuteri; in the fabricated "incriminating" text messages of May 24, 2018, sent to Plaintiff in the knowledge that he would attribute them to the Shumans.

89.     Fourth, it would have revealed that Plaintiff was the victim not of the Shumans, but rather of the individuals — such as Margaret Klein, Howard Cooper, Bob Long, and the sender of the fabricated incriminating messages — who had contributed to the false portrayal of the Shumans as criminals and were now using it to inflame the conflict between him and the two women, which was ruining his life as well as theirs.

90.     Fifth, it would have revealed that the real story here was about the destructive effects of transphobia, misogyny, and bigotry toward unconventional families. These prejudices (and their skillful deployment) were at the root of the false portrayal of the Shumans as "predators," a portrayal that Plaintiff had been deceived and manipulated into accepting despite his abhorrence of the prejudices that underlay it. The Shumans, in turn, had been deceived and manipulated into believing that Plaintiff was a sexual "predator" who had aligned himself with the bigots, and were fighting back. The ensuing war was devastating all three of them.

91.     Sixth, it would have revealed that this tragedy was having real consequences not only for Plaintiff, the Shumans, and their families, but for the broader world. It would have revealed, for example, that in wrecking Mischa Shuman's life and reputation, demonizers of the Shumans had silenced the voice of a brilliant writer and commentator on transgender rights, gender equality, and other subjects related to politics and injustice. It would have revealed that they had also deprived transgender girls of the rarest of role models — a transgender woman who is in a stable, loving relationship with a cisgender man; who is the one and only mother to her three children; who has a dazzling record of intellectual achievement despite the formidable barriers put in her way.

92.     As detailed below, Defendants knowingly or recklessly disregarded the facts just described, and deliberately concealed the evidence for them in their published coverage of the story, because these facts and evidence did not square with the tabloid-style, stereotype-filled thriller they wanted to tell about Plaintiff and the Shumans.

## Defendants' Abuse of Trust and Exploitation of Plaintiff

93.     From the beginning of their work with Plaintiff, the goal of Bolonik and her editors at New York Media was to exploit Plaintiff's story to produce a salacious "True Crime" tale, featuring him as the hapless victim and the Shumans as deviant villains who target men for extortion by means of paternity scams and false sexual assault accusations. That is how Bolonik pitched the story to the editors; it is how she and her editors conceived of the project throughout its development; it is how they packaged the final product. They knowingly or recklessly disregarded the facts inconsistent with their desired "true crime" narrative.

94.     Bolonik's explicit model for the project, shared with her editors at New York Media, was her late friend Michelle McNamara's *I'll Be Gone in the Dark: My Obsessive Quest for the Golden State Killer* — a book that Bolonik mentioned in her first conversation with Plaintiff and many times afterward, with a combination of reverence and envy. Bolonik and McNamara had known each other since childhood and, at least in Bolonik's mind, were close friends and professional rivals until McNamara's death in 2016 at the age of 48.

95.     McNamara's book, published shortly after the author's death, had reputedly helped the police catch and imprison a serial killer. It had become a bestseller, had led to a lucrative movie deal, and had won the author considerable posthumous fame. Upon being contacted by Plaintiff in June 2018, Bolonik quickly spotted an opportunity to match her late friend's feat. She would don the mantle of investigative reporter, would "expose" the Shumans as dangerous serial predators,

and get them prosecuted and imprisoned. This would make her a bestselling author, would lead to a Hollywood deal, and would bring her fame and fortune.

96.     To Bolonik, Plaintiff represented not just an opportunity for financial gain and professional success; he represented an attractive prospect for an intimate personal and romantic relationship with a professor at Harvard, the glamorous "intellectual epicenter of the country," as she called it. She was openly jealous of his erstwhile relationship with the Shumans, who had top degrees from world-class universities and "think they're smarter than everyone else," as she told him. She openly suspected that he still had feelings for them, which she would try hard to extinguish. Throughout her association with Plaintiff, she both overtly and covertly sought t to replace the Shumans as the object of his romantic affections.

97.     Bolonik's pursuit of intimacy with Plaintiff frequently crossed the line into sexual harassment. Early in their acquaintance, in August 2018, she took Plaintiff to dinner and then to a bar with two of her personal friends; the next day she told him that her friends had "approved" him for her. Over the next few days, she made statements in a tone and affect that strongly suggested that she was interested in a romantic relationship with Plaintiff, and that she was finding ways to try to interest Plaintiff in the same. When she detected Plaintiff's discomfort with her intimate advances, she sought to reassure him by saying that though she had been romantically involved with both men and women in the past, she was now exclusively lesbian. Nonetheless, she continued to repeat that she "cared" about him in a way that appeared to suggest intimacy, and repeatedly expressed concern that he did not return her feelings towards him. These statements alarmed Plaintiff, but he tolerated them and gently brushed them aside because he was depending on Bolonik to report his story accurately and did not want to anger or alienate her.

98.     Throughout their association, Bolonik contacted Plaintiff from almost daily by

telephone and text message from her home in Brooklyn, often outside of business hours, insinuating herself into his personal life and trying to draw him into hers. In the calls, she often made statements that were intended as romantic overtures and were perceived by Plaintiff as such; she often shared inappropriate details about her romantic and sexual relationship with her current domestic partner, about her past romantic and sexual relationships, and about her sexual preferences and practices; she often asked Plaintiff to share inappropriate details about his own romantic and sexual history and about his relationships with Maria-Pia, Mischa and Jennifer. Plaintiff was uncomfortable with these exchanges and did his best to steer the conversation to more appropriate subjects. Nonetheless, Bolonik continued the behavior throughout their work together.

99. Upon information and belief, Bolonik's editors and supervisors at the Magazine knew of Bolonik's development of an inappropriate emotional attachment to Plaintiff, knew she was forcing herself on Plaintiff in a romantic manner, and encouraged, condoned and approved of it. Upon information and belief, they were aware that these actions and behaviors were unwelcome to Plaintiff. Bolonik spoke to many people, including her editors and supervisors, about the close personal relationship she had formed with Plaintiff and her desire for romantic intimacy with him. Her numerous conversations with them put them on notice of the existence of sex-based harassment.

100. To New York Media, Plaintiff represented an opportunity for a sensational article that would help stave off the tide of red ink at the company. It would sell print copies of *New York* Magazine and would generate "clicks "on New York Media's online platforms — and might then go on to have a profitable afterlife in other media. From the beginning, Bolonik's editors and supervisors shared her hope that her article, if it generated enough buzz, would lead to a book and/or movie and/or TV series labeled as being "based on" the article, which would redound to

the benefit of New York Media as well as Bolonik herself. The prospect of these rewards led them to sacrifice the professional standards of investigative journalism, and to disregard the numerous warning signs that Bolonik's "wild storytelling" (as editor Genevieve Smith called it) was crime fiction rather than responsible reporting.

101.    When they commissioned Bolonik to write the article, her editors and supervisors at New York Media knew that Bolonik was unqualified to do the work of professional investigative journalism that Plaintiff had been promised, and that the Magazine holds itself out as adhering to.

102.    Throughout her reporting and afterward, Bolonik's editors and supervisors at New York Media ignored the abundant signs that Bolonik had no regard for the procedures, standards, and ethical norms of professional investigative journalism, including rules against forming intimate ties with sources and sexually harassing them. In the spring of 2019, *New York* editor Laurie Abraham — shortly before leaving New York Media for another job — told her superiors at the Magazine that she had developed doubts about the project; that Bolonik's reporting was unprofessional; and that her article, then in draft form on the editors' desks, did not meet criteria for responsible journalism; and that the Magazine should not go forward with the article. Abraham's superiors ignored her professional opinion, based on many years of experience in the field of investigative journalism, for which she has won numerous awards. They instead replaced her with another editor to shepherd the article through the remaining stages of publication. Bolonik told Plaintiff that Abraham had developed qualms about the article, expressed her relief that Abraham was no longer working on it, and said that Abraham's departure was a positive development that would eliminate a major barrier to the article's publication.

103.    Throughout their work together, Bolonik used Plaintiff as a researcher, fact-checker, and legal expert as well as a source. She frequently relied on him to obtain and interpret

documents for her, including legal documents; to evaluate information she obtained from other sources; to explain past and present proceedings involving the Shumans, including those in which he had no role; and to answer her questions about the law, including questions about her own legal exposure to the Shumans, and the circumstances in which they might successfully attack her article as defamatory. Referring to Plaintiff's assistance in explaining the latest motion practice in litigation between the Shumans and Jeffrey Scuteri, she wrote to him "It's a good thing I have a civ pro prof to consult!"

104.   Throughout their association, Bolonik encouraged Plaintiff to treat her as a close friend and personal adviser, whom he should rely on for emotional solace as well as an understanding of what he was going through in his conflict with the Shumans; pressed him to confide in her about the most intimate aspects of his life, sparing no detail; and assured him that this was necessary for her work, that she could be relied on to use his confidences professionally and responsibly.

105.   Plaintiff, believing Bolonik could be trusted as a journalist despite his discomfort with her romantic overtures, confided in her accordingly throughout their association.

106.   Bolonik proceeded to use Plaintiff's trust, confidence and reliance to manipulate and exploit him, and also to prevent him from seeing how badly he was being used by her and New York Media. She was successful in this effort precisely because she — along with New York Media — had deceived Plaintiff into falsely believing she was responsibly and professionally carrying out her duties as an investigative journalist.

107.   Bolonik never had any interest in conducting an impartial journalistic investigation, or in ascertaining  and reporting the facts about the Shumans. Rather, her objective throughout was to build a case against them, and to help others do the same, with no regard for the precautions and

ethical standards of investigative journalism designed to protect the integrity of the reporting process, or for the appropriate boundaries that normally separate a reporter from her sources and story.

108.    Throughout her reporting, Bolonik sought out evidence that supported the case she was building against the Shumans, while ignoring or minimizing contrary evidence. She cultivated relationships with sources who had negative things to say about the Shumans, and avoided sources who did not. For example, she had been given information to contact members of Mischa's family, and Harvard colleagues, but she did not contact these sources because she believed they would not give the story she wanted to tell. She compromised sources' independence by sharing negative information about the Shumans given to her in confidence by other sources. She pushed her preferred narrative on sources, encouraged them to believe the worst about the Shumans, and "corrected" them if they did not tell her what she wanted to hear. She did not interview the Shumans or anyone close to them, made no attempt to get their side of the story or the evidence that supported it, and made no serious attempt to do so. She did not interview the Shumans' other supposed "victims" John Poe and Richard Roe (see ¶¶ 38-39 above), or anyone with direct knowledge of their stories. She reached an agreement with Jeffrey Scuteri (see ¶ 40 above) that in exchange for an interview, she would give him a pseudonym in the article and would conceal from the reader the fact that Maria-Pia had publicly accused him of sexual assaulting her.

109.    Throughout her reporting, Bolonik formed inappropriate ties to sources, and inappropriately intervened in the events she was reporting on. For example, she sought to aggravate the Shumans' conflicts with their adversaries. She also advised their adversaries on strategies to take in legal proceedings. She encouraged sources to file lawsuits against the Shumans, to file police reports against them, and to seek their criminal prosecution. She befriended

Howard Cooper and recruited clients for him, urging sources to hire him to initiate proceedings against the Shumans. She befriended Margaret Klein, whom she promised to help "free" her brother and exact revenge against the Shumans, particularly Mischa, for having "brainwashed" him into joining their family.

110.    Throughout her reporting, Bolonik deceived and manipulated Plaintiff into believing that she was performing her duties as an investigative reporter responsibly and professionally; that her investigation established the truth of the accusations against the Shumans lodged by Cooper, Brooks, and Plaintiff himself; that she had uncovered evidence demonstrating that the Shumans were even worse predators than he had imagined; that he had indeed been victimized by the Shumans, and was doing a great public service by helping Bolonik "expose" them before they did more harm.

111.    As desired by Bolonik, this had the effect of further escalating Plaintiff's conflict with the Shumans.  All talk of settlement in the litigation between them vanished, and the accusations and counter-accusations in the Title IX proceeding at Harvard became more extreme. In early 2019, the Shumans were charged with larceny after Plaintiff — at Bolonik's urging — called the police about some withdrawals they had made from his bank account in 2017, which he had authorized but forgotten about. Arrest warrants were issued, which effectively prevented the Shumans from returning to the United States from France, where they had settled in May 2018; understandably, they were fearful of what would happen to a transgender woman of color taken into custody at the United States border. Plaintiff eventually realized his mistake and notified authorities, which led to the charges being dropped and the warrants withdrawn — but not before Cooper secured a default judgment on Scuteri's behalf, taking advantage of the Shumans' inability to come to this country to defend themselves, and thereby preventing the facts of the case from

being aired.

112.    Bolonik consistently tried to run down the Shumans in Plaintiff's estimation in a very unprofessional manner designed to manipulate Plaintiff into giving her the story that she wanted him to construct — claiming (ridiculously) that Maria-Pia was not "smart" enough to have a physics degree, that Mischa might not really be enrolled at Harvard, that their demonstrated intellectual achievements were fraudulent. She repeatedly told Plaintiff that his relationship with the Shumans had been a sham, that their feelings for him were feigned, and that (unlike her) they did not care about him and never had.

113.    Bolonik repeatedly told Plaintiff that she had no desire to get the Shumans' side of the story.  Following an off-record phone call with Mischa in October 2018, she shared details of the call with Plaintiff; she told Plaintiff that she had refused Mischa's request for ground rules of the conversation, such as that her name not be used in the article; that Bolonik quickly ended the conversation after refusing to agree to ground rules, that she neither needed to nor had any desire to interview Mischa, or to speak with her ever again; that she had not believed a word Mischa had said; and that further communication with the Shumans was pointless. She later gloated to Plaintiff that that no reporter or publication would help the Shumans tell their side of the story, because "everybody knows they are liars and grifters."

114.    Bolonik consistently expressed an almost boundless antipathy toward Mischa in particular, using crude transphobic stereotypes to describe her as a fraud and impostor, a leech who sucks the life and productive energy out of others. In the early months of her work with Plaintiff, Bolonik described Mischa as the weak and ineffectual dependent of Maria-Pia, who had "turned Mischa into the conniving person she is now." But Bolonik's words about Mischa took a darker turn in March 2019, when she befriended Andrew's sister Margaret — who (as Bolonik well knew)

had told the FBI in April 2013 that the transgender *woman* who had "brainwashed" Andrew into marrying her might also be the cisgender *man* who had "brainwashed" the Boston Marathon bombers into committing mass murder. From March 2019 forward, Bolonik routinely described Mischa as a "cult leader" who had "brainwashed" not only Andrew but also Maria-Pia into leaving "normal" lives and moving in with her. Bolonik repeatedly told Plaintiff that he himself had been brainwashed by Mischa, but fortunately had made a narrow escape from her "cult." Bolonik repeatedly insisted to Plaintiff that Andrew could not possibly be in a healthy romantic relationship with Mischa, and that Mischa was not actually the mother and principal parent to her three children.

115.    Bolonik repeatedly expressed to Plaintiff her view that Andrew should leave Mischa, and take the children with him; that if he did not do so, the authorities should take the children away and put them up for adoption; and that the Shumans, particularly Mischa, should be criminally prosecuted and sentenced to long prison terms. Bolonik repeatedly expressed to Plaintiff her fervent hope and confidence that these things would happen as a result of her own reporting about the Shumans.

116.    Bolonik repeatedly told Plaintiff that he should view the Shumans as monsters, and should view Bolonik as his savior and avenger. She told him that the Shumans were "demonic" and "vampiric," that they were "sharks out for blood" who "suss out people's vulnerabilities and seize upon them."  She told Plaintiff that the Shumans had ruined his life, and that now — because of her — "the favor is being returned." She told him that he would be "redeemed" by her work.

## Defendants' Publication of the Fictitious "True Crime" Narrative

117.    Bolonik's article, entitled "The Most Gullible Man in Cambridge," appeared in the July 22, 2019 print edition of *New York*, and appeared in the July 23, 2019 issue of *The Cut*, https://www.thecut.com/2019/07/bruce-hay-paternity-trap-maria-pia-shuman-mischa-

haider.html. (The article is attached below as **Exhibit A** to this complaint.)

118.   The article, approximately 6,000 words long, is primarily about Plaintiff's history with the Shumans, which it presents in a thoroughly false, misleading, and journalistically irresponsible manner. It converts a complex, turbulent relationship among three people who loved each other into a *Fatal Attraction*-style thriller featuring sinister, crazed women tormenting a hapless man and his family — a fiction that bears no relation to reality. A non-exhaustive list of some of the article's falsehoods includes the following:

- It falsely asserts that the Plaintiff was a "mark" whom Maria-Pia lured into the relationship.

  The truth is that Plaintiff pursued her from the first day as much as she pursued him, and that there was deception on both sides as their romance blossomed. He did not disclose the fact that Jennifer was likely to oppose and obstruct the relationship; she did not disclose the fact that she continued to see other men in the early days of the relationship. He was no more a "mark" than she was.

- It falsely describes Plaintiff as the victim of a paternity trap.

  The truth is that Plaintiff would have remained with the Shumans even if there had been no pregnancy, and that the pregnancy and baby played almost no role in their relationship.

- It falsely implies that Plaintiff was pressured or tricked into showing affection for Mischa, and that he was somehow reluctant or ashamed of loving a transgender woman.

  The truth is that he loved her unreservedly during their relationship, had romantic feelings for her, and said so publicly.

34

- It falsely claims that the Shumans deceived him with an invented story that Maria-Pia was suffering from cancer.

  The truth is that Maria-Pia's cancer was very real; she suffered cervical cancer in 2011, went into remission for five years, and then suffered a recurrence in 2016.

- It falsely asserts that the Shumans sought to separate Plaintiff from his family and from his money.

  The truth is that they simply did not want to be treated as mistresses. They resented the fact that Plaintiff lavished all of his resources on Jennifer, who rewarded their overtures to her with unrelenting hostility, and did all she could to sabotage the relationship. They felt they should not be asked to "subsidize" Jennifer and his household by giving him money or covering his share of expenses in his relationship with them.

- It falsely claims that the Shumans invaded Plaintiff's house and held it for ransom, forcing Jennifer and her children onto the streets.

  The truth is that Plaintiff invited them to stay in the house; that they remained because they felt they had a right to be there; that they said Jennifer and the children were also welcome there, so long as Jennifer acknowledged their right to be there; and that their purpose was not to exact ransom, but to be treated as equals rather than as mistresses.

- It falsely states that Mischa's Harvard complaint against Plaintiff was an attempt to "weaponize" Title IX with deliberately false accusations.

  The truth is that Mischa was manipulated by others into believing, genuinely but

mistakenly, that Plaintiff had harassed and exploited her; that her allegations were based

on genuine misunderstandings about Plaintiff's actions and intentions toward her; and

that a frank conversation between the parties (which was prevented by their lawyers)

would have cleared up these mistakes and misunderstandings.

These and other falsehoods — and, more generally, the false notion that the Shumans "scammed" Plaintiff — are contradicted by his written correspondence with the Shumans, which Plaintiff had supplied Bolonik with as soon as she began her reporting. On information and belief, they are also contradicted by written materials that the Shumans furnished to New York Media before the article was published. The article distorts the evidence that was available to Bolonik and her editors, and jumps to conclusions that are utterly unwarranted by the investigation Bolonik and her editors had conducted and the evidence that was available to them.

119.    The article also contains accounts of the Shumans' dealings with John Poe, Richard Roe, and Jeffrey Scuteri (whom the article refers to as John Doe). The accounts essentially repeat, and present as fact, the unsubstantiated accusations described previously (see ¶¶ 39-40 above). Designed by Bolonik and her editors to create the appearance that the Shumans have a "trail of victims," each of these accounts is false, misleading, and journalistically irresponsible in the extreme. First, with respect to the Poe account:

- With the exception of a single brief phone call with Mischa, Bolonik never contacted anyone involved in the events, either as a participant or a witness. The article conceals this from the reader.

- Indeed, on information and belief, she never contacted anyone who had ever *heard* about the events, directly or indirectly, from anyone involved. The article also conceals this from the reader.

- Contrary to the article's implication, the money supposedly "extorted" from Poe was understood by all concerned to be repayment of funds Maria-Pia had given him in a time of need. This fact, and the documentary evidence establishing it, go unmentioned in the article.

- Contrary to the article's implication, the judge hearing Maria-Pia's request for a restraining order made no finding on the Shumans' assertion that Poe had assaulted and threatened her.  The article conceals this from the reader.

Second, with respect to the Roe account:

- Bolonik did not contact anyone involved in the Roe events, either as a participant or a witness; her only source was Plaintiff himself, who was repeating the client-serving account offered by Roe's former lawyer Brooks.

- The story that the Shumans' "extorted" money from Roe is contradicted by the undisputed fact that the Shumans never sought or received money from him, which is readily admitted by Roe's former attorney Brooks.

- None of this is disclosed to the reader.

Third, with respect to the Scuteri (Doe) account:

- Astonishingly, the article repeats Scuteri's uncorroborated accusations against the Shumans, without revealing that he has been publicly accused of sexually assaulting Maria-Pia.

- While *his* accusations against them are presented as fact, *their* accusations against him (which are contained in public litigation filings in New York Media's possession) are completely concealed from the reader.

In short, Bolonik and her editors made no effort to check the facts of these accounts; the accounts distort the evidence that was available to Bolonik and her editors; and the article jumps to conclusions that are utterly unwarranted by the investigation Bolonik and her editors had conducted and the evidence that was available to them.

120.   A few weeks after the article appeared, Defendants published a shorter follow-up article entitled "The Harvard Professor Scam Gets Even Weirder." It appeared in the August 8, 2019 issue of *The Cut,* https://www.thecut.com/2019/08/bruce-hay-paternity-trap-maria-pia-shuman-mischa-haider-follow-up.html. (The followup article is contained in **Exhibit A** below, appended to the original article.)

121.   The follow-up article, which purportedly reports what Bolonik heard from several sources who contacted her after reading the original article. These accounts, also designed by Bolonik and her editors to create the appearance that the Shumans are predators with a "trail of victims" are also false, misleading, and journalistically irresponsible.

- It falsely implies that several innocuous exchanges on the street between the Shumans and men they did not know were evidence of predatory intentions on their part.

- It falsely implies that the Shumans attempted to commit a paternity "scam" against a man the article calls Anthony, with whom Maria-Pia had a sexual encounter in April 2015, and whom she later informed that she was pregnant.

- It does not disclose to the reader the fact that Maria-Pia never sought or received money from Anthony, a fact he himself readily acknowledges.

As with the stories in the original article, these stories fall far short of any reasonable standard for responsible reporting. Most egregiously in the Anthony story, Bolonik and her editors made no

effort to ascertain the facts, they distorted the evidence readily available to them, and leaped to unwarranted conclusions.

122.   Both the original article and the followup article employ transphobic and misogynistic stereotypes to falsely portray the Shumans as criminal predators. The reliance on stereotypes is magnified by photos of the Shumans in the original article, which are cropped and distorted to resemble "mug shots" bearing little resemblance to their actual appearance. It is further magnified by the use of cover photos done in what the editors told Plaintiff was a "Hitchcock" style; they evoke the movie *Psycho*, the notorious and iconic film about a cross-dressing male serial killer who believes he is a woman.

123.   The combined effect of the articles is falsely portray Plaintiff as a fool, utterly lacking in common sense or judgment — a fool who (according to the articles' false representations) fell for a "scam" run by two scheming, deranged *femmes fatales*, and allowed them to deceive him with obvious lies and to terrorize his family over a period of months, without having the faintest idea of what was truly happening.

124.   The combined effect of the articles is to hold Plaintiff up to ridicule based on this false narrative, and to make clear to the reader that Plaintiff had no business holding a faculty position at Harvard, much less teaching a course on Judgment and Decision Making there.

### Aftermath of the Articles' Publication

125.   In July 2019, Bolonik announced to Plaintiff she was considering the idea of expanding the articles into what she called a "True Crime" book. She pretended to have just spoken with her literary agent Sarah Burnes about this idea for the first time. In fact, she had planned all along to publish such a book, had written the articles with that objective, and had frequently discussed the idea with Burnes ever since beginning her reporting.

126.    In August 2019, Bolonik informed Plaintiff that she was arranging for United Talent Agency in Los Angeles to solicit bids for a possible movie or TV series based on the articles. Bolonik persuaded Plaintiff to join the arrangement with the agency, which (in her words) was setting up a "nice bidding war" for the movie and TV rights, which is "great news for us, drives up the price."

127.    In September 2019, Bolonik informed Plaintiff that the Harper Collins publishing house had agreed to publish her proposed book, which was to be entitled *Gullible.* She persuaded Plaintiff to continue working with her, and not to work with any other journalists, as she completed the book.

128.    In November 2019, Bolonik informed Plaintiff that she, along with New York Media and Harper Collins, had received a letter from counsel for the Shumans claiming that the articles and book-in-progress were defamatory. Bolonik disparaged Harper Collins's lawyers, and said she was depending on New York Media's lawyer — Defendant David Korzenik, who had cleared the articles for publication the previous summer — to repel the Shumans' attack and keep her book project alive. At Korzenik's request, Bolonik used Plaintiff to help write a response to the letter that would negate the defamation claims. Plaintiff's task was to write about the various legal proceedings involving the Shumans; once again, Defendants were using him as a legal consultant as well as a source. Plaintiff was not shown the letter or informed of the basis of the defamation claims. Plaintiff wrote the requested material, which (on information and belief) Korzenik used in the response he eventually sent to the Shumans' counsel.

129.    In December 2019, Jeffrey Scuteri won a default judgment against the Shumans, exploiting their inability to safely travel to the United States to defend themselves (see ¶ 111 above). In securing the judgment, Scuteri's counsel Cooper called the judge's attention to the

articles' portrayal of the Shumans as predators, attaching them to his filings. Bolonik expressed joy to Plaintiff that her "reporting" was bringing the Shumans to "justice," and encouraged him to employ Cooper's strategy in Plaintiff's own litigation against the Shumans.

130.    Throughout the fall and winter of 2019, Bolonik continued, as she had since 2018, to seek inappropriate personal and romantic intimacy with Plaintiff, to emotionally manipulate him into thinking the worse of the Shumans, and to pressure him to support her quest to get them arrested and imprisoned.

131.    In January 2020, Plaintiff complained to Bolonik about her lack of journalistic interest in what was happening to him at Harvard, where his conflict with the Shumans was continuing to have adverse repercussions for him. In response, Bolonik sent Plaintiff text messages castigating him for never showing any personal interest in her, despite all the attention she lavished on him: "I talk to you more than anyone in my life";" When was the last time you asked what was going on w me?"

132.    In several telephone exchanges in February and March 2020, Bolonik angrily accused Plaintiff of failing to appreciate what she was doing for him, failing to reciprocate her attention to his personal life, and failing to match her emotional investment in their relationship.

133.    During the early months of 2020, Plaintiff began to realize he had been badly used by Defendants, and that the Shumans were not the predators he had been led to believe they were by Bolonik, Cooper, and others who stood to gain from the Shumans' demonization. This realization had several sources: evidence had emerged in the litigation between Plaintiff and the Shumans, clarifying previous evidence that many of the accusations lodged against them were simply false; the bitter Title IX dispute at Harvard had ended in late 2019, ratcheting down the level of conflict; and most crucially, Plaintiff — much to Bolonik's chagrin — was having less

contact with Bolonik herself, with the result that her outsize influence on him was correspondingly reduced and he was able to see things more clearly.

134.    In March 2020, Plaintiff informed the Middlesex County District Attorney's office of his discovery that he had in fact authorized the bank withdrawals (see ¶ 111 above) that he had previously reported as unauthorized.

135.    In April 2020, Plaintiff withdrew his lawsuit against the Shumans, which rested on allegations he no longer believed to be true.

136.    In June 2020, the Middlesex District Attorney's office dropped the mistaken larceny charges against the Shumans and had the warrants for their arrest withdrawn.

137.    In the year since their publication, the articles have been extensively circulated, and have exposed Plaintiff to widespread ridicule among his friends and colleagues, in professional circles, and in the public at large. His personal and professional reputations have suffered immeasurably as a result of the falsehoods in the articles.

138.    As a result of the articles' false statements, Harvard has not allowed Plaintiff to teach the courses he regularly taught in its division of continuing education, which resulted in lost earnings.

### Defendants' Recent Conduct

139.    On April 23, 2020, Plaintiff wrote a letter designated "confidential and off-record" to Defendant Korzenik. In the letter, Plaintiff stated he no longer stood by the account of him and the Shumans presented in the original article; that both articles were inaccurate and misleading; that Bolonik had committed serious professional misconduct in reporting the articles; that the articles should be removed from circulation; and that Plaintiff was prepared to provide information in support of his position upon request.

140.    Korzenik did not reply to Plaintiff, did not request any supporting information from him, and did not launch an investigation into his assertions.

141.    Instead, Korzenik immediately telephoned Doug Brooks, Plaintiff's counsel in the civil litigation against the Shumans. In the call, Korzenik — ignoring the "confidential and off-record" designation — informed Brooks of the letter he had received from Plaintiff. He then falsely accused Plaintiff of having written the letter under pressure from the Shumans, or in exchange for something; stated that New York Media would never remove the articles from circulation; and threatened that if Plaintiff persisted in the matter, New York Media would publish another negative article about him.

142.    Korzenik also immediately telephoned Howard Cooper, informing him — again in violation of the "confidential and off-record" designation — of Plaintiff's letter and stating that Plaintiff had written it under the Shumans' "spell," falsely implying that the letter was not sincere and that it had been written under duress or in exchange for something.

143.    On information and belief, Korzenik also contacted other third parties about Plaintiff's letter, making the same false statements to them.

144.    The obvious purpose of Korzenik's calls to Brooks and Cooper was to exert pressure on Plaintiff into backing away from the position he had taken in his letter. The pressure took several forms.

145.    First, Korzenik's calls were intended to convey to Plaintiff that his attempt to correct the record and report journalistic misconduct would be futile. Korzenik was signaling that he and New York Media had no intention of taking Plaintiff's letter seriously; that they would reflexively dismiss the letter's charges, without investigating them or taking into account the information Plaintiff had to offer; and that they were going to stand by the articles no matter what

the evidence showed.

146.   Second, Korzenik's calls signaled that Plaintiff's confidential, off-record communications to Korzenik would be shared with others — despite Plaintiff's long understanding with New York Media that his communications with them would remain confidential and off-record unless he explicitly agreed otherwise. Bolonik and her editors had explicitly assured Plaintiff of this on numerous occasions; Plaintiff had supplied enormous quantities of highly sensitive information to them, and freely shared his thoughts and opinions with them,  in reliance on this assurance. Indeed, the previous November, Korzenik himself had sought out Plaintiff's confidential assistance on the written response Korzenik was preparing to send the Shumans' counsel. Now, Korzenik was making clear to Plaintiff that whatever he said to Defendants — including, perhaps, some or all of the things he had shared with them in the past — was fair game for them to disclose to others, regardless of their previous assurances of confidentiality.

147.   Third, Korzenik was signaling to Plaintiff that if he persisted in his attempt to correct the record and call out Bolonik's unprofessional conduct, he would face retaliation from New York Media in the form of another negative article about him — which (Korzenik implied) would surely get the same national and international attention that the original articles had received, would bring still more humiliation and ridicule upon him, and would cause still more harm to his personal and professional reputation and further endanger his position at Harvard.

148.   Fourth, Korzenik was enlisting Brooks and Cooper, lawyers with whom Plaintiff was working closely in the pending civil litigation, to use their influence with Plaintiff to get him to back away from the position taken in his April 23 letter.

149.   Still another obvious purpose of Korzenik's calls to Brooks and Cooper — and of the communications that, on information and belief, he made to other third parties about Plaintiff's

letter — was to discredit Plaintiff with the defamatory accusation that his April 23 letter was not sincere, and that it had been written under duress or as part of an exchange.

150.    Such treatment of Plaintiff — who had served as the principal source for the articles, who had long relied on the promise of confidentiality, who was now trying to correct the record and to blow the whistle on a reporter's misconduct — was a shocking departure from the high journalistic standards *New York* Magazine has long held itself out as adhering to, and a bad-faith breach of Plaintiff's agreement with the Magazine.  Plaintiff was attempting to secure the accurate journalistic coverage he had been promised; Korzenik, on New York Media's behalf, was seeking to intimidate him into silence and to discredit him with defamatory accusations.

151.    Korzenik's motive for doing this was plain to see: he himself had conducted the pre-publication review of the articles the previous summer; he had botched the job, approving them for publication when no reasonably competent counsel in his position would have done so;. Plaintiff's April 23 letter raised the prospect that Korzenik's substandard performance would come to light, and therefore put at risk Korzenik's position as New York Media's counsel.

152.    On May 7, 2020, Plaintiff wrote a followup email to Korzenik. The email called attention to Korzenik's unacceptable actions and demanded a response to Plaintiff's April 23 letter.

153.    On May 12, 2020, Korzenik sent an email to Plaintiff. The email warned Plaintiff that his communications with Korzenik were not confidential; it questioned the "credibility" of his challenge to the articles and to Bolonik's conduct; and it defended Bolonik's "past and current work." The email requested no information or documentation from Plaintiff, and gave no indication that Korzenik, or anyone associated with New York Media, was conducting any investigation into the concerns Plaintiff had raised about the articles and their reporter.

154.    On June 9, 2020, Plaintiff sent Korzenik a letter making clear that Plaintiff had no

intention of backing down, and that Korzenik's efforts to intimidate and silence him were only further steeling his resolve to speak up. In the letter, Plaintiff went on to detail at length the articles' inaccuracies, their failure to meet the standards of sound journalism, and Bolonik's misconduct in reporting them. Plaintiff one again offered to provide documentation in support of his assertions, and reiterated his demand that New York Media remove the articles from circulation. (Plaintiff's letter is attached below as **Exhibit B** to this complaint.)

155.    On June 15, 2020, Korzenik sent an email to Plaintiff again warning him that his communications were not confidential; cautioning him against "impugning" Bolonik; and asking a series of irrelevant and intrusive personal questions that (combined with the implied threat that his answers would be shared with third parties or even published in the press) were clearly intended to deter him for pursuing the matter further. Once again, the email requested no documentation from Plaintiff, and gave no indication that New York Media was seriously investigating the concerns Plaintiff had raised.

156.    A few days later, former *New York* editor Laurie Abraham confirmed to Plaintiff that no one associated with New York Media had recently contacted her about the articles. This was fully two months after Plaintiff's April 23 letter. Clearly, New York Media was not seriously investigating Plaintiff's concerns; if it had been doing so, it would surely have contacted Abraham, who oversaw Bolonik's work on the original article until leaving her job at New York Media in the spring of 2019.

157.    On June 18 and 23, 2020, Plaintiff sent two more letters to Korzenik, in which he observed that Korzenik was not acting in good faith, and stated that he was preparing to file suit.

158.    At that point, Korzenik adopted a conciliatory tone, suddenly pretending to be interested in addressing Plaintiff's concerns about the articles. On June 26, 2020, he sent an email

telling Plaintiff that he would respond to the concerns within two weeks. On July 9, 2020, he sent an email telling Plaintiff to expect his response the following week. On July 17, 2020, Korzenik sent an email telling Plaintiff that the response would arrive the week after that. Plaintiff never did receive the promised response.

159.    The transparent purpose behind these repeated delays and assurances was to run out the New York statute of limitations for Plaintiff's defamation claims against Defendants, which Korzenik believed would soon be expiring.

160.    As *New York* continued to lose money in the spring of 2020, a number of the Magazine's journalists were put on unpaid leave. In mid-July 2020, it was announced that many of these furloughed journalists were being laid off permanently. Meanwhile, New York Media continues to promote Bolonik's shameful "True Crime" articles on social media.

## CLAIMS FOR RELIEF

### COUNT ONE
### Breach of Contract
### (Against Bolonik and New York Media)

161.    Plaintiff repeats and re-alleges each of the foregoing paragraphs.

162.    Defendant Bolonik warranted that she was authorized by Defendant New York Media to enter into agreements with Plaintiff regarding the article published by New York Media, or she had apparent authority to do so, as Plaintiff reasonably believed, based on her employment by New York Media, the participation by New York Media in the investigation, writing and publishing of the article by Bolonik, and the ratification by New York Media of Bolonik's actions and article. To the extent that Bolonik was not so authorized by Defendant New York Media to act, she is personally liable for breach of contract.

163.    Plaintiff had a contract with Bolonik and/or New York Media providing that in

return for his working exclusively with them to investigate, write and report the story, and to cease contact and not work with the *New York Times* and other media outlets, (1) that her investigation and reporting of the story would be thorough, (2) that the investigation and the reporting of the story by her and the Magazine would be professional, (3) that the investigation and reporting of the story by her and the Magazine would be sensitive to the delicate gender issues raised by the story and (4) that as a source for the story Plaintiff would be treated with the utmost professionalism and respect by Bolonik and *New York* Magazine.

164.     Contrary to these promises by Bolonik and New York Magazine, they did not perform a thorough, professional or sensitive job of investigative reporting about Plaintiff and the Shumans within the ethical and journalistic standards customarily applied to investigative reporting, they did not ensure that the resulting published work of journalism was commensurate with the Magazine's usual and professed standards of quality; and they did not accord Plaintiff the respect and dignity that they promised and that is customarily given to a journalistic source.

165.     Bolonik and New York Magazine portrayed Plaintiff and others falsely by the use and sensationalization of information without the promised thorough, professional, sensitive and respectful reporting within the promised customary standards of journalistic ethics and practice.

166.     By these actions, Bolonik and New York Media breached the contract between the parties.

167.     Defendants' actions caused Plaintiff to suffer loss of income exceeding $75,000 as well as other economic and noneconomic losses.

**COUNT TWO**
**Defamation**
**(Against all Defendants)**

168.     Plaintiff repeats and re-alleges each of the foregoing paragraphs.

48

169.     In the *New York* Magazine articles, Bolonik and New York Media made statements about Plaintiff and others that were false, unprivileged, and maliciously published to third parties.

170.     Bolonik and New York Media knew, should have known, and recklessly disregarded the fact that their statements were false and harmful to Plaintiff.

171.     The false and defamatory statements made by Bolonik and New York Media constitute libel and libel per se.

172.     The statements by Bolonik and New York Media are defamatory because, in falsely portraying Plaintiff as a foolish and gullible victim of persons falsely portrayed as extortionate fraudsters and abusers of legal process, the statement impugn Plaintiff's skills, credibility, and professional fitness and expose him to public ridicule. These statements have damaged, and continue to damage, Plaintiff's reputation and relationships with professional colleagues and associates, personal friends, academic institutions and others.

173.     Plaintiff was, at the time of the publication of the article, a private individual, not a public figure, and he continues to be a private individual and not a public figure.

174.     Prior to the publication of the article, the information set forth in the article was not a legitimate matter of public concern, but was rather a matter for gossip and prurient concern, and continues to be so.

175.     Bolonik and New York Media knowingly and maliciously made and publicized the defamatory statements in a negligent and grossly irresponsible manner, violating the standards of information gathering and dissemination ordinarily followed by responsible parties.

176.     Bolonik and New York Media published these statements online and in print, with the knowledge and intent that they would cause other news media outlets, including Facebook and other social media, to widely republish the Articles, causing damage to Plaintiff.

177.    When Plaintiff attempted to correct the record after the articles were published, Defendant Korzenik made statements about Plaintiff that were false, unprivileged, and maliciously published to third parties.

178.    Defendant Korzenik's statements constitute libel and libel per se.

179.    Defendant Korzenik's statements are defamatory because they falsely accuse Plaintiff of raising false claims about the truthfulness, thoroughness and professionalism of the Magazine's article in exchange for something of value from the Shumans.

180.    Defendant Korzenik's statements impugn Plaintiff's honesty, trustworthiness and professional fitness, damaging his reputation and relationships with professional colleagues and associates, personal friends, academic institutions and others.

181.    Defendant Korzenik knew, or should have known, that his defamatory statement was false and extremely harmful to Plaintiff.

182.    Defendants' conduct harmed Plaintiff's personal and professional reputation, causing him loss of income exceeding $75,000 as well as other economic and noneconomic losses.

**COUNT THREE**
**Gender-Based Discrimination in Violation of NYSHRL and NYCHRL**
**(Against Bolonik and New York Media)**

183.    Plaintiff repeats and re-alleges each of the foregoing paragraphs.

184.    Plaintiff was a consultant to Defendants Bolonik and New York Media, essential to the project of writing the article, who was employed on the project with Bolonik and New York Media for months, engaging in long and extensive interactions with Bolonik regarding the project.

185.    Defendant Bolonik, with the knowledge and connivance of Defendant New York Media, attempted to create a relationship with Plaintiff beyond the professional relationship of

journalist to source, engaging in many behaviors, statements and actions daily and weekly, during the months they worked together on the article, designed to suggest to Plaintiff that he engage in a romantic relationship with Bolonik, in order to engage his trust and lower his guard to the improper investigation and reporting that he began to see from Bolonik and New York Media.

186.    These behaviors, statements and actions by Bolonik were unwelcome to Plaintiff.

187.    Plaintiff conveyed to Bolonik that these were unwelcome, yet Bolonik continued to harass Plaintiff by engaging in them.

188.    These behaviors, statements and actions by Bolonik were based on Plaintiff's sex, a protected category.

189.    This sexual harassment of Plaintiff constituted gender-based discrimination in violation of the New York State Human Rights Law, N.Y. Exec. L. § 296, and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107(1).

190.    New York Media's failure to take appropriate corrective action against Bolonik's sexual harassment of Plaintiff constituted gender-based discrimination in violation of the New York State Human Rights Law, N.Y. Exec. L. § 296-d, and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107(1).

191.    As a result of this gender-based discrimination, Plaintiff suffered damages exceeding $75,000.

## **PRAYER FOR RELIEF**

Plaintiff requests damages not less than $75,000 to be determined at trial, together with costs, interest, and such other relief as the Court finds just and proper.

Respectfully submitted,

  s/ Jillian T. Weiss
Jillian T. Weiss
Law Office of Jillian T. Weiss, P..C.
442 15th Street No. 1R
Brooklyn, New York 11215
New York, NY 10014
Tel: (845) 709-3237
Fax: (845) 684-0160
jweiss@jtweisslaw.com

Date:  October 6, 2020